08 CV 03479

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

———————————————————
BRECKENRIDGE PHARMACEUTICAL, INC.,    )
                                      )
                Plaintiff,            )
                                      )
        v.                            )    Civil Action No. _____
                                      )
INTERPHARM HOLDINGS, INC., and        )
INTERPHARM, INC.,                     )    JURY TRIAL DEMANDED
                                      )
                Defendants.           )
                                      )
———————————————————

## COMPLAINT

Breckenridge Pharmaceutical, Inc., by and through its attorneys, states as follows for its

Complaint against Defendants Interpharm Holdings, Inc. and Interpharm, Inc.:

### The Parties

1.      Plaintiff Breckenridge Pharmaceutical, Inc. ("Breckenridge") is a corporation

existing under the laws of the State of Florida, with its principal place of business at 1141 South

Rogers Circle, Suite 3, Boca Raton, Florida.

2.      Breckenridge is in the business of developing, marketing and selling

pharmaceutical products to retailers, wholesalers, distributors, and other purchasers of such

products nationwide.

3.      Defendant Interpharm Holdings, Inc. is a corporation existing under the laws of

the State of Delaware, with its principal place of business at 75 Adams Avenue, Hauppauge,

New York 11788.

4.    Defendant Interpharm, Inc. is a corporation existing under the laws of the State of New York, with its principal place of business at 75 Adams Avenue, Hauppauge, New York 11788.

5.    Defendants (collectively "Interpharm") are in the business of developing, manufacturing, packaging, marketing, and selling pharmaceutical products to retailers, wholesalers, distributors, and other purchasers of such products nationwide, including in this judicial district.

## Jurisdiction And Venue

6.    Jurisdiction is based on 28 U.S.C. § 1332, as the parties are of diverse citizenship and the amount in controversy exceeds $75,000, exclusive of interest and costs, and also on 28 U.S.C. §§ 1331 and 1337, and 15 U.S.C. § 1221(a), because Breckenridge alleges violation of section 43 of the Lanham Act, 15 U.S.C. § 1125.  In addition, this is an action for a declaratory judgment pursuant to 28 U.S.C. § 2201, for the purpose of determining a case of actual controversy between the parties.

7.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391.

## Statement Of Facts

8.    Esterified estrogens and methyltestosterone ("EE/MT" or the "Product") is a prescription pharmaceutical product that is primarily used to treat menopausal symptoms.

9.    In or about 1997, Breckenridge began marketing the first lower-cost alternative to the established "brand" version of EE/MT.

10.    Breckenridge has built up and maintained customer loyalty for the Product over more than a decade, which is an exceptional track record in the highly competitive market place for these types of pharmaceutical products.

11.     In 2005, Breckenridge and Centrix Pharmaceutical, Inc. ("Centrix") (an affiliate of Breckenridge that markets its own alternative version of EE/MT under the Creekwood label) discussed with Interpharm a proposal for Interpharm to manufacture the Product for Breckenridge and Centrix.

12.     Prior to that time, Interpharm did not manufacture EE/MT, and had no established relationship as a provider of EE/MT to any purchasers of the Product.

13.     On or about May 24, 2005, Interpharm entered into a Supply Agreement with Centrix, pursuant to which Interpharm would supply Centrix's needs for EE/MT. Pertinent provisions of the Supply Agreement are filed herewith as Exhibit A.[1]

14.     By means of a concurrent Assumption Agreement, Breckenridge also assumed the benefits and obligations of the Supply Agreement with Interpharm. The Assumption Agreement is filed herewith as Exhibit B.

15.     "Confidential Information" is defined in section 1.7 of the Supply Agreement to mean "all information of any kind whatsoever . . . and all tangible and intangible embodiments thereof of any kind whatsoever . . . which is disclosed by such Party to the other Party and is marked, identified as or otherwise acknowledged to be confidential at the time of disclosure to the other party." (Exh. A, § 1.7.)

16.     Section 8.2 of the Supply Agreement, captioned "Confidentiality," provides in relevant part:

> [E]ach Party will treat as confidential the Confidential Information, and will take all necessary precautions to assure the confidentiality of such information. Each Party agrees to return to the other Party upon the . . . termination of this Supply Agreement all Confidential Information acquired from such other party, except as to such information it may be

---

[1] Because of the confidential nature of certain provisions in the Supply Agreement, a full copy will be filed under seal at an appropriate time, upon approval of the requisite motion.

required to retain under applicable law or regulation, and except for one copy of such information to be retained by such party's legal department or outside counsel. . . . Neither Party shall, during the period of this Supply Agreement or for five (5) years thereafter, without the other Party's express prior written consent use or disclose any such Confidential Information for any purpose other than to carry out its obligations hereunder. (Exh. A, § 8.2.)

17.    Pursuant to section 10.5 of the Supply Agreement, the provisions of Section 8.2 of the Supply Agreement, "Confidentiality," survive the termination of the Supply Agreement.

18.    The Supply Agreement was amended, effective November 1, 2006, to provide that Interpharm's compensation for providing the EE/MT would include a share of Breckenridge's and Centrix's profits from sale of the Product.

19.    Accordingly, Breckenridge provided to Interpharm such confidential information as customer identities, the amount of Product sold to each customer, the per unit prices charged and rebates provided to each customer, profits realized for each customer, total sales for the Product, and monthly profit-split analyses.

20.    All such information was Confidential Information under the Supply Agreement, and was understood by Interpharm to be highly confidential and proprietary information of Breckenridge.

21.    Moreover, such Confidential Information constitutes precisely the kind of information that would permit a new competitor to break into the market for this particular product, knowledge which otherwise would require considerable time, effort, and resources to develop.

22.    In 2007 a dispute arose among the parties to the Supply Agreement, which was resolved and settled by the execution of a letter agreement dated March 6, 2008 (the "Letter Agreement"), by which Interpharm agreed to terminate the Supply Agreement in exchange for

4

the payment of an agreed amount "[i]n full satisfaction of [Breckenridge's] obligations to share profits under the Supply Agreement," which payment was made to Interpharm at that time. *See* the Letter Agreement (filed herewith as Exhibit C, with confidential terms redacted), ¶¶ 1-2.

23.    The Letter Agreement specifically provides that the sections of the Supply Agreement enumerated in Section 10.5 thereof continues in effect (Exh. C, ¶ 1); such sections include Section 8.2 concerning Confidentiality.

24.    Also in the Letter Agreement, in addition to and separate from the provisions for termination of the Supply Agreement, in paragraph 3 captioned "Continuing Supply" it was agreed that, notwithstanding the termination of the Supply Agreement, Interpharm would supply "a maximum" of a specified number of bottles of EE/MT products "under the terms provided in the attached purchase orders." (Exh. C, ¶ 3.)

25.    The first three purchase orders attached to the Letter Agreement provided that a specified number of bottles were to be delivered by Interpharm to Breckenridge by the dates of March 1, March 24, and March 31, 2008, so that a cumulative total of one-half of the maximum number of bottles was to be supplied by March 31, 2008. *Id.*

26.    However, neither the March 1 nor the March 24 shipment was received by Breckenridge by March 24, 2008.

27.    Accordingly, as a result of this breach of the "Continuing Supply" paragraph of the Letter Agreement and the referenced purchase orders attached thereto, on March 24, 2008, Breckenridge instructed Interpharm to put all pending purchase orders on hold until further notice.

28.    In spite of Interpharm's failure to meet the explicit terms of the first two purchase orders, Interpharm informed Breckenridge in a letter dated March 27, 2008, that it is

Interpharm's position that Breckenridge was nonetheless still obligated to purchase one-half of the maximum number of bottles of the Product by March 31, 2008.

29.    By reason thereof, an actual dispute exists between the parties as to their rights and obligations under the Letter Agreement.

30.    Beginning in or about early March, 2008, Breckenridge began to receive reports from its customers that representatives and agents of Interpharm were falsely representing to these customers that Breckenridge is exiting the market for the Product, and that Breckenridge only had sufficient quantity of the Product to last 30 days.

31.    Interpharm improperly used Breckenridge's Confidential Information provided to it under the Supply Agreement to specifically target Breckenridge's established customers for EE/MT with its false and misleading representations.

32.    These false and misleading statements denigrating Breckenridge's reliability as a supplier of one of its long-standing pharmaceutical products were made by Interpharm to encourage Breckenridge's customers to purchase the Product from Interpharm instead of from Breckenridge.

33.    Interpharm also improperly used Breckenridge's Confidential Information concerning the pricing and rebates provided to specific customers to undercut the price at which Breckenridge has been providing EE/MT to its established customers.

34.    In short, Interpharm has now begun marketing and selling EE/MT as competitor to Breckenridge, using Breckenridge's own Confidential Information to give itself a competitive advantage over Breckenridge.

35.    Moreover, as a part of Interpharm's scheme, in March, 2008, a representative of Interpharm sent to Breckenridge customers a solicitation for the purchase of EE/MT directly from Interpharm, stating therein:

> Here is a little background of what is happening. Many customers have been buying Interpharm's EEMT product through a third party. Interpharm is transitioning these customers to go direct this translates into a tremendous cost saving. This will be a very easy transition at the pharmacy level.
>
> On top of this very aggressive offer Interpharm will allow a one time 10% buy in on Estrogen and Methyltestosterone .625mg/1.25mg and 1.25mg/2.5mg as a bill back on the first purchase order.

36.    Breckenridge's customers are aware that the "third party" through which they have been purchasing EE/MT is Breckenridge.

37.    Upon information and belief, this statement by Interpharm was intended to give the false impression to Breckenridge's customers, and was likely to give the false impression, that Breckenridge had agreed to Interpharm "transitioning" their purchases of the Product to Interpharm, and/or that the only way that they could continue purchasing the Product was to begin purchasing it directly from Interpharm as opposed to from Breckenridge.

38.    By reason of the above-described conduct of Interpharm, Breckenridge's good will and reputation with its customers as a reliable supplier of pharmaceutical products in general, and of its long-established EE/MT product in particular, have been damaged.

39.    Moreover, Breckenridge has been injured by the resulting loss of sales of and profit from its EE/MT product to its established customers, in an amount to be proved at trial, but in excess of $75,000.

7

## COUNT I
### Tortious Interference With Contract

40.    Breckenridge incorporates the allegations of the preceding paragraphs as though fully set forth herein.

41.    Interpharm made its misrepresentations and solicitations to Breckenridge's customers, based on Breckenridge's own Confidential Information, with the knowledge that they were established customers of Breckenridge, and with the intent to induce them to purchase EE/MT from Interpharm instead of from Breckenridge.

42.    But for Interpharm's actions, such customers would have continued to make their purchases of EE/MT from Breckenridge.

43.    Breckenridge has suffered economic injury from lost sales of EE/MT due to Interpharm's actions, in an amount to be proved at trial.

44.    In addition, the good will and reputation that Breckenridge has built up over more than a decade of supplying EE/MT to its customers have been be injured as a result of Interpharm's intentional actions.

45.    Breckenridge will continue to suffer such irreparable injury unless Interpharm is enjoined from engaging in such tortious behavior.

## COUNT II
### Tortious Interference With Prospective Business Relations

46.    Breckenridge incorporates the allegations of the preceding paragraphs as though fully set forth herein.

47.    Interpharm made its misrepresentations and solicitations to Breckenridge's customers, based on Breckenridge's own Confidential Information, with the knowledge that they were established customers of Breckenridge such that in the normal course of business they

8

would have placed future orders for EE/MT with Breckenridge, with the intent to induce them to purchase EE/MT from Interpharm instead of from Breckenridge.

48.    But for Interpharm's actions, such customers would have continued to make their purchases of EE/MT from Breckenridge.

49.    Breckenridge has suffered economic injury from lost sales of EE/MT due to Interpharm's actions, in an amount to be proved at trial.

50.    In addition, the good will and reputation that Breckenridge has built up over more than a decade of supplying EE/MT to its customers have been be injured as a result of Interpharm's intentional actions.

51.    Breckenridge will continue to suffer such irreparable injury unless Interpharm is enjoined from engaging in such tortious behavior.

### COUNT III
### Breach Of The Confidentiality Provision Of The Supply Agreement

52.    Breckenridge incorporates the allegations of the preceding paragraphs as though fully set forth herein.

53.    By using Breckenridge's Confidential Information to target Breckenridge's established customers and to undercut the price at which Interpharm knew Breckenridge had been selling the Product, for its own pecuniary gain, Interpharm has breached Section 8.2 of the Supply Agreement, by which it agreed not to "use or disclose any such Confidential Information for any purpose other than to carry out its obligations" under the Supply Agreement.

54.    Breckenridge has suffered economic injury from lost sales of EE/MT due to Interpharm's actions, in an amount to be proved at trial.

55.     In addition, the good will and reputation that Breckenridge has built up over more than a decade of supplying EE/MT to its customers have been be injured as a result of Interpharm's breach of Section 8.2 of the Supply Agreement.

56.     Breckenridge will continue to suffer such irreparable injury unless Interpharm is enjoined from engaging in such behavior.

## COUNT IV
### Misappropriation Of Trade Secrets

57.     Breckenridge incorporates the allegations of the preceding paragraphs as though fully set forth herein.

58.     Interpharm's use of Breckenridge's Confidential Information to target Breckenridge's established customers and to undercut the price at which Interpharm knew Breckenridge had been selling the Product, for its own pecuniary gain, constitutes misappropriation by Interpharm of Breckenridge's trade secrets.

59.     Breckenridge has suffered economic injury from lost sales of EE/MT due to Interpharm's actions, in an amount to be proved at trial.

60.     In addition, the good will and reputation that Breckenridge has built up over more than a decade of supplying EE/MT to its customers have been be injured as a result of Interpharm's intentional actions.

61.     Breckenridge will continue to suffer such irreparable injury unless Interpharm is enjoined from engaging in such behavior.

## COUNT V
### Violation Of The Lanham Act

62.     Breckenridge incorporates the allegations of the preceding paragraphs as though fully set forth herein.

63.    Interpharm's statements concerning Breckenridge's inability to continue supplying EE/MT to its customers constitute false and misleading statements under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

64.    Breckenridge has suffered economic injury from lost sales of EE/MT due to Interpharm's violation of the Lanham Act, in an amount to be proved at trial.

65.    In addition, the good will and reputation that Breckenridge has built up over more than a decade of supplying EE/MT to its customers have been be injured as a result of Interpharm's violation of the Lanham Act.

66.    Breckenridge will continue to suffer such irreparable injury unless Interpharm is enjoined from engaging in such behavior.

**COUNT VI**
**Declaratory Judgment That Breckenridge Has No Further**
**Obligations To Interpharm Under The Letter Agreement**

67.    Breckenridge incorporates the allegations of the preceding paragraphs as though fully set forth herein.

68.    Interpharm failed to deliver any bottles of the Product to Breckenridge pursuant to the terms contained in the first two purchase orders attached to the Letter Agreement.

69.    This failure constituted a material breach of the "Continuing Supply" paragraph of the Letter Agreement, so that Breckenridge was justified in suspending any further purchases from Interpharm.

70.    Because the Letter Agreement provides for the purchase of a specified *maximum* number of bottles of the Product, Breckenridge is under no obligation to purchase any additional amount of EE/MT from Interpharm.

71. Moreover, if the Letter Agreement did contain any obligation by Breckenridge to purchase any minimum amount of EE/MT from Interpharm, which it does not, Interpharm's conduct described above constituted a breach of the covenant of good faith and fair dealing that is implied by law in every contract, such that Interpharm has forfeited any contractual right it may have had to supply any EE/MT to Breckenridge.

72. Accordingly, Breckenridge is entitled to a declaration that it is not in breach of the Letter Agreement and that the provisions of the Letter Agreement do not obligate Breckenridge to purchase any amount of EE/MT from Interpharm.

**WHEREFORE,** Breckenridge requests that the Court:

(a) Preliminarily and permanently enjoin Interpharm and its agents from marketing, selling, offering to sell, or taking orders for, any EE/MT product from any entity disclosed to Interpharm as a customer of Breckenridge;

(b) Preliminarily and permanently enjoin Interpharm and its agents from making any statements that Breckenridge may not or will not be filling any and all orders for EE/MT now and in the future;

(c) Order Interpharm to disseminate corrective information to all customers and potential customers of Breckenridge concerning Breckenridge's continuing ability to fill present and future orders for EE/MT;

(d) Enter judgment against Interpharm for compensatory and exemplary damages by reason of its tortious interference with contract and with prospective business relations, as determined at trial;

(e) Enter judgment against Interpharm for compensatory damages by reason of its breach of contract, as determined at trial;

(f)     Enter judgment against Interpharm for compensatory and exemplary damages by reason of its misappropriation of Breckenridge's trade secrets, as determined at trial;

(g)     Enter judgment against Interpharm for compensatory damages by reason of its violation of the Lanham Act, as determined at trial;

(h)     Enter judgment declaring that Breckenridge is not in breach of the Letter Agreement and that the provisions of the Letter Agreement do not obligate Breckenridge to purchase any amount of EE/MT from Interpharm; and

(i)     Enter an Order granting Breckenridge such other and additional relief against Interpharm as may be just and proper in the circumstances.


## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Breckenridge demands a trial by jury of all issues properly triable to a jury in this case.


Dated:   New York, New York
         April 9, 2008

C. Randolph Ross, Esquire (CR 8966)
Kathleen Van De Loo, Esquire (KO 0310)
CROWELL & MORING, LLP
153 East 53rd Street, 31st Floor
New York, New York 10022
Telephone:  (212) 895-4200
Fax:  (212) 223-4134

Attorneys for Plaintiff
Breckenridge Pharmaceutical, Inc.

# EXHIBIT A

# SUPPLY AGREEMENT

THIS SUPPLY AGREEMENT ("Supply Agreement") made as of the Commencement Date (as defined below) between CENTRIX PHARMACEUTICAL, INC., an Alabama corporation having its principal place of business at 31 Inverness Center Parkway, Suite 270, Birmingham, Alabama 35242 ("CENTRIX") and INTERPHARM HOLDINGS, INC., a Delaware corporation having its principal place of business at 69 Mall Drive, Commack, New York 11725 ("INTERPHARM").

## RECITALS

A.  WHEREAS, INTERPHARM is engaged in the business of developing, manufacturing, packaging and selling pharmaceutical products.

B.  WHEREAS, CENTRIX is engaged in the business of developing, selling and marketing certain prescription and non-prescription pharmaceutical products.

C.  WHEREAS, CENTRIX desires to retain the services of INTERPHARM to develop, manufacture, package and supply certain products as more fully set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants set forth herein, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, each intending to be legally bound, hereby agree as follows:

## ARTICLE 1 - DEFINITIONS

1.1  **After Year 1.** "After Year 1" shall mean each twelve (12) month period of the Purchase Term following Year 1.

1.2  **Approved Labeling.** "Approved Labeling" shall include all of the following : (i) the Product label to be affixed to the bottle; (ii) the Product package insert (the "Insert"); and (iii) the Product patient-information leaflet, in the form attached as Exhibit E.

1.3  **Bright Stock.** "Bright Stock" shall mean bottles of Product packaged without an external label that are *not* for commercial sale or distribution and require further processing. Bright Stock shall be shipped only to a CENTRIX facility for final processing which shall include, *inter alia*, affixing the Approved Labeling to the Bright Stock, except for the Insert, which shall be the responsibility of Interpharm.  No sample tablets will be shipped Bright Stock.

1.4  **CENTRIX Trade Dress.**    "CENTRIX Trade Dress" shall mean CENTRIX's trade dress and Approved Labeling  for the Product set forth in Exhibit C(2).

1.5  **Commencement Date.**    "Commencement Date" shall mean the date of the first shipment of Product by INTERPHARM.

1.6   **Commercially Reasonable.** Commercially Reasonable shall mean a Party's reasonable efforts and diligence in accordance with its normal business, economic, legal, medical and scientific judgment, taking into account the competitiveness of the marketplace, the proprietary position of a Product, other products it produces, the regulatory structure involved, the profitability of a Product, and other relevant factors including, without limitation, technical, legal, scientific, medical, economic or other related factors.

1.7   **Confidential Information.** "Confidential Information" shall mean with respect to a Party, all information of any kind whatsoever (including without limitation, data, Data (as defined in Section 2.1, compilations, formulae, models, patent disclosures, procedures, processes, projections, protocols, results of experimentation and testing, specifications, strategies and techniques), and all tangible and intangible embodiments thereof of any kind whatsoever (including without limitation, apparatus, compositions, documents, drawings, machinery, patent applications, records and reports), which is disclosed by such Party to the other Party and is marked, identified as or otherwise acknowledged to be confidential at the time of disclosure to the other Party.  Notwithstanding the foregoing, Confidential Information of a party shall not include information which the other Party can establish by written documentation (a) to have been publicly known prior to disclosure of such information by the disclosing Party to the other Party, (b) to have become publicly known, without fault on the part of the other Party, subsequent to disclosure of such information by the disclosing party to the other party, (c) to have been received by the other Party at any time from a source, other than the disclosing Party, rightfully having possession of and the right to disclose such information, (d) to have been otherwise known by the other Party prior to disclosure of such information by the disclosing party to the other Party, or (e) to have been independently developed by employees or agents of the other party without the use of such information disclosed by the disclosing party to the other Party.

1.8   **The FDA.** The "FDA" shall mean the United States Food and Drug Administration, or any successor entity thereto.

1.9   **Firm Commitment.** "Firm Commitment" shall mean the total number of tablets of the Product, regardless of trade dress or configuration, that CENTRIX has committed to purchase from INTERPHARM in any one year period under this Supply Agreement, as set under the heading Firm Commitment in Exhibit A. All tablets must be ordered in increments of one hundred (100), and all tablets of Product ordered in any Year shall be deemed to be part of the Firm Commitment until the full amount of the Firm Commitment is satisfied.

1.10  **Forecast.**    "Forecast" shall mean a rolling twelve (12) month forecast of CENTRIX's orders for the Product from INTERPHARM.

1.11  **Hidden Defect.**    "Hidden Defect" shall mean any instance where a lot of a Product fails to conform to the applicable specifications or is otherwise defective or fails to conform to the warranties given by INTERPHARM herein, and such failure would not be

other rights pursuant to this Supply Agreement.

7.3 **EFFECT OF TERMINATION**.    In the event that either Party has the right to terminate this Supply Agreement (the "Terminating Party"), this Supply Agreement shall automatically terminate, unless such Party notifies the other Party that it does not wish for the Supply Agreement to terminate, and the Terminating Party shall have the rights set forth in this Supply Agreement, as well as such other rights as to which it is entitled under applicable law. In the event of a termination of this Supply Agreement, CENTRIX may not utilize, or allow another party to utilize, directly or indirectly, in any way, the Data, in order to develop the Product or make sales of the Product in the Territory or Outside Sales, or for any other purpose. In the interest of clarity, in the event this Supply Agreement is terminated, any party supplying CENTRIX with Product may not utilize the Data in any way.

7.4 **WAIVER**.  Failure to terminate this Supply Agreement following a breach or failure to comply with the terms and conditions of this Supply Agreement shall not be deemed a waiver of the non- breaching Party's defenses, rights or causes of action arising from such or any future breach or noncompliance.

7.5 **CHANGE IN CIRCUMSTANCE.** In the event that (i) generic versions of the Product are introduced into the market; and/or (ii) there are significant regulatory changes which affect the manufacture, distribution, sale, and marketing of the Product, the Parties agree to discuss such changed circumstances, but have no obligation to vary the terms of this Supply Agreement.

### ARTICLE 8 – CONFIDENTIALITY; NON ASSIGNABILITY

8.1 **Non-Assignability.**  This Supply Agreement and the rights of the Parties hereunder shall not be assignable nor shall the obligations of either Party be delegable, without the prior written consent of the other Party, which consent shall not be unreasonably withheld, provided that either Party may assign its rights or delegate its duties under this Supply Agreement without obtaining such consent, to any affiliate or to a successor in interest to the assigning Party's business (whether by sale of assets, stock, merger, or otherwise). In the event either Party seeks and obtains the other party's consent to assign or delegate its rights or obligations to another Party, or in the event of an assignment or delegation to an Affiliate, or to a successor in interest, the assigning party shall remain liable for its obligations hereunder.

8.2 **Confidentiality**.    Except for literature and information intended for disclosure to customers, and except as may be required to obtain government approval to manufacture, sell or use a Product, or as may be required under applicable federal securities laws, each Party will treat as confidential the Confidential Information, and will take all necessary precautions to assure the confidentiality of such information. Each Party agrees to return to the other Party upon the expiration of the Purchase Term or termination of this Supply Agreement all Confidential Information acquired from such other party, except as to such

information it may be required to retain under applicable law or regulation, and except for one copy of such information to be retained by such party's legal department or outside counsel. Notwithstanding the foregoing, all Data shall be shall be returned by CENTRIX to INTERPHARM upon termination of this Supply Agreement. Neither Party shall, during the period of this Supply Agreement or for five (5) years thereafter, without the other Party's express prior written consent use or disclose any such Confidential Information for any purpose other than to carry out its obligations hereunder. Each Party, prior to disclosure of such Confidential Information to any employee, consultant or advisor shall ensure that such person is bound in writing to observe the confidentiality provisions of this Supply Agreement. The obligations of confidentiality shall not apply to information that the receiving party is required by law or regulation to disclose, provided however that the receiving party shall so notify the disclosing party of its intent and cooperate with the disclosing party on reasonable measures to protect the confidentiality of the information.

8.3    **Public Disclosure.**  Except for such disclosure as is deemed necessary, in the reasonable judgment of a Party, to comply with applicable laws, no announcement, news release, public statement, publication, or presentation relating to the existence of this Supply Agreement, the subject matter hereof, or either Party's performance hereunder will be made without the other Party's prior written approval, which approval shall not be unreasonably withheld.   The Parties agree that they will use reasonable efforts to coordinate with respect to a joint press release relating to the existence of this Supply Agreement, as well as the Form 8-K to be filed by INTERPHARM relating to the same; provided, that with respect to such press release and the Form 8-K, INTERPHARM may make any statements deemed by its counsel to be necessary under applicable law.

## ARTICLE 9 - FORCE MAJEURE

9.1    **Force Majeure.**  No failure or omission by the parties in the performance of any obligation according to this Supply Agreement shall be deemed a breach of this Supply Agreement or create any liability if the same shall arise from any cause or causes beyond the control of the party, including, but not limited to, strikes, riots, war, acts of God, invasion, fire, explosion, floods, delay of carrier, shortage or failure in the supply of materials, energy shortage and acts of government or governmental agencies or instrumentalities.

9.2    **Obligations of the Parties in case of Force Majeure.**  In the event that due to force majeure either party hereto shall be delayed or hindered in or prevented from the performance of its duties or doing acts required under the terms of this Supply Agreement, the performance of such act, except for the obligation to pay amounts due under this Supply Agreement, shall be excused for the period of the delay. Notwithstanding the aforementioned, the party subject to force majeure shall take all reasonable steps to resolve the condition(s) forming the basis of force majeure.

## ARTICLE 10 - MISCELLANEOUS

10.1  **Governing Law.**  This Supply Agreement, and its enforcement, shall be governed by, and construed in accordance with, the laws of the State of New York (without regard for conflict rules thereof) and the United States.

10.2  **Severability.**  Should any section, or portion, of this Supply Agreement be held invalid by reason of any law, statute or regulation existing now or in the future in any jurisdiction by any court of competent authority or by legally enforceable directive of any governmental body, then such section or portion thereof shall be validly reformed so as to approximate the intent of the parties as nearly as possible and, if unreformable, shall be deemed divisible and deleted with respect to such jurisdiction; this Supply Agreement shall not otherwise be affected.

10.3  Waiver.  The rights and remedies of the parties to this Supply Agreement are cumulative and not alternative.  Neither the failure nor any delay by any party in exercising any right, power or privilege under this Supply Agreement will operate as a waiver of any such right, power or privilege, and no single or partial exercise of any such right, power or privilege will preclude any other or further exercise of such right, power or privilege or the exercise of any other right, power or privilege.

10.4  **Notices.**  All notices hereunder shall be deemed to have been delivered if by certified mail, return receipt requested, or if sent by facsimile, as follows:

If to INTERPHARM:

Name: Bob Sutaria
Title:  President
75 Adams Avenue
Hauppauge, New York 11788

If to CENTRIX PHARMACEUTICAL, INC.:
Bob Booth
President
31 Inverness Center Parkway, Suite 270
Birmingham, Alabama 35242

10.5  **Survival.**  The provisions of Article 4, Article 6 and Article 8 of this Supply Agreement shall survive the termination of this Supply Agreement.

10.6  **Counterparts.**  This Supply Agreement may be executed in two or more counterparts, each of which will be deemed to be an original of this Supply Agreement and all of which, when taken together, shall be deemed to constitute one and the same agreement. Any party to this Supply Agreement may deliver an executed copy hereof by facsimile transmission to another party hereto and any such delivery shall have the same force and effect as any other delivery of a manually signed copy of this Supply Agreement.



# EXHIBIT B

## ASSUMPTION AGREEMENT

THIS ASSUMPTION AGREEMENT ("Agreement") made as of the Commencement Date (as defined in the Supply Agreement which is defined in Recital A below) by and among CENTRIX PHARMACEUTICAL, INC., an Alabama corporation having its principal place of business at 31 Inverness Center Parkway, Suite 270, Birmingham, Alabama 35242 ("CENTRIX"), BRECKENRIDGE PHARMACEUTICAL, INC., a Florida corporation having its principal place of business at 1141 S. Rogers Circle, Suite 3, Boca Raton, Florida 33487 ("BRECKENRIDGE") and INTERPHARM HOLDINGS, INC., a Delaware corporation having its principal place of business at 69 Mall Drive, Commack, New York 11725 ("INTERPHARM").

### RECITALS

A.  WHEREAS, INTERPHARM and CENTRIX have entered into a supply agreement dated as of the Commencement Date (the "Supply Agreement") for the purchase, sale and supply of the Product (as defined in the Supply Agreement);

B.  WHEREAS, CENTRIX and BRECKENRIDGE acknowledge that as a condition of INTERPHARM entering into the Supply Agreement, BRECKENRIDGE shall be jointly and severally liable with CENTRIX with respect to each of the obligations of CENTRIX under the Supply Agreement.

C.  WHEREAS, BRECKENRIDGE, upon and subject to the specific conditions described below, may receive the benefits negotiated by CENTRIX in the Supply Agreement.

NOW, THEREFORE, in consideration of the mutual covenants set forth herein, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, each intending to be legally bound, hereby agree as follows:

1.1   **Assumption.** BRECKENRIDGE hereby agrees that it shall, from the date of this agreement, be jointly and severally liable with CENTRIX for each and every obligation and liability of CENTRIX under the Supply Agreement as if it were a party to the Supply Agreement along with CENTRIX. Each of CENTRIX and INTERPHARM hereby consents to the assumption of liability and obligations by BRECKENRIDGE in the previous sentence.

1.2   **Default; Notice.**    In the event of any default by CENTRIX under the Supply Agreement, INTERPHARM hereby agrees that it will provide any notice to BRECKENRIDGE that it is required to provide to CENTRIX and that it will not take any action against BRECKENRIDGE hereunder unless and until any applicable cure period under the Supply Agreement has expired. If BRECKENRIDGE cures a CENTRIX default within the applicable cure period under the Supply Agreement, it shall become entitled to receive the benefits to which CENTRIX would have been entitled under the Supply Agreement.

pg 1 of 3

1.3 **Acknowledgement**. CENTRIX and BRECKENRIDGE hereby acknowledge that this agreement is a material inducement for INTERPHARM to enter into the Supply Agreement, and that Interpharm would not have entered into the Supply Agreement without this Agreement.

1.4 **Miscellaneous**.    This Agreement, and its enforcement, shall be governed by, and construed in accordance with, the laws of the State of New York (without regard for conflict rules thereof) and the United States. This agreement may be executed in two or more counterparts, each of which will be deemed to be an original of this agreement and all of which, when taken together, shall be deemed to constitute one and the same agreement.    Any party to this Agreement may deliver an executed copy hereof by facsimile transmission to another party hereto and any such delivery shall have the same force and effect as any other delivery of a manually signed copy of this Agreement. It is understood and agreed by the Parties that each represents and warrants to the other that the individual signing this Agreement on behalf of the Party is their duly authorized representative and that such individual's signature binds the Party represented to the terms of this Agreement. The terms and provisions contained in this Agreement, and the Supply Agreement, constitute the entire agreement between the parties and shall supersede all previous communications, representations, agreements or understandings, either oral or written, between the parties with respect to the subject matter hereof, with the exception of any confidentiality or nondisclosure agreements which may be executed prior or subsequent to execution of this Agreement.    No agreement or understanding varying or extending this Agreement shall be binding upon either party hereto, unless set forth in a writing which specifically refers to this Agreement, signed by duly authorized officers or represent representatives of the respective parties, and the provisions hereof not specifically amended thereby shall remain in full force and effect.

1.5 **Confidentiality.**    For a period of ten (10) years after termination of the Supply Agreement for any reason, the existence and terms of this Agreement shall remain confidential and shall not be disclosed to any third party, other than CENTRIX, without the express written consent of both parties; provided, however, the foregoing obligations of confidentiality shall not apply to information that is required by law or regulation to be disclosed.    In the event such disclosure is necessary, the disclosing party shall so notify the other party of its intent and cooperate with such party on reasonable measures to protect the confidentiality of the information.



IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized officers on the day and year first set forth above.

**INTERPHARM, INC.**

By: _____

Name: Bob Sutaria

Title: President

**CENTRIX PHARMACEUTICAL, INC.**

By: _____

Name:    Bob Booth

Title:    President

**BRECKENRIDGE PHARMACEUTICAL, INC.**

By: _____

Name: Laurence D. Runsdorf

Title:  President



pg 3 of 3

EXHIBIT C



**Innovative Generics**

<u>VIA UPS and E-mail</u>

March 6, 2008

Mr. Laurence D. Runsdorf
President
Breckenridge Pharmaceutical, Inc.
1141 S. Rogers Circle, Suite 3
Boca Raton, FL 33487

Mr. Bob Booth
President & CEO
Centrix Pharmaceutical, Inc.
31 Inverness center parkway, Suite 270
Birmingham, Alabama 35242

Re: **Termination of the EE/MT Supply Agreement**

Gentlemen:

This letter agreement ("Agreement") memorializes the undersigned parties' discussions and concurrence regarding termination of the EE/MT Supply Agreement ("Supply Agreement"). Intending to be legally bound, Interpharm, Centrix and Breckenridge (collectively the "Parties") acknowledge and agree as follows:

1. **Termination.** Subject to Interpharm's receipt of the Payment in term 2 below, the Supply Agreement shall be of no further force or effect with the exception of the following sections of the Supply Agreement: 3.2, 3.4, 3.7, 5.2 and those sections enumerated in Section 10.5 **Survival.**

2. **Payment.** In full satisfaction of its obligation to share profits under the Supply Agreement, including any amendments thereto, Centrix and/or Breckenridge shall immediately pay Interpharm the sum of _____
_____ hundred dollars) ("Payment").

3. **Continuing Supply.** Notwithstanding the termination of the Supply Agreement, Interpharm shall supply a maximum of ( _____ bottles of EE/MT products under the terms provided in the attached purchase orders and in the following manner: a maximum of ( _____ bottles ( _____ bottles of each strength of the EE/MT Products in Breckenridge labeling and Interpharm trade dress) to be supplied (i) the first _____ bottles by March 31, 2008 and (ii) the second _____ bottles pursuant to Breckenridge purchase orders appended hereto. This Agreement shall not be construed in any way to limit Interpharm's sales and marketing activities of EE/MT Products to customers other than Centrix and/or Breckenridge.



Innovative Generics

4. **Mutual Release.** For the consideration referenced herein, this Agreement hereby resolves, settles, and waives all controversies, claims, causes of action of any kind or nature, damages and demands, known or unknown, existing or potentially existing between and among the Parties at or prior to the date of this Agreement, relating to the Supply Agreement and any amendments and related agreements thereto.

5. **Amendments.** The terms and provisions set forth in this Agreement shall modify and supersede all inconsistent terms and provisions set forth in the Supply Agreement.

6. **Headings.** The section headings contained in this Agreement are for purposes of convenience only, and shall in no way bear upon the construction or interpretation of this Agreement.

7. **Entire Agreement.** This Agreement contains the entire agreement between Interpharm, Breckenridge and Centrix and shall be binding upon and inure to the benefit of each party. Except as set forth or referenced herein, no other representations, warranties or promises have been made or relied upon by Interpharm, Breckenridge or Centrix in entering into this Agreement.

8. **Modification and Waiver.** This Agreement may not be modified or amended except by an instrument or instruments in writing signed by the parties hereto. No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of any other provisions, whether or not similar. No waiver shall be binding unless executed in writing by the party making the waiver.

9. **Counterparts.** This Agreement may be executed simultaneously in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

10. **Severability.** The provisions of this Agreement are severable, and the invalidity of any provision shall not affect the validity of any other provisions.

11. **Binding Effect.** This Agreement shall be binding upon, and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns.

12. **Governing Law.** This Agreement, its validity, interpretation and performance shall be governed by and construed in accordance with the internal laws of the State of New York without giving effect to the conflict of laws provisions thereof.



**Innovative Generics**

IN WITNESS WHEREOF, this Agreement has been executed and is effective as of the date first written above.

**INTERPHARM HOLDINGS, INC.**
**INTERPHARM, INC.**
**(collectively "INTERPHARM")**

By: ~~C____ R____~~

Name: ~~Jeffrey Weiss~~   Cameron Reid

Title: ~~Executive Vice President~~
      CEO

**CENTRIX PHARMACEUTICAL, INC.**
**("CENTRIX")**

By: _____

Name:
Bob Booth

Title:
President

**BRECKENRIDGE PHARMACEUTICAL, INC.**
**("BRECKENRIDGE")**

By: _____

Name:
Laurence D. Runsdorf

Title:
President

75 Adams Avenue  p  Hauppauge, NY 11788
Phone: (516) 952-0214  p  Fax: (516) 952-9587



# Purchase Order

**Breckenridge Pharmaceutical, Inc.**

| Branch | 1000 | Print | 2/25/2008 |
|---|---|---|---|
| Page | 1 of 1 | PO Number | 1168 OP |
| Ordered | 2/25/2008 | Delivery | 3/1/2008 |
| Requested | 3/1/2008 | | |

**Ship From**
Interpharm, Inc.
75 Adams Ave.
Hauppauge NY 11788

**Ship To**
DDN/Obergfel
c/o Breckenridge Pharmaceutical, Inc.
4580 Mendenhall Road
Suite 101
Memphis TN 38141

| Line | Rv. | Description | Order | UOM | Quantity | PO UM | Promised Delivery | Broker No. | Tx | Extended Price |
|---|---|---|---|---|---|---|---|---|---|---|
| 1.000 | 0 | 51991-078-01 E.E.M.T. H.S. Tabs 100's EEMT HS 0.625/1.25mg Tabs 100 | | EA | | EA | 3/1/2008 | | | |
| 2.000 | 0 | 51991-079-01 E.E.M.T. D.S. Tabs 100's EEMT D.S. 1.25/2.5mg Tabs 100 | | EA | | EA | 3/1/2008 | | 1 | |
| 3.000 | 0 | PAYMENT TERMS Payment Terms-see below | 1 | EA | 0.00 | EA | 3/1/2008 | | | |

Sales Taxable

.00

Total:

C of A, Bill of Lading, Packaging Slip and copy of NDC upc codes must be provided

Payment Terms: 1

This PO cancels all previous PO's from Breckenridge and/or Centrix
Label/insert proofs must be approved by BPI Reg Dept prior to printing
Send proofs to:
Please note Tablet imprint to be changed to the following:
--- for HS G 020  --- for DS C 010
Please provide quantity that will be in old imprint and when new imprint
will be available.



# Purchase Order

**Breckenridge Pharmaceutical, Inc.**

| Branch | 1000 | Printed | 2/25/2008 |
|---|---|---|---|
| Page | 1 of 1 | P.O. Number | 1170  OP |
| Ordered | 2/25/2008 | Delivery | 3/24/2008 |
| Sequence | 3/24/2008 | | |

**Ship From**
Interpharm, Inc.
75 Adams Ave.
Hauppauge NY 11788

**Ship To**
DDN/Obergfel
c/o Breckenridge Pharmaceutical, Inc.
4580 Mendenhall Road
Suite 101
Memphis TN 38141

| Line | Rv | Description | Ordered | Quantity | U/M | Unit Price | Pri U/M | Custom Delivery | Order No. | TX | Extended Price |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1.000 | 0 | 51991-078-01<br>E.E.M.T. H.S. Tabs 100's<br>EEMT HS 0.625/1.25mg Tabs 100 | | | EA | | EA | 3/24/2008 | | | |
| 2.000 | 0 | 51991-079-01<br>E.E.M.T. D.S. Tabs 100's<br>EEMT D.S. 1.25/2.5mg Tabs 100 | | 1 | EA | | EA | 3/24/2008 | | | |
| 3.000 | 0 | TERMS<br>Payment Terms-See below | | 1 | EA | 0.00 | EA | 3/24/2008 | | | |

| | Sales Taxable | |
|---|---|---|
| | | .00 |
| | Total: | |

Payment Terms:          Receipt of goods



**Purchase Order**

**Breckenridge Pharmaceutical, Inc.**

| Branch | 1000 | Printed | 2/25/2008 |
| Page | 1 of 1 | P.O. Number | 1169 OP |
| Ordered | 2/25/2008 | Delivery | 3/17/2008 |
| Requested | 3/17/2008 | | |

**Ship From**
Interpharm, Inc.
75 Adams Ave.
Hauppauge NY 11788

**Ship To**
DDN/Obergfel
c/o Breckenridge Pharmaceutical, Inc.
4580 Mendenhall Road
Suite 101
Memphis TN 38141

| Line | rv | Description | Qty Ordered | UOM | Unit Price | PU UM | Promised Delivery | Order No. | Rv | Extended Price |
|------|----|-----|-----|-----|-----|-----|-----|-----|----|-----|
| 1.000 | 0 | 51991-078-01<br>E.E.M.T. H.S. Tabs 100's<br>EEMT HS 0.625/1.25mg Tabs 100 | | EA | | EA | 3/17/2008<br>3/31/08 | | | |
| 2.000 | 0 | 51991-079-01<br>E.E.M.T. D.S. Tabs 100's<br>EEMT D.S. 1.25/2.5mg Tabs 100 | | EA | | EA | 3/17/2008<br>3/31/08 | | | |
| 3.000 | 0 | TERMS<br>Payment Terms-see below | 1 | EA | 0.00 | EA | 3/17/2008 | | | |

| | Sales Taxable | |
|---|---|---|
| | | .00 |
| | Total: | |

C of A, Bill of Lading, Packaging Slip and copy of UPC case codes must be faxed to

Payment Terms:            receipt of goods



# Purchase Order

**Breckenridge Pharmaceutical, Inc.**

| Branch | 1000 | Printed | 2/25/2008 |
|---|---|---|---|
| Page | 1 of 1 | P.O. Number | 1171 OP |
| Ordered | 2/25/2008 | Delivery | 4/15/2008 |
| Requested | 4/15/2008 | | |

**Ship From**
Interpharm, Inc.
75 Adams Ave.
Hauppauge NY 11788

**Ship To**
DDN/Obergfel
c/o Breckenridge Pharmaceutical, Inc.
4580 Mendenhall Road
Suite 101
Memphis TN 38141

| Line | Qty | Description | Ordered | UOM | Unit Price | Price UOM | Promised Delivery | Order Date | Ty | Extended Price |
|---|---|---|---|---|---|---|---|---|---|---|
| 1.000 | 0 | 51991-078-01<br>E.E.M.T. H.S. Tabs 100's<br>EEMT HS 0.625/1.25mg Tabs 100 | | EA | | EA | 4/15/2008 | | | |
| 2.000 | 0 | 51991-079-01<br>E.E.M.T. D.S. Tabs 100's<br>EEMT D.S 1.25/2.5mg Tabs 100 | | EA | | EA | 4/15/2008 | | | |
| 3.000 | 0 | TERMS<br>Payment Terms-see below | 1 | EA | 0.00 | EA | 4/15/2008 | | | |

Sales Taxable

Total: .00

C of A, Bill of Lading, Packaging Slip and copy of UPC bar code must be faxed to

Payment Terms: 1    receipt of goods

*Delivery date as requested by*
*Breckenridge — To be determined*



# Purchase Order

**Breckenridge Pharmaceutical, Inc.**

| Branch | 1000 | Printed | 2/25/2008 |
|---|---|---|---|
| Page | 1 of 1 | P.O. Number | 1172   OP |
| Ordered | 2/25/2008 | Delivery | 4/30/2008 |
| Required | 4/30/2008 | | |

**Ship From**
Interpharm, Inc.
75 Adams Ave.
Hauppauge NY 11788

**Ship To**
DDN/Obergfel
c/o Breckenridge Pharmaceutical, Inc.
4580 Mendenhall Road
Suite 101
Memphis TN 38141

| Line | rv | Description | Ordered | U/M | Unit Price | Tax U/M | Promised Delivery | Order No. | Ty | Extended Price |
|---|---|---|---|---|---|---|---|---|---|---|
| 1.000 | 0 | 51991-078-01<br>E.E.M.T.  H.S. Tabs 100's<br>EEMT HS 0.625/1.25mg Tabs 100 | | EA | | EA | 4/30/2008 | | | |
| 2.000 | 0 | 51991-079-01<br>E.E.M.T. D.S. Tabs 100's<br>EEMT D.S. 1.25/2.5mg Tabs 100 | | EA | | EA | 4/30/2008 | | | |
| 3.000 | 0 | TERMS<br>Payment Terms-see below | 1 | EA | 0.00 | EA | 4/30/2008 | | | |

Sales Taxable

.00

Total:

C of A, Bill of Lading, Packaging Slip and copy of UPC case codes must be faxed to:

Payment Terms: _____  receipt of goods

*Delivery date as requested*
*by Breckenridge – To be determined*



# Purchase Order

**Breckenridge Pharmaceutical, Inc.**

| Branch | 1000 | Printed | 2/25/2008 |
|---|---|---|---|
| Page | 1 of 1 | P.O. Number | 1173  OP |
| Created | 2/25/2008 | Delivery | 5/15/2008 |
| Requested | 5/15/2008 | | |

**Ship From**
Interpharm, Inc.
75 Adams Ave.
Hauppauge NY 11788

**Ship To**
DDN/Obergfel
c/o Breckenridge Pharmaceutical, Inc.
4580 Mendenhall Road
Suite 101
Memphis TN 38141

| Line | rv | Description | Quantity | UoM | Unit Price | PU UM | Promised Delivery | Order No | TV | Extended Price |
|---|---|---|---|---|---|---|---|---|---|---|
| 1.000 | 0 | 51991-078-01 E.E.M.T. H.S. Tabs 100's EEMT H.S 0.625/1.25mg Tabs 100 | | EA | | EA | 5/15/2008 | | | |
| 2.000 | 0 | 51991-079-01 E.E.M.T. D.S. Tabs 100's EEMT D.S. 1.25/2.5mg Tabs 100 | | EA | | EA | 5/15/2008 | | | |
| 3.000 | 0 | TERMS Payment Terms-see below | 1 | EA | 0.00 | EA | 5/15/2008 | | | |

Sales Taxable

.00

Total:

C of A, Bill of Lading, Packaging Slip and copy of UPC case codes must be faxed to

Payment Terms:                    receipt of goods

*Delivery date will be inspected by Breckenridge - to be determined*