UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

_____
                                        )
BRECKENRIDGE PHARMACEUTICAL, INC.,      )
                                        )
            Plaintiff,                  )
                                        )
        v.                              )   Civil Action No. 08-cv-03479
                                        )
INTERPHARM HOLDINGS, INC., and          )
INTERPHARM, INC.,                       )   JURY TRIAL DEMANDED
                                        )
            Defendants.                 )
_____)


**MEMORANDUM OF LAW IN SUPPORT OF THE
MOTION OF BRECKENRIDGE PHARMACEUTICAL, INC.
<u>FOR A PRELIMINARY INJUNCTION</u>**


C. Randolph Ross, Esquire (CR 8966)
Kathleen Van De Loo, Esquire (KO 0310)
CROWELL & MORING, LLP
153 East 53rd Street, 31st Floor
New York, New York 10022
Telephone:  (212) 895-4200
Fax:  (212) 223-4134

Attorneys for Plaintiff
Breckenridge Pharmaceutical, Inc.

**PRELIMINARY STATEMENT**

Plaintiff Breckenridge Pharmaceutical, Inc. ("Breckenridge") is suffering irreparable injury from the actions of Defendants Interpharm Holdings, Inc. and Interpharm, Inc. (collectively, "Interpharm"). Specifically, Interpharm is using Breckenridge's trade secrets, in breach of the confidentiality provisions of a contract between them, to tortiously interfere with Breckenridge's business relations and to harm Breckenridge's carefully established business reputation and customer good will. Moreover, Interpharm is misrepresenting to Breckenridge's established customers that Breckenridge will no longer be able to supply them with the product at issue. Finally, Interpharm's financial status renders it unlikely that it could satisfy a damages award in favor of Breckenridge. For all these reasons, explained in more detail below and the accompanying five declarations, Breckenridge requests that this Court preliminarily enjoin Interpharm and its agents from continuing all such conduct.

**STATEMENT OF FACTS**

**I.     Breckenridge Has Spent More Than A Decade Building Up Its Reputation And Customer Good Will With Respect To EE/MT**

Breckenridge develops prescription pharmaceutical products that are lower-cost alternatives to "brand name" products, which it markets to retail chains, wholesalers, and distributors nationwide. (Kim Decl., ¶ 2.[1]) In 1997, Breckenridge began supplying the first such alternative to the "brand name" version of prescription tablets containing esterified estrogens and methyltestosterone ("EE/MT" or the "Product"). (Kim Decl., ¶ 3.) Breckenridge has thus spent more than a decade developing customer good will and establishing its reputation as a reliable source for EE/MT. (Lapila Decl., ¶ 3.) This reliability as a provider able to meet its customers

---

[1] Each of the declarations referenced are filed herewith.

needs for this product is an important factor in maintaining Breckenridge's business reputation, and thus in building and maintaining customer good will. (Lapila Decl., ¶ 4.)

**II.     In 2005 Breckenridge Began Purchasing EE/MT Manufactured By Interpharm, And Later Shared With Interpharm Its Trade Secret Information Concerning Its Customers, Sales And Pricing Pursuant To A Profit-Sharing Agreement**

In 2005, Breckenridge and Centrix Pharmaceutical, Inc. ("Centrix"), an affiliate of Breckenridge that markets its own alternative version of EE/MT under the Creekwood label, entered into a Supply Agreement with Interpharm pursuant to which Interpharm would manufacture the Product for Breckenridge and Centrix. (Pertinent portions of the Supply Agreement, as well the Assumption Agreement by which Breckenridge became a party to the Supply Agreement, are filed herewith as Exhibits A and B to the Declaration of Mr. Kim.) Breckenridge and Centrix do not possess manufacturing capability and wholly rely upon contract manufacturers, such as Interpharm, to manufacture products to be marketed under the Breckenridge or Centrix labels. Prior to that time, Interpharm had not manufactured EE/MT; consequently, Interpharm had not established a supplier relationship with any purchasers of the Product. Accordingly, beginning in about mid-2005, Interpharm began to supply Breckenridge with some of the EE/MT which Breckenridge in turn supplied to its established customers for the Product.

In 2006 the Supply Agreement was amended to provide that Breckenridge and Centrix would pay Interpharm a portion of the profits they realized from their sales of EE/MT. (Kim Decl, ¶ 10.) This was for only a one-year period out of the ten-year term for the Supply Agreement (which was renewable for another five years). (Kim Decl, ¶¶ 8,10.) Accordingly, pursuant to the confidentiality provisions of the Supply Agreement, Breckenridge provided to Interpharm not only the total monthly sales amounts for the Product and the identities of its

2

customers, but also very specific and proprietary information that included the amount of Product sold to each of these customers, the per unit prices charged and the amount of rebates provided to each customer, the profits realized from the sales to each customer, marketing expenses, and other such confidential information (the "Proprietary EE/MT Sales Data"). A sample of the form provided monthly to Interpharm, with figures redacted, is Exhibit D to the Kim Declaration. All such information was understood by Interpharm to be "Confidential Information" under section 8.2 of the Supply Agreement, and thus subject to its provisions. (Kim Decl., ¶ 9 and Exh. A.)

      The Proprietary EE/MT Sales Data provided to Interpharm constitute precisely the kind of information that would permit a new competitor to break into the market for this product. (Lapila Decl. ¶¶ 6-11.) In particular, it provided Interpharm with the knowledge necessary to select the high-volume and repeat customers developed by Breckenridge over the years, and to offer them a price that undercut Breckenridge's established price for the Product. (Lapila Decl. ¶ 11.) This is knowledge which otherwise would require considerable time, effort, and resources to develop while building up a market. (Lapila Decl., ¶ 6.) With the information provided to Interpharm concerning Breckenridge's net profits, a competitor would know exactly how to price its EE/MT at a level that undercut Breckenridge's pricing to each customer, without having to price its product any lower than necessary to present an attractive price differential. Taken together, the information provided in these monthly reports reveals all the details of Breckenridge's whole EE/MT program that it has spent over a decade developing, at considerable cost and effort. (Lapila Decl., ¶¶ 3-7, 13.)

### III.     Breckenridge Has Taken Significant Steps To Protect The Trade Secret Information That It Provided To Interpharm

Breckenridge has taken steps to limit access and protect the Proprietary EE/MT Sales Data consistent with its high value and its nature as a trade secret. It is the standard policy of Breckenridge that every new employee must sign a confidentiality agreement that prevents him or her from disclosing any of Breckenridge's proprietary and confidential information not only while they are employed here but also for a period of five years thereafter. (Kim Decl., ¶ 15.) Similarly, it is also Breckenridge's strict policy that each and every discussion initiated with other companies concerning development, supply, manufacture, or any other facet of the pharmaceutical business is preceded by a signed confidentiality agreement to preclude the disclosure or misuse of Breckenridge's proprietary and confidential information. (Kim Decl., ¶ 14.)

In addition, Breckenridge's internal computer network is password-protected, so that only current Breckenridge employees with a valid password may access information contained on Breckenridge's internal computer network. (Kim Decl., ¶ 16.) The Proprietary EE/MT Sales Data are not available in such an aggregated form in any one report or set of data even to Breckenridge's employees. Rather, Mr. Todd Ruonavaara, the controller of Breckenridge, spent considerable time each month compiling these reports from different sources. (Kim Decl., ¶ 17.) He then stored this sensitive compilation of data on his own office computer, not on the Breckenridge computer network, so that even current Breckenridge employees with valid passwords could not access this report. (Kim Decl., ¶ 18.) The Proprietary EE/MT Sales Data were then made available to only one other individual within Breckenridge (its president), and to the president and controller of Centrix. (Kim Decl., ¶ 19.)

4

IV.  **The Supply Agreement With Interpharm Was Terminated By Agreement In March, 2008**

In 2008, a dispute arose among the parties to the Supply Agreement, which was resolved and settled by the execution of a letter agreement dated March 6, 2008. (Kim Decl., ¶ and Exh. 13 (the "Letter Agreement").)  The Supply Agreement was terminated in exchange for the payment of an agreed sum to Interpharm "[i]n full satisfaction of [Breckenridge's] obligations to share profits under the Supply Agreement." (Kim Decl., Exh. C, ¶¶ 1-2.) However, both the Supply Agreement and the Letter Agreement provide that certain sections of the Supply Agreement continue in effect, including Section 8.2 concerning "Confidentiality." (Kim Decl., Exh. A, section 10.5, Exh. C, ¶ 1.)

V.  **Interpharm Has Now Begun Using Breckenridge's Trade Secret Information To Tortiously Interfere With Breckenridge's Relationships With Its Established Customers**

Following the execution of the Letter Agreement, Interpharm attempted to enter the EE/MT market for the first time by using the Confidential Information it received by virtue of the confidentiality provisions of the Supply Agreement. Interpharm approached Breckenridge's customers listed in the confidential disclosures and informed them that (1) Interpharm would no longer be supplying EE/MT to Breckenridge, (2) therefore Breckenridge would no longer be supplying its customers with EE/MT, and (3) Breckenridge had no more than a 20 day supply of EE/MT left for sale. *See* Goldstein Decl., ¶¶ 4-5 and Exh. A; Lyle Decl., ¶¶ 2-3. In fact, an Interpharm representative sent written communications to at least one of Breckenridge's customers, Kinray, Inc., stating:

> Here is a little background of what is happening. Many customers have been buying Interpharm's EEMT product through a third party. Interpharm is transitioning these customers to go direct this translates into a tremendous cost saving. This will be a very easy transition at the pharmacy level.

5

> On top of this very aggressive offer Interpharm will allow a one time 10% buy in on Estrogen and Methyltestosterone .625mg/1.25mg and 1.25mg/2.5mg as a bill back on the first purchase order.

*See* Burns Decl., ¶ 3 and Exh. A.[2]  This statement conveys the false impression to Breckenridge's customers that, as a result of some agreement, Breckenridge had agreed to Interpharm "transitioning" these accounts to Interpharm, and/or that the only way that these customers could continue purchasing the Product was to begin purchasing it directly from Interpharm as opposed to from Breckenridge.

Further, by advising Breckenridge's customers that the "transitioning" process would "translate" to "tremendous cost savings," Interpharm concedes that it utilized Breckenridge's pricing structures to develop its own competitive pricing. Without having Breckenridge's confidential pricing structures, no competitor newly entering this market could safely promise and deliver "tremendous cost savings."

These communications damaged Breckenridge's good will with its customers as they led them to question whether Breckenridge would be able to continue to meet their needs for the Product. (Goldstein Decl., ¶¶ 4-7.) As a result, instead of focusing on selling the product, Breckenridge's sales people are focusing on reassuring its customers that EE/MT is and will continue to be available from Breckenridge. (Goldstein Decl., ¶¶ 6-7.). In addition to the time spent on reassuring its established clients, Breckenridge has been required to lower the price at which it sells EE/MT to some of its customers, in order to avoid losing these customers for the Product (Goldstein Decl., ¶¶ 8-9). Of course, Interpharm was able to precisely develop and target such lower prices with the use of the Proprietary EE/MT Sales Data provided by Breckenridge. To date, Breckenridge's salespersons are uncertain whether Interpharm is

---

[2]  This document from Interpharm had confidential pricing information redacted before it was faxed from Kinray, Inc. to Breckenridge.

6

continuing these false representations, whether customers have viewed Breckenridge negatively as a result, whether Breckenridge will be compelled to further reduce pricing, and, worst, whether Breckenridge may lost customers to Interpharm.

VI. **Interpharm Is Insolvent And Is Unlikely To Be Able To Satisfy A Money Judgment Against It In Favor Of Breckenridge**

On February 5, 2008, Interpharm filed an 8-K with the SEC (Kim Decl., Exh. E) detailing its entry into a Forbearance Agreement with Wells Fargo Bank, National Association ("Wells Fargo") on February 5, 2008 (the "Forbearance Agreement") (Kim Decl., Exh. F).  According to the February 5, 2008 8-K, Wells Fargo provided additional credit to Interpharm and agreed to forbear from exercising its rights and remedies relating to prior defaults by Interpharm under a Credit Agreement and related loan documents.  (Kim Decl., Exh. E.)  As Interpharm has been in default under the Wells Fargo Credit Agreement since June 30, 2007, it entered into an Initial Forbearance Agreement with Wells Fargo on October 26, 2007  (Interpharm Form 8-K, dated 11/7/07 ((Kim Decl., Exh. G); Interpharm 8-K, February 5, 2008 (Kim Decl., Exh. E)).  Prior to the execution of the Forbearance Agreement, it was also necessary for Interpharm to execute an "Interim Forbearance Agreement" with Wells Fargo on February 1, 2008, to satisfy its "immediate cash needs." (Interpharm 8-K, February 5, 2008 (Kim Decl., Exh. E).)

Pursuant to the Forbearance Agreement, Interpharm acknowledged its continuing loan defaults and Wells Fargo agreed to forbear from exercising its rights against Interpharm until June 30, 2008, provided that there was no new default by Interpharm. (Kim Decl., Exh. F, p. 9, ¶ 6.)  To reach this new agreement with Wells Fargo, Interpharm was required to submit rolling budgets, engage a chief restructuring officer, grant an equity line of credit mortgage to secure a new equity line and grant a collateral mortgage to secure $7,000,000.00 of debt due under the Credit Agreement which was converted to a term obligation.  (*Id.*, pp. 1-2.)

7

On March 25, 2008, Interpharm filed an 8-K with the SEC detailing its entry into an Amended and Restated Forbearance Agreement of the same date (the "Amended Forbearance Agreement") (Kim Decl., Exh. H). According to the Amended Forbearance Agreement, Interpharm is indebted to Wells Fargo in the amount of at least $30,928,858.02, plus interest and additional costs, including but not limited to legal fees, expenses, disbursements and additional advances made by Wells Fargo (the Indebtedness"). (Interpharm 8-K, March 25, 2008 (Kim Decl., Exh. I).) The Indebtedness is secured by a "a first priority security interest in and to all of [Interpharm's] assets," as well as first, second and collateral mortgages on its real property. (Kim Decl., Exh. H, pp. 1-2.)

Wells Fargo has agreed to continue its forbearance through June 30, 2008. The Amended Forbearance Agreement provides that an event of default shall include the failure of Interpharm to send Wells Fargo "a letter of intent to purchase substantially all of the assets of [Interpharm] for an amount in excess of the outstanding balance of the Obligations owing to Wells Fargo" or a proposal letter by a third party to refinance the outstanding balance by March 31, 2008. (Kim Decl., Exh. H, pp. 18-19.) Interpharm is also in default if it has not received a commitment to purchase or refinance substantially all of its assets by April 30, 2008, and sold or refinanced the same by June 30, 2008. (*Id.*, p. 19.)

Just under three months ago, Interpharm was already lacking the cash flow necessary to run its business. Now, as set forth in Interpharm's April 16, 2008 8-K, the American Stock Exchange ("AMEX") has notified Interpharm that it is not in compliance with listing standards of the AMEX Company Guide due to its sustained losses. (Interpharm 8-K, April 16, 2008 (Kim Decl., Exh. J).) This April 16 filing also noted that Interpharm's CEO had resigned, thus casting more uncertainty over its stability.

Moreover, in addition to this lawsuit between Breckenridge and Interpharm, Interpharm is currently involved in at least seven prior litigations. (Kim Decl., Exh. H (Interpharm 8-K, March 25, 2008), Schedule 4(c).) As these lawsuits are further along than the current proceeding, any recovery in those actions will further limit the recovery, if any, available here.

It is unlikely, therefore, that Breckenridge would be able to recover any portion of a money judgment when Interpharm has already granted Wells Fargo a first priority security interest in all its assets, may have possibly already defaulted on its responsibilities under the Amended Forbearance Agreement, and continues to suffer losses to the extent of losing its CEO and perhaps its AMEX listing.

## ARGUMENT

### I. The Standard For A Preliminary Injunction

In the Second Circuit, "[t]o obtain a preliminary injunction a party must demonstrate: (1) that it will be irreparably harmed if an injunction is not granted, and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation, and a balance of the hardships tipping decidedly in its favor." *Bronx Household of Faith v. Board of Education of the City of New York*, 331 F.3d 342, 348-349 (2d Cir. 2003); *see also, e.g., Brenntag Int'l Chemicals, Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999) (same).

### II. Breckenridge Has Demonstrated That It Will Be Irreparably Harmed In The Absence Of A Preliminary Injunction

"Because a showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction, the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered." *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990) (citations

9

and internal quotation marks omitted).  The facts set forth above demonstrate the presence of three separate factors, each of which the courts have found to constitute irreparable injury for the purposes of preliminary injunctive relief:  (1) The loss of Breckenridge's customer good will and business reputation due to Interpharm's conduct; (2) The misuse by Interpharm of Breckenridge's trade secret customer and pricing information; and (3) Interpharm's inability to satisfy a money judgment.

### A. It Is Well Established That The Loss Of Customer Good Will And Business Reputation That Interpharm Is Now Threatening Constitutes Irreparable Injury To Breckenridge That Warrants A Preliminary Injunction

Interpharm is undertaking actions that, if allowed to continue, will undermine the customer good will and the business reputation for reliability that Breckenridge has spent years establishing.  Breckenridge has already invested time, energy and money attempting to counter Interpharm's false and misleading representations concerning Breckenridge's inability or unwillingness to continue to supply its customers with EE/MT.  Of course, Breckenridge can only directly address those misrepresentations of which it is made aware, and not every customer or competitor will make the effort to confirm the truth of what they are told by one of Breckenridge's former manufacturers.

The injury to Breckenridge here takes two related forms, one of which might be compensable by money damages (if collectible), but the second of which is not.  First, Breckenridge has already lost profits because it has been forced to reduce the price at which is sells EE/MT to certain customers in response to Interpharm's offer to sell the Product at a lower price to these customers.  Of course, Interpharm is able to select its price with precision to undercut Breckenridge's established prices based on its misuse of Breckenridge's trade secrets, as discussed in the next section.

Second, Breckenridge is suffering harm to its customer good will and business reputation on account of the misrepresentations being spread by Interpharm that Breckenridge is unreliable as a supplier because it is unable or unwilling to continue to supply EE/MT, particularly without any prior notice to customers. A company of Breckenridge's reputation would not permit a serious supply disruption of a product as important as EE/MT and particularly without advance notice to a customer. This type of injury to reputation and good will has been found by the courts to constitute irreparable injury, because harm to the good will and reputation that a company has built up over the years is simply not compensable by money damages. "'Numerous courts have held that harm to a company's operations, reputation, good will or customer relations is irreparable because money damages cannot provide adequate compensation for such injuries.'" *National Elevator Cab & Door Corp. v. H & B, Inc.*, No. 07 CV 1562(ERK)(RML), 2008 WL 207843, at *5 (E.D.N.Y. Jan. 24, 2008) (quoting *Ivy Mar Co. v. C.R. Seasons, Ltd.,* 907 F. Supp. 547, 565 (E.D.N.Y. 1995)). "'By siphoning off plaintiff's carefully gleaned customers, defendants subject plaintiff to a definite possibility of irreparable harm, which increases as long as it continues unrestrained. What is at stake here is plaintiff's good will built up over the years, which is not, contrary to defendant's assertion, monetarily ascertainable.'" *Johnson Controls, Inc. v. A.P.T. Critical Systems, Inc.*, 323 F. Supp. 2d 525, 532 (S.D.N.Y. 2004) (quoting *Velo-Bind, Inc. v. Scheck,* 485 F. Supp. 102, 109 (S.D.N.Y. 1979)). "[T]he Second Circuit has recognized that damage to one's business reputation and loss of customer goodwill can constitute irreparable harm." *Xelus, Inc. v. Servigistics, Inc.*, 371 F. Supp. 2d 387, 390 (W.D.N.Y. 2005) (citations omitted). *See also, e.g., EMI Latin v. Bautista*, No. 03 Civ. 0947(WHP), 2003 WL 470333, at *14 (S.D.N.Y. Feb. 24, 2003) (harm to goodwill and business relationships constitute injuries "incapable of being fully remedied by monetary damages"); *TVT Records v.*

11

*Island Def Jam Music*, 225 F. Supp. 2d 398, 405 (S.D.N.Y. 2002) ("Beyond losses, the Second Circuit regards damage to business relationships significant") (citations omitted); *Unisource Worldwide, Inc. v. Valenti*, 196 F. Supp. 2d 269, 280 (E.D.N.Y. 2002) ("the loss of goodwill can constitute irreparable harm which cannot be compensated by money damages").

By misrepresenting to Breckenridge's customers that Breckenridge is unable or unwilling to continue supplying EE/MT, Interpharm is undermining the customer good will and the business reputation for reliability that Breckenridge has spent years establishing. If this conduct is not enjoined, it will result in the kind if injury that is widely recognized as irreparable.

> **B.    Interpharm's Misappropriation Of Breckenridge's Proprietary EE/MT Sales Data For The Purpose Of Luring Away Breckenridge's Customers Constitutes Irreparable Injury That Warrants Injunctive Relief**

The Second Circuit has made clear that the misuse of trade secrets by a competitor constitutes irreparable injury warranting an injunction, and that such trade secrets may include confidential customer lists and pricing information. "[I]t it is clear that the loss of trade secrets cannot be measured in money damages." *FMC Corp. v. Taiwan Tainan Giant Indus. Co., Ltd.*, 730 F.2d 61, 63 (2d Cir. 1984) (reversing trial court's denial of preliminary injunction against use of plaintiff's confidential customer list); *see also, e,g., Johnson Controls, Inc. v. A.P.T. Critical Systems, Inc.*, 323 F. Supp. 2d 525, 533 (S.D.N.Y. 2004) ("Indeed, irreparable harm is presumed where a trade secret has been misappropriated . . . ."); *Inflight Newspapers, Inc. v. Magazines In-Flight, LLC*, 990 F. Supp. 119, 124 (E.D.N.Y. 1997) ("the law is clear in the Second Circuit that irreparable harm is presumed where a trade secret has been misappropriated").

Even a customer list itself may be a trade secret where it has been "developed by a business through substantial effort and kept in confidence . . . provided the information it

12

contains is not otherwise readily ascertainable." *North Atlantic Instruments, Inc. v. Haber*, 188 F.3d 38, 44 (2d Cir. 1999) (citations and internal quotation marks omitted). However, as explained above, the trade secrets disclosed by Breckenridge to Interpharm include much more than just customer names. The Propietary EE/MT Sales Data provided to Interpharm constitutes a comprehensive and analytical snapshot of Breckenridge's entire EE/MT market, which included a detailed matrix of the actual quantities of EE/MT sold to each customer, the price at which it was sold, the rebates or other discounts, Breckenridge's costs and profits, and more. This is a detailed road map for a competitor that wishes to undermine the EE/MT market that Breckenridge has spent considerable effort and more than a decade to develop.

As such, this is precisely the kind of information that has been found by the courts to constitute trade secrets, the use of which by a competitor would constitute irreparable injury:

> It was not the knowledge of the customers' names or their general needs that rose to trade secret status. Rather, [the defendant] was aware of every facet of [the plaintiff's] contracts with every customer, information that included pricing, billing, delivery, product selection, etc. This was not publicly accessible information and it represented current [] data. Having the exact knowledge of current [] pricing afforded [the defendant] an opportunity to underbid and secure the airline contracts.

*Inflight Newspapers, Inc. v. Magazines In-Flight, LLC*, 990 F. Supp. 119, 127-28 (E.D.N.Y. 1997) (citation omitted). "Plaintiffs' cost structures, bidding information, and customer lists are trade secrets . . . if a competitor knew about the cost structure it could slightly underbid Plaintiffs." *B.U.S.A. Corp. v. Ecogloves, Inc.*, No. 05 CIV. 9988(SCR), 2006 WL 3302841, at *2 (S.D.N.Y. Jan. 31, 2006). *See also Colonize.Com, Inc. v. Perlow*, No. 03-CV-466, 2003 WL 24256576, at *5 (N.D.N.Y. Oct. 23, 2003) ("In addition to the names of its customers, a typical confidential list would contain such sales information such as, precise discounts given to customers, pricing book and data, usage reports and details of ordering and purchase histories")

(citation omitted); *Ikon Office Solutions, Inc. v. Leichtnam*, No. 02-CV-0721E(SC), 2003 WL 251954, at *3 (W.D.N.Y. Jan. 3, 2003) (denying motion to dismiss because "[plaintiff's] pricing would be a likely candidate for trade secret protection," citing *General Elec. Co. v.. Macejka,* 252 A.D.2d 700, 675 N.Y.S.2d 420 (3d Dep't 1998) for the proposition that pricing and profit margins constitute trade secrets); *Ecolab Inc. v. Paolo*, 753 F. Supp. 1100, 1104, 1112 (E.D.N.Y. 1991) ("price discount and product use and preference information" found to constitute trade secrets; "[i]f disclosed, Ecolab's price and individual customer discount information would allow competitors to undercut Ecolab").

Thus, the information contained in the Proprietary EE/MT Sales Data provided to Interpharm, including current data on volume, pricing, discounts, costs, and more, fits precisely into the type of such information found by the courts to constitute trade secrets. Accordingly, it is well established that Interpharm's misappropriation of this information to compete with and undercut Breckenridge is irreparable injury that should be enjoined.

    **C.    The Likely Inability Of Interpharm To Satisfy A Money Judgment Also Means That Breckenridge's Injury Is Irreparable**

It is also well established that where a defendant faces a reasonable likelihood of insolvency during the pendency of a lawsuit, or otherwise is likely to be unable to satisfy a money judgment, this will support a finding of irreparable harm. A plaintiff's injury cannot be compensated by money damages if such damages cannot be collected. "A serious threat of insolvency by a defendant can constitute [the] "substantial chance" of irreparable harm" for purpose of preliminary injunction. *Serio v. Black, Davis & Shue Agency, Inc.*, No. 05 Civ. 15(MHD), 2005 WL 3642217, at *16 (S.D.N.Y. Dec. 30, 2005) (citations omitted). "[W]here the defendant is insolvent, or may become insolvent during the pendency of the litigation, monetary injury is deemed irreparable because the plaintiff may never be able to recover

damages." *Netwolves Corp. v. Sullivan,* Nos. 00 Civ. 8943, 00 Civ. 9628(AGS), 2001 WL 492463, at *11 (S.D.N.Y. May 9, 2001). *See also Brenntag Int'l. Chemicals, Inc. v. Bank of India*, 175 F.3d 245, 249-50 (2d Cir. 1999) ("courts have excepted from the general rule regarding monetary injury situations involving obligations owed by insolvents") (citing cases); *Alpha Capital Aktiengesellschaft v. Group Management Corp.*, No. 02 Civ. 2219(LBS), 2002 WL 31681798, at *11 (S.D.N.Y. Nov. 25, 2002) "The Second Circuit has made abundantly clear that irreparable harm is presented in 'monetary injury situations involving obligations owed by insolvents.'" (quoting *Brenntag*, 175 F.3d at 250).

As made clear by *Brenntag*, it is not just insolvency that triggers a finding of irreparable harm. "[A] perhaps more accurate description of the circumstances that constitute irreparable harm is that where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Brenntag*, 175 F.3d at 249. Thus, *Brenntag* noted a prior case in which the harm was found not to be irreparable because the plaintiff would have "priority and adequate security" in a bankruptcy proceeding. *Id.* at 250 (citation omitted). Here, the opposite is true. Not only does it appear likely that Interpharm may be insolvent and may have its assets foreclosed upon by Wells Fargo, but Breckenridge would be unlikely to be able to collect a money judgment in any case because Wells Fargo has been granted security interests in all of Interpharm's assets, it is continuing to incur losses, it has just lost its CEO, and there are seven other lawsuits already proceeding against it. Accordingly, the injury that Breckenridge suffers from Interpharm's actions is likely to be irreparable because money damages will not be recoverable.

### III.     Breckenridge Has Demonstrated A Likelihood Of Success On The Merits

In addition to irreparable injury, to justify a preliminary injunction Breckenridge must demonstrate the likelihood of success on the merits. It is sufficient for this purpose to demonstrate the likelihood of success on three counts that implicate the irreparable injury discussed above: Interpharm's harm to Breckenridge's business reputation and customer good will in connection with its tortious interference with Breckenridge's prospective business relations (Count II), its breach of the confidentiality provisions of the Supply Agreement (Count III), and its misappropriation of Breckenridge's trade secret information concerning sales of EE/MT (which itself constitutes irreparable injury) (Count IV).

#### A.     Breckenridge Is Likely To Succeed on The Merits of Count II for Tortious Interference With Prospective Business Relations

"To state a claim for tortious interference with business relations under New York law, four conditions must be met: (i) the plaintiff had business relations with a third party; (ii) the defendants interfered with those business relations; (iii) the defendants acted for a wrongful purpose or used dishonest, unfair, or improper means; and (iv) the defendants' acts injured the relationship." *Scutti Enterprises, LLC, v. Park Place Entertainment Corp*, 322 F.3d 211, 215 (2d Cir. 2003) (quoting *Lombard v. Booz-Allen & Hamilton, Inc.,* 280 F.3d 209, 214 (2d Cir. 2002).

To satisfy the first prong, it is well-established that the plaintiff need only prove "that the defendant tortiously interfered with a 'continuing business or other customary relationship not amounting to a formal contract.'" *Hannex Corp. v. GMI, Inc.*, 140 F.3d 194, 205 (2d Cir. 1998) (citing the Restatement (Second) of Torts sec. 766B cmt. C (1979)) (other citation omitted). Breckenridge had "continuing business" with the third-party purchasers it set forth in its Proprietary EE/MT Sales Data to Interpharm, in that these were regular customers of Breckenridge who were continuing to purchase their EE/MT supply from Breckenridge, as noted

16

in the data provided to Interpharm on monthly basis through 2007.

The declarations filed herewith demonstrate that Interpharm has interfered with the customary relationship Breckenridge by means of its solicitation of those customers with precisely targeted lower prices. The "dishonest, unfair, or improper means" include misrepresentation. *Scutti*, *supra*, at 216. Here, Interpharm has been misrepresenting to Breckenridge's customers that Breckenridge would not be able to supply them with EE/MT in the future. Additionally, Interpharm has used the unfair and improper means of breaching its confidentiality obligations under the Supply Agreement and of misusing Breckenridge's trade secrets in order to interfere with Breckenridge's continuing business relationships with its EE/MT customers. Accordingly, Breckenridge has demonstrated a likelihood of success on Count II of its Complaint.

    **B.**    **Breckenridge Is Likely To Succeed on The Merits of Count III for Breach of the Confidentiality Provision of the Supply Agreement**

"In New York, the elements of a breach of contract claim are (1) the existence of a contract, (2) performance by the party seeking recovery, (3) non-performance by the other party, and (4) damages attributable to the breach." *Musket Corp. v. PDVSA Petroleo, S.A.*, 512 F. Supp. 2d 155, 160 (S.D.N.Y. 2007) (citations and internal quotation marks omitted). As explained above, an earlier dispute concerning the Supply Agreement was resolved by the March 6, 2008, Letter Agreement, which terminated the Supply Agreement. However, among the surviving provisions of the Supply Agreement is section 8.2, concerning confidentiality. (Kim Decl., Exh. A, section 10.5, Exh. C, ¶ 1.) Pursuant to section 8.2, Interpharm was prohibited from using or disclosing confidential information that had been provided to it for any purpose other than to carry out its obligations under the Supply Agreement. However, as detailed above and in the declarations filed herewith, Interpharm has used the Proprietary EE/MT Sales Data

17

provided to it by Breckenridge in furtherance of its own scheme to take Breckenridge's customers for itself. Breckenridge has thus established the likelihood that it will prevail on its breach of contract claim.

### C. Breckenridge Is Likely To Succeed on The Merits of Count IV for Misappropriation Of Trade Secrets

"To succeed on a claim for the misrepresentation of trade secrets under New York Law, a party must demonstrate (1) that it possessed a trade secret, and (2) that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means." *North Atlantic Instruments, Inc. v. Haber*, 188 F.3d 38, 43-44 (2d Cir. 1999) (citing *Hudson Hotels Corp. v. Choice Hotels Int'l*, 995 F.2d 1173, 1176 (2d Cir. 1993) (citing *Integrated Cash Management Servs. Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 173 (2d Cir. 1990)).

The courts consider the following factors in determining whether particular information constitutes a trade secret:

> (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*North Atlantic Instruments,* 188 F.3d at 44. As explained above, (1) this information was disclosed "outside the business" only under the confidentiality provisions of the Supply Agreement, and would no longer have been current had the Supply Agreement run its intended term; (2) this compilation of information is provided to only two individuals at Breckenridge and two at Centrix; (3) the data is protected by computer passwords, and the compilation is <u>not</u> accessible through Breckenridge's internal computer network; (4) the Proprietary EE/MT Sales

Data are extremely valuable to the day-to-day business of Breckenridge, and provides an invaluable roadmap to any would-be competitor; and (5-6) Breckenridge has spent over a decade developing the customer relationships, the costs, and the pricing that are all set forth in the Proprietary EE/MT Sales Data.

Accordingly, the Proprietary EE/MT Sales Data constitute a protectable trade secret, and Interpharm has misused this trade secret information in breach of the confidentially provision of the Supply Agreement, and in tortious interference of Breckenridge's business relations. Thus, Breckenridge is likely to prevail on the merits of Count IV for misappropriation of trade secrets.

## **CONCLUSION**

For all the foregoing reasons, Breckenridge's motion for a preliminary injunction should be granted.

Dated:   New York, New York
         April 18, 2008

                                           /s/  C. Randolph Ross
                                    C. Randolph Ross, Esquire (CR 8966)
                                    Kathleen Van De Loo, Esquire (KO 0310)
                                    CROWELL & MORING, LLP
                                    153 East 53rd Street, 31st Floor
                                    New York, New York 10022
                                    Telephone:  (212) 895-4200
                                    Fax:  (212) 223-4134

                                    Attorneys for Plaintiff
                                    Breckenridge Pharmaceutical, Inc.