UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

_____ )
)
BRECKENRIDGE PHARMACEUTICAL, INC., )
)
Plaintiff, )
)
v. )          Civil Action No. 08-cv-03479
)
INTERPHARM HOLDINGS, INC., and )
INTERPHARM, INC., )          JURY TRIAL DEMANDED
)
Defendants. )
_____ )

**MEMORANDUM OF LAW IN SUPPORT OF THE
MOTION OF BRECKENRIDGE PHARMACEUTICAL, INC.
<u>FOR A PRELIMINARY INJUNCTION</u>**

C. Randolph Ross, Esquire (CR 8966)
Kathleen Van De Loo, Esquire (KO 0310)
CROWELL & MORING, LLP
153 East 53rd Street, 31st Floor
New York, New York 10022
Telephone:  (212) 895-4200
Fax:  (212) 223-4134

Attorneys for Plaintiff
Breckenridge Pharmaceutical, Inc.

<u>**PRELIMINARY STATEMENT**</u>

Plaintiff Breckenridge Pharmaceutical, Inc. ("Breckenridge") is suffering irreparable injury from the actions of Defendants Interpharm Holdings, Inc. and Interpharm, Inc. (collectively, "Interpharm"). Specifically, Interpharm is using Breckenridge's trade secrets, in breach of the confidentiality provisions of a contract between them, to tortiously interfere with Breckenridge's business relations and to harm Breckenridge's carefully established business reputation and customer good will. Moreover, Interpharm is misrepresenting to Breckenridge's established customers that Breckenridge will no longer be able to supply them with the product at issue. Finally, Interpharm's financial status renders it unlikely that it could satisfy a damages award in favor of Breckenridge. For all these reasons, explained in more detail below and the accompanying five declarations, Breckenridge requests that this Court preliminarily enjoin Interpharm and its agents from continuing all such conduct.

<u>**STATEMENT OF FACTS**</u>

**I.      Breckenridge Has Spent More Than A Decade Building Up Its Reputation And Customer Good Will With Respect To EE/MT**

Breckenridge develops prescription pharmaceutical products that are lower-cost alternatives to "brand name" products, which it markets to retail chains, wholesalers, and distributors nationwide. (Kim Decl., ¶ 2.[1]) In 1997, Breckenridge began supplying the first such alternative to the "brand name" version of prescription tablets containing esterified estrogens and methyltestosterone ("EE/MT" or the "Product"). (Kim Decl., ¶ 3.) Breckenridge has thus spent more than a decade developing customer good will and establishing its reputation as a reliable source for EE/MT. (Lapila Decl., ¶ 3.) This reliability as a provider able to meet its customers

---

[1]  Each of the declarations referenced are filed herewith.

needs for this product is an important factor in maintaining Breckenridge's business reputation, and thus in building and maintaining customer good will.  (Lapila Decl., ¶ 4.)

## II.    In 2005 Breckenridge Began Purchasing EE/MT Manufactured By Interpharm, And Later Shared With Interpharm Its Trade Secret Information Concerning Its Customers, Sales And Pricing Pursuant To A Profit-Sharing Agreement

In 2005, Breckenridge and Centrix Pharmaceutical, Inc. ("Centrix"), an affiliate of Breckenridge that markets its own alternative version of EE/MT under the Creekwood label, entered into a Supply Agreement with Interpharm pursuant to which Interpharm would manufacture the Product for Breckenridge and Centrix.  (Pertinent portions of the Supply Agreement, as well the Assumption Agreement by which Breckenridge became a party to the Supply Agreement, are filed herewith as Exhibits A and B to the Declaration of Mr. Kim.) Breckenridge and Centrix do not possess manufacturing capability and wholly rely upon contract manufacturers, such as Interpharm, to manufacture products to be marketed under the Breckenridge or Centrix labels.  Prior to that time, Interpharm had not manufactured EE/MT; consequently, Interpharm had not established a supplier relationship with any purchasers of the Product.  Accordingly, beginning in about mid-2005, Interpharm began to supply Breckenridge with some of the EE/MT which Breckenridge in turn supplied to its established customers for the Product.

In 2006 the Supply Agreement was amended to provide that Breckenridge and Centrix would pay Interpharm a portion of the profits they realized from their sales of EE/MT.  (Kim Decl, ¶ 10.)  This was for only a one-year period out of the ten-year term for the Supply Agreement (which was renewable for another five years).  (Kim Decl, ¶¶ 8,10.)  Accordingly, pursuant to the confidentiality provisions of the Supply Agreement, Breckenridge provided to Interpharm not only the total monthly sales amounts for the Product and the identities of its

customers, but also very specific and proprietary information that included the amount of Product sold to each of these customers, the per unit prices charged and the amount of rebates provided to each customer, the profits realized from the sales to each customer, marketing expenses, and other such confidential information (the "Proprietary EE/MT Sales Data").  A sample of the form provided monthly to Interpharm, with figures redacted, is Exhibit D to the Kim Declaration.  All such information was understood by Interpharm to be "Confidential Information" under section 8.2 of the Supply Agreement, and thus subject to its provisions. (Kim Decl., ¶ 9 and Exh. A.)

The Proprietary EE/MT Sales Data provided to Interpharm constitute precisely the kind of information that would permit a new competitor to break into the market for this product. (Lapila Decl. ¶¶ 6-11.)  In particular, it provided Interpharm with the knowledge necessary to select the high-volume and repeat customers developed by Breckenridge over the years, and to offer them a price that undercut Breckenridge's established price for the Product.  (Lapila Decl. ¶ 11.)  This is knowledge which otherwise would require considerable time, effort, and resources to develop while building up a market.  (Lapila Decl., ¶ 6.)  With the information provided to Interpharm concerning Breckenridge's net profits, a competitor would know exactly how to price its EE/MT at a level that undercut Breckenridge's pricing to each customer, without having to price its product any lower than necessary to present an attractive price differential.  Taken together, the information provided in these monthly reports reveals all the details of Breckenridge's whole EE/MT program that it has spent over a decade developing, at considerable cost and effort.  (Lapila Decl., ¶¶ 3-7, 13.)

**III.    Breckenridge Has Taken Significant Steps To Protect The Trade Secret Information That It Provided To Interpharm**

Breckenridge has taken steps to limit access and protect the Proprietary EE/MT Sales Data consistent with its high value and its nature as a trade secret.  It is the standard policy of Breckenridge that every new employee must sign a confidentiality agreement that prevents him or her from disclosing any of Breckenridge's proprietary and confidential information not only while they are employed here but also for a period of five years thereafter.  (Kim Decl., ¶ 15.)  Similarly, it is also Breckenridge's strict policy that each and every discussion initiated with other companies concerning development, supply, manufacture, or any other facet of the pharmaceutical business is preceded by a signed confidentiality agreement to preclude the disclosure or misuse of Breckenridge's proprietary and confidential information.  (Kim Decl., ¶ 14.)

In addition, Breckenridge's internal computer network is password-protected, so that only current Breckenridge employees with a valid password may access information contained on Breckenridge's internal computer network.  (Kim Decl., ¶ 16.)  The Proprietary EE/MT Sales Data are not available in such an aggregated form in any one report or set of data even to Breckenridge's employees.  Rather, Mr. Todd Ruonavaara, the controller of Breckenridge, spent considerable time each month compiling these reports from different sources.  (Kim Decl., ¶ 17.)  He then stored this sensitive compilation of data on his own office computer, not on the Breckenridge computer network, so that even current Breckenridge employees with valid passwords could not access this report.  (Kim Decl., ¶ 18.)  The Proprietary EE/MT Sales Data were then made available to only one other individual within Breckenridge (its president), and to the president and controller of Centrix.  (Kim Decl., ¶ 19.)

4

**IV.    The Supply Agreement With Interpharm Was Terminated By Agreement
In March, 2008**

In 2008, a dispute arose among the parties to the Supply Agreement, which was resolved
and settled by the execution of a letter agreement dated March 6, 2008.  (Kim Decl., ¶ and Exh.
13 (the "Letter Agreement").)  The Supply Agreement was terminated in exchange for the
payment of an agreed sum to Interpharm "[i]n full satisfaction of [Breckenridge's ] obligations to
share profits under the Supply Agreement."  (Kim Decl., Exh. C, ¶¶ 1-2.) However, both the
Supply Agreement and the Letter Agreement provide that certain sections of the Supply
Agreement continue in effect, including Section 8.2 concerning "Confidentiality."  (Kim Decl.,
Exh. A, section 10.5, Exh. C, ¶ 1.)

**V.    Interpharm Has Now Begun Using Breckenridge's Trade Secret Information
To Tortiously Interfere With Breckenridge's Relationships With Its Established
Customers**

Following the execution of the Letter Agreement, Interpharm attempted to enter the
EE/MT market for the first time by using the Confidential Information it received by virtue of
the confidentiality provisions of the Supply Agreement.  Interpharm approached Breckenridge's
customers listed in the confidential disclosures and informed them that (1) Interpharm would no
longer be supplying EE/MT to Breckenridge, (2) therefore Breckenridge would no longer be
supplying its customers with EE/MT, and (3) Breckenridge had no more than a 20 day supply of
EE/MT left for sale.  *See* Goldstein Decl., ¶¶ 4-5 and Exh. A; Lyle Decl., ¶¶ 2-3.  In fact, an
Interpharm representative sent written communications to at least one of Breckenridge's
customers, Kinray, Inc., stating:

> Here is a little background of what is happening.  Many customers have
> been buying Interpharm's EEMT product through a third party.
> Interpharm is transitioning these customers to go direct this translates into
> a tremendous cost saving.  This will be a very easy transition at the
> pharmacy level.

5

> On top of this very aggressive offer Interpharm will allow a one time 10%
> buy in on Estrogen and Methyltestosterone .625mg/1.25mg and 1.25mg/
> 2.5mg as a bill back on the first purchase order.

*See* Burns Decl., ¶ 3 and Exh. A.[2]   This statement conveys the false impression to

Breckenridge's customers that, as a result of some agreement, Breckenridge had agreed to

Interpharm "transitioning" these accounts to Interpharm, and/or that the only way that these

customers could continue purchasing the Product was to begin purchasing it directly from

Interpharm as opposed to from Breckenridge.

Further, by advising Breckenridge's customers that the "transitioning" process would

"translate" to "tremendous cost savings," Interpharm concedes that it utilized Breckenridge's

pricing structures to develop its own competitive pricing.  Without having Breckenridge's

confidential pricing structures, no competitor newly entering this market could safely promise

and deliver "tremendous cost savings."

These communications damaged Breckenridge's good will with its customers as they led

them to question whether Breckenridge would be able to continue to meet their needs for the

Product.  (Goldstein Decl., ¶¶ 4-7.)  As a result, instead of focusing on selling the product,

Breckenridge's sales people are focusing on reassuring its customers that EE/MT is and will

continue to be available from Breckenridge.  (Goldstein Decl., ¶¶ 6-7.).  In addition to the time

spent on reassuring its established clients, Breckenridge has been required to lower the price at

which it sells EE/MT to some of its customers, in order to avoid losing these customers for the

Product (Goldstein Decl., ¶¶ 8-9)  Of course, Interpharm was able to precisely develop and

target such lower prices with the use of the Proprietary EE/MT Sales Data provided by

Breckenridge.  To date, Breckenridge's salespersons are uncertain whether Interpharm is

---

[2]  This document from Interpharm had confidential pricing information redacted before it was faxed from Kinray, Inc. to Breckenridge.

continuing these false representations, whether customers have viewed Breckenridge negatively

as a result, whether Breckenridge will be compelled to further reduce pricing, and, worst,

whether Breckenridge may lost customers to Interpharm.

## VI. Interpharm Is Insolvent And Is Unlikely To Be Able To Satisfy A Money Judgment Against It In Favor Of Breckenridge

On February 5, 2008, Interpharm filed an 8-K with the SEC (Kim Decl., Exh. E) detailing

its entry into a Forbearance Agreement with Wells Fargo Bank, National Association ("Wells

Fargo") on February 5, 2008 (the "Forbearance Agreement") (Kim Decl., Exh. F).  According to

the February 5, 2008 8-K, Wells Fargo provided additional credit to Interpharm and agreed to

forbear from exercising its rights and remedies relating to prior defaults by Interpharm under a

Credit Agreement and related loan documents.  (Kim Decl., Exh. E.)  As Interpharm has been in

default under the Wells Fargo Credit Agreement since June 30, 2007, it entered into an Initial

Forbearance Agreement with Wells Fargo on October 26, 2007  (Interpharm Form 8-K, dated

11/7/07 ((Kim Decl., Exh. G); Interpharm 8-K, February 5, 2008 (Kim Decl., Exh. E)).  Prior to

the execution of the Forbearance Agreement, it was also necessary for Interpharm to execute an

"Interim Forbearance Agreement" with Wells Fargo on February 1, 2008, to satisfy its

"immediate cash needs."  (Interpharm 8-K, February 5, 2008 (Kim Decl., Exh. E).)

Pursuant to the Forbearance Agreement, Interpharm acknowledged its continuing loan

defaults and Wells Fargo agreed to forbear from exercising its rights against Interpharm until

June 30, 2008, provided that there was no new default by Interpharm.  (Kim Decl., Exh. F, p. 9, ¶

6.)  To reach this new agreement with Wells Fargo, Interpharm was required to submit rolling

budgets, engage a chief restructuring officer, grant an equity line of credit mortgage to secure a

new equity line and grant a collateral mortgage to secure $7,000,000.00 of debt due under the

Credit Agreement which was converted to a term obligation.  (*Id.*, pp. 1-2.)

On March 25, 2008, Interpharm filed an 8-K with the SEC detailing its entry into an Amended and Restated Forbearance Agreement of the same date (the "Amended Forbearance Agreement") (Kim Decl., Exh. H).  According to the Amended Forbearance Agreement, Interpharm is indebted to Wells Fargo in the amount of at least $30,928,858.02, plus interest and additional costs, including but not limited to legal fees, expenses, disbursements and additional advances made by Wells Fargo (the Indebtedness").  (Interpharm 8-K, March 25, 2008 (Kim Decl., Exh. I).)  The Indebtedness is secured by a "a first priority security interest in and to all of [Interpharm's] assets," as well as first, second and collateral mortgages on its real property. (Kim Decl., Exh. H, pp. 1-2.)

Wells Fargo has agreed to continue its forbearance through June 30, 2008.   The Amended Forbearance Agreement provides that an event of default shall include the failure of Interpharm to send Wells Fargo "a letter of intent to purchase substantially all of the assets of [Interpharm] for an amount in excess of the outstanding balance of the Obligations owing to Wells Fargo" or a proposal letter by a third party to refinance the outstanding balance by March 31, 2008.  (Kim Decl., Exh. H, pp. 18-19.)  Interpharm is also in default if it has not received a commitment to purchase or refinance substantially all of its assets by April 30, 2008, and sold or refinanced the same by June 30, 2008.  (*Id.*, p. 19.)

Just under three months ago, Interpharm was already lacking the cash flow necessary to run its business.  Now, as set forth in Interpharm's April 16, 2008 8-K,  the American Stock Exchange ("AMEX") has notified Interpharm that it is not in compliance with listing standards of the AMEX Company Guide due to its sustained losses. (Interpharm 8-K, April 16, 2008 (Kim Decl., Exh. J).)  This April 16 filing also noted that Interpharm's CEO had resigned, thus casting more uncertainty over its stability.

Moreover, in addition to this lawsuit between Breckenridge and Interpharm, Interpharm is currently involved in at least seven prior litigations.  (Kim Decl., Exh. H (Interpharm 8-K, March 25, 2008), Schedule 4(c).)   As these lawsuits are further along than the current proceeding, any recovery in those actions will further limit the recovery, if any, available here.

It is unlikely, therefore, that Breckenridge would be able to recover any portion of a money judgment when Interpharm has already granted Wells Fargo a first priority security interest in all its assets, may have possibly already defaulted on its responsibilities under the Amended Forbearance Agreement, and continues to suffer losses to the extent of losing its CEO and perhaps its AMEX listing.

## ARGUMENT

### I.     The Standard For A Preliminary Injunction

In the Second Circuit, "[t]o obtain a preliminary injunction a party must demonstrate: (1) that it will be irreparably harmed if an injunction is not granted, and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation, and a balance of the hardships tipping decidedly in its favor."  *Bronx Household of Faith v. Board of Education of the City of New York*, 331 F.3d 342, 348-349 (2d Cir. 2003); *see also, e.g., Brenntag Int'l Chemicals, Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999) (same).

### II.    Breckenridge Has Demonstrated That It Will Be Irreparably Harmed In The Absence Of A Preliminary Injunction

"Because a showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction, the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered."  *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990) (citations

and internal quotation marks omitted). The facts set forth above demonstrate the presence of

three separate factors, each of which the courts have found to constitute irreparable injury for the

purposes of preliminary injunctive relief: (1) The loss of Breckenridge's customer good will and

business reputation due to Interpharm's conduct; (2) The misuse by Interpharm of

Breckenridge's trade secret customer and pricing information; and (3) Interpharm's inability to

satisfy a money judgment.

    **A.**    **It Is Well Established That The Loss Of Customer Good Will And Business Reputation That Interpharm Is Now Threatening Constitutes Irreparable Injury To Breckenridge That Warrants A Preliminary Injunction**

Interpharm is undertaking actions that, if allowed to continue, will undermine the

customer good will and the business reputation for reliability that Breckenridge has spent years

establishing. Breckenridge has already invested time, energy and money attempting to counter

Interpharm's false and misleading representations concerning Breckenridge's inability or

unwillingness to continue to supply its customers with EE/MT. Of course, Breckenridge can

only directly address those misrepresentations of which it is made aware, and not every customer

or competitor will make the effort to confirm the truth of what they are told by one of

Breckenridge's former manufacturers.

The injury to Breckenridge here takes two related forms, one of which might be

compensable by money damages (if collectible), but the second of which is not. First,

Breckenridge has already lost profits because it has been forced to reduce the price at which is

sells EE/MT to certain customers in response to Interpharm's offer to sell the Product at a lower

price to these customers. Of course, Interpharm is able to select its price with precision to

undercut Breckenridge's established prices based on its misuse of Breckenridge's trade secrets,

as discussed in the next section.

Second, Breckenridge is suffering harm to its customer good will and business reputation on account of the misrepresentations being spread by Interpharm that Breckenridge is unreliable as a supplier because it is unable or unwilling to continue to supply EE/MT, particularly without any prior notice to customers. A company of Breckenridge's reputation would not permit a serious supply disruption of a product as important as EE/MT and particularly without advance notice to a customer. This type of injury to reputation and good will has been found by the courts to constitute irreparable injury, because harm to the good will and reputation that a company has built up over the years is simply not compensable by money damages. "'Numerous courts have held that harm to a company's operations, reputation, good will or customer relations is irreparable because money damages cannot provide adequate compensation for such injuries.'" *National Elevator Cab & Door Corp. v. H & B, Inc.*, No. 07 CV 1562(ERK)(RML), 2008 WL 207843, at *5 (E.D.N.Y. Jan. 24, 2008) (quoting *Ivy Mar Co. v. C.R. Seasons, Ltd.,* 907 F. Supp. 547, 565 (E.D.N.Y. 1995)). "'By siphoning off plaintiff's carefully gleaned customers, defendants subject plaintiff to a definite possibility of irreparable harm, which increases as long as it continues unrestrained. What is at stake here is plaintiff's good will built up over the years, which is not, contrary to defendant's assertion, monetarily ascertainable.'" *Johnson Controls, Inc. v. A.P.T. Critical Systems, Inc.*, 323 F. Supp. 2d 525, 532 (S.D.N.Y. 2004) (quoting *Velo-Bind, Inc. v. Scheck,* 485 F. Supp. 102, 109 (S.D.N.Y. 1979)). "[T]he Second Circuit has recognized that damage to one's business reputation and loss of customer goodwill can constitute irreparable harm." *Xelus, Inc. v. Servigistics, Inc.*, 371 F. Supp. 2d 387, 390 (W.D.N.Y. 2005) (citations omitted). *See also, e.g., EMI Latin v. Bautista*, No. 03 Civ. 0947(WHP), 2003 WL 470333, at *14 (S.D.N.Y. Feb. 24, 2003) (harm to goodwill and business relationships constitute injuries "incapable of being fully remedied by monetary damages"); *TVT Records v.*

*Island Def Jam Music*, 225 F. Supp. 2d 398, 405 (S.D.N.Y. 2002) ("Beyond losses, the Second

Circuit regards damage to business relationships significant") (citations omitted); *Unisource*

*Worldwide, Inc. v. Valenti*, 196 F. Supp. 2d 269, 280 (E.D.N.Y. 2002) ("the loss of goodwill can

constitute irreparable harm which cannot be compensated by money damages").

By misrepresenting to Breckenridge's customers that Breckenridge is unable or unwilling

to continue supplying EE/MT, Interpharm is undermining the customer good will and the

business reputation for reliability that Breckenridge has spent years establishing.  If this conduct

is not enjoined, it will result in the kind if injury that is widely recognized as irreparable.

**B.     Interpharm's Misappropriation Of Breckenridge's Proprietary EE/MT Sales
        Data For The Purpose Of Luring Away Breckenridge's Customers
        Constitutes Irreparable Injury That Warrants Injunctive Relief**

The Second Circuit has made clear that the misuse of trade secrets by a competitor

constitutes irreparable injury warranting an injunction, and that such trade secrets may include

confidential customer lists and pricing information.  "[I]t it is clear that the loss of trade secrets

cannot be measured in money damages."  *FMC Corp. v. Taiwan Tainan Giant Indus. Co., Ltd.*,

730 F.2d 61, 63 (2d Cir. 1984) (reversing trial court's denial of preliminary injunction against

use of plaintiff's confidential customer list); *see also, e.g., Johnson Controls, Inc. v. A.P.T.*

*Critical Systems, Inc.*, 323 F. Supp. 2d 525, 533 (S.D.N.Y. 2004) ("Indeed, irreparable harm is

presumed where a trade secret has been misappropriated . . . ."); *Inflight Newspapers, Inc. v.*

*Magazines In-Flight, LLC*, 990 F. Supp. 119, 124 (E.D.N.Y. 1997) ("the law is clear in the

Second Circuit that irreparable harm is presumed where a trade secret has been

misappropriated").

Even a customer list itself may be a trade secret where it has been "developed by a

business through substantial effort and kept in confidence . . . provided the information it

contains is not otherwise readily ascertainable." *North Atlantic Instruments, Inc. v. Haber*, 188

F.3d 38, 44 (2d Cir. 1999) (citations and internal quotation marks omitted). However, as

explained above, the trade secrets disclosed by Breckenridge to Interpharm include much more

than just customer names. The Propietary EE/MT Sales Data provided to Interpharm constitutes

a comprehensive and analytical snapshot of Breckenridge's entire EE/MT market, which

included a detailed matrix of the actual quantities of EE/MT sold to each customer, the price at

which it was sold, the rebates or other discounts, Breckenridge's costs and profits, and more.

This is a detailed road map for a competitor that wishes to undermine the EE/MT market that

Breckenridge has spent considerable effort and more than a decade to develop.

As such, this is precisely the kind of information that has been found by the courts to

constitute trade secrets, the use of which by a competitor would constitute irreparable injury:

> It was not the knowledge of the customers' names or their general needs
> that rose to trade secret status. Rather, [the defendant] was aware of every
> facet of [the plaintiff's] contracts with every customer, information that
> included pricing, billing, delivery, product selection, etc. This was not
> publicly accessible information and it represented current [] data. Having
> the exact knowledge of current [] pricing afforded [the defendant] an
> opportunity to underbid and secure the airline contracts.

*Inflight Newspapers, Inc. v. Magazines In-Flight, LLC*, 990 F. Supp. 119, 127-28 (E.D.N.Y.

1997) (citation omitted). "Plaintiffs' cost structures, bidding information, and customer lists are

trade secrets . . . if a competitor knew about the cost structure it could slightly underbid

Plaintiffs." *B.U.S.A. Corp. v. Ecogloves, Inc.*, No. 05 CIV. 9988(SCR), 2006 WL 3302841, at *2

(S.D.N.Y. Jan. 31, 2006). *See also Colonize.Com, Inc. v. Perlow*, No. 03-CV-466, 2003 WL

24256576, at *5 (N.D.N.Y. Oct. 23, 2003) ("In addition to the names of its customers, a typical

confidential list would contain such sales information such as, precise discounts given to

customers, pricing book and data, usage reports and details of ordering and purchase histories")

(citation omitted); *Ikon Office Solutions, Inc. v. Leichtnam*, No. 02-CV-0721E(SC), 2003 WL 251954, at *3 (W.D.N.Y. Jan. 3, 2003) (denying motion to dismiss because "[plaintiff's] pricing would be a likely candidate for trade secret protection," citing *General Elec. Co. v.. Macejka*, 252 A.D.2d 700, 675 N.Y.S.2d 420 (3d Dep't 1998) for the proposition that pricing and profit margins constitute trade secrets); *Ecolab Inc. v. Paolo*, 753 F. Supp. 1100, 1104, 1112 (E.D.N.Y. 1991) ("price discount and product use and preference information" found to constitute trade secrets; "[i]f disclosed, Ecolab's price and individual customer discount information would allow competitors to undercut Ecolab").

Thus, the information contained in the Proprietary EE/MT Sales Data provided to Interpharm, including current data on volume, pricing, discounts, costs, and more, fits precisely into the type of such information found by the courts to constitute trade secrets. Accordingly, it is well established that Interpharm's misappropriation of this information to compete with and undercut Breckenridge is irreparable injury that should be enjoined.

### C. The Likely Inability Of Interpharm To Satisfy A Money Judgment Also Means That Breckenridge's Injury Is Irreparable

It is also well established that where a defendant faces a reasonable likelihood of insolvency during the pendency of a lawsuit, or otherwise is likely to be unable to satisfy a money judgment, this will support a finding of irreparable harm. A plaintiff's injury cannot be compensated by money damages if such damages cannot be collected. "A serious threat of insolvency by a defendant can constitute [the] "substantial chance" of irreparable harm" for purpose of preliminary injunction. *Serio v. Black, Davis & Shue Agency, Inc.*, No. 05 Civ. 15(MHD), 2005 WL 3642217, at *16 (S.D.N.Y. Dec. 30, 2005) (citations omitted). "[W]here the defendant is insolvent, or may become insolvent during the pendency of the litigation, monetary injury is deemed irreparable because the plaintiff may never be able to recover

damages." *Netwolves Corp. v. Sullivan,* Nos. 00 Civ. 8943, 00 Civ. 9628(AGS), 2001 WL 492463, at *11 (S.D.N.Y. May 9, 2001).  *See also Brenntag Int'l. Chemicals, Inc. v. Bank of India*, 175 F.3d 245, 249-50 (2d Cir. 1999)  ("courts have excepted from the general rule regarding monetary injury situations involving obligations owed by insolvents") (citing cases); *Alpha Capital Aktiengesellschaft v. Group Management Corp.*, No. 02 Civ. 2219(LBS), 2002 WL 31681798, at *11 (S.D.N.Y. Nov. 25, 2002) "The Second Circuit has made abundantly clear that irreparable harm is presented in 'monetary injury situations involving obligations owed by insolvents.'" (quoting *Brenntag*, 175 F.3d at 250).

As made clear by *Brenntag*, it is not just insolvency that triggers a finding of irreparable harm.  "[A] perhaps more accurate description of the circumstances that constitute irreparable harm is that where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Brenntag*, 175 F.3d at 249.  Thus, *Brenntag* noted a prior case in which the harm was found not to be irreparable because the plaintiff would have "priority and adequate security" in a bankruptcy proceeding.  *Id.* at 250 (citation omitted).  Here, the opposite is true.  Not only does it appear likely that Interpharm may be insolvent and may have its assets foreclosed upon by Wells Fargo, but Breckenridge would be unlikely to be able to collect a money judgment in any case because Wells Fargo has been granted security interests in all of Interpharm's assets, it is continuing to incur losses, it has just lost its CEO, and there are seven other lawsuits already proceeding against it.  Accordingly, the injury that Breckenridge suffers from Interpharm's actions is likely to be irreparable because money damages will not be recoverable.

**III.**    **Breckenridge Has Demonstrated A Likelihood Of Success On The Merits**

In addition to irreparable injury, to justify a preliminary injunction Breckenridge must demonstrate the likelihood of success on the merits.  It is sufficient for this purpose to demonstrate the likelihood of success on three counts that implicate the irreparable injury discussed above:  Interpharm's harm to Breckenridge's business reputation and customer good will in connection with its tortious interference with Breckenridge's prospective business relations (Count II), its breach of the confidentiality provisions of the Supply Agreement (Count III), and its misappropriation of Breckenridge's trade secret information concerning sales of EE/MT (which itself constitutes irreparable injury) (Count IV).

**A.    Breckenridge Is Likely To Succeed on The Merits of Count II for Tortious Interference With Prospective Business Relations**

"To state a claim for tortious interference with business relations under New York law, four conditions must be met: (i) the plaintiff had business relations with a third party; (ii) the defendants interfered with those business relations; (iii) the defendants acted for a wrongful purpose or used dishonest, unfair, or improper means; and (iv) the defendants' acts injured the relationship." *Scutti Enterprises, LLC, v. Park Place Entertainment Corp*, 322 F.3d 211, 215 (2d Cir. 2003) (quoting *Lombard v. Booz-Allen & Hamilton, Inc.,* 280 F.3d 209, 214 (2d Cir. 2002).

To satisfy the first prong, it is well-established that the plaintiff need only prove "that the defendant tortiously interfered with a 'continuing business or other customary relationship not amounting to a formal contract.'" *Hannex Corp. v. GMI, Inc.*, 140 F.3d 194, 205 (2d Cir. 1998) (citing the Restatement (Second) of Torts sec. 766B cmt. C (1979)) (other citation omitted). Breckenridge had "continuing business" with the third-party purchasers it set forth in its Proprietary EE/MT Sales Data to Interpharm, in that these were regular customers of Breckenridge who were continuing to purchase their EE/MT supply from Breckenridge, as noted

in the data provided to Interpharm on monthly basis through 2007.

The declarations filed herewith demonstrate that Interpharm has interfered with the customary relationship Breckenridge by means of its solicitation of those customers with precisely targeted lower prices. The "dishonest, unfair, or improper means" include misrepresentation. *Scutti, supra*, at 216. Here, Interpharm has been misrepresenting to Breckenridge's customers that Breckenridge would not be able to supply them with EE/MT in the future. Additionally, Interpharm has used the unfair and improper means of breaching its confidentiality obligations under the Supply Agreement and of misusing Breckenridge's trade secrets in order to interfere with Breckenridge's continuing business relationships with its EE/MT customers. Accordingly, Breckenridge has demonstrated a likelihood of success on Count II of its Complaint.

### B. Breckenridge Is Likely To Succeed on The Merits of Count III for Breach of the Confidentiality Provision of the Supply Agreement

"In New York, the elements of a breach of contract claim are (1) the existence of a contract, (2) performance by the party seeking recovery, (3) non-performance by the other party, and (4) damages attributable to the breach." *Musket Corp. v. PDVSA Petroleo, S.A.*, 512 F. Supp. 2d 155, 160 (S.D.N.Y. 2007) (citations and internal quotation marks omitted). As explained above, an earlier dispute concerning the Supply Agreement was resolved by the March 6, 2008, Letter Agreement, which terminated the Supply Agreement. However, among the surviving provisions of the Supply Agreement is section 8.2, concerning confidentiality. (Kim Decl., Exh. A, section 10.5, Exh. C, ¶ 1.) Pursuant to section 8.2, Interpharm was prohibited from using or disclosing confidential information that had been provided to it for any purpose other than to carry out its obligations under the Supply Agreement. However, as detailed above and in the declarations filed herewith, Interpharm has used the Proprietary EE/MT Sales Data

provided to it by Breckenridge in furtherance of its own scheme to take Breckenridge's

customers for itself.  Breckenridge has thus established the likelihood that it will prevail on its

breach of contract claim.

> **C.    Breckenridge Is Likely To Succeed on The Merits of Count IV for Misappropriation Of Trade Secrets**

"To succeed on a claim for the misrepresentation of trade secrets under New York Law, a

party must demonstrate (1) that it possessed a trade secret, and (2) that the defendants used that

trade secret in breach of an agreement, confidential relationship or duty, or as a result of

discovery by improper means." *North Atlantic Instruments, Inc. v. Haber*, 188 F.3d 38, 43-44

(2d Cir. 1999) (citing *Hudson Hotels Corp. v. Choice Hotels Int'l*, 995 F.2d 1173, 1176 (2d Cir.

1993) (citing *Integrated Cash Management Servs. Inc. v. Digital Transactions, Inc.*, 920 F.2d

171, 173 (2d Cir. 1990)).

The courts consider the following factors in determining whether particular information

constitutes a trade secret:

> (1) the extent to which the information is known outside of the business;
> (2) the extent to which it is known by employees and others involved in
> the business; (3) the extent of measures taken by the business to guard the
> secrecy of the information; (4) the value of the information to the business
> and its competitors; (5) the amount of effort or money expended by the
> business in developing the information; (6) the ease or difficulty with
> which the information could be properly acquired or duplicated by others.

*North Atlantic Instruments,* 188 F.3d at 44.  As explained above, (1) this information was

disclosed "outside the business" only under the confidentiality provisions of the Supply

Agreement, and would no longer have been current had the Supply Agreement run its intended

term; (2) this compilation of information is provided to only two individuals at Breckenridge and

two at Centrix; (3) the data is protected by computer passwords, and the compilation is <u>not</u>

accessible through Breckenridge's internal computer network; (4) the Proprietary EE/MT Sales

Data are extremely valuable to the day-to-day business of Breckenridge, and provides an invaluable roadmap to any would-be competitor; and (5-6) Breckenridge has spent over a decade developing the customer relationships, the costs, and the pricing that are all set forth in the Proprietary EE/MT Sales Data.

Accordingly, the Proprietary EE/MT Sales Data constitute a protectable trade secret, and Interpharm has misused this trade secret information in breach of the confidentially provision of the Supply Agreement, and in tortious interference of Breckenridge's business relations. Thus, Breckenridge is likely to prevail on the merits of Count IV for misappropriation of trade secrets.

## <u>CONCLUSION</u>

For all the foregoing reasons, Breckenridge's motion for a preliminary injunction should be granted.

Dated:   New York, New York
       April 18, 2008

                                    __/s/  C. Randolph Ross____
                                    C. Randolph Ross, Esquire (CR 8966)
                                    Kathleen Van De Loo, Esquire (KO 0310)
                                    CROWELL & MORING, LLP
                                    153 East 53rd Street, 31st Floor
                                    New York, New York 10022
                                    Telephone:  (212) 895-4200
                                    Fax:  (212) 223-4134

                                    Attorneys for Plaintiff
                                    Breckenridge Pharmaceutical, Inc.

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BRECKENRIDGE PHARMACEUTICAL, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Civil Action No. 08-cv-03479 |
| | ) |
| INTERPHARM HOLDINGS, INC., and | ) |
| INTERPHARM, INC., | ) |
| | ) |
| Defendant. | ) |

## DECLARATION OF LARRY J. LAPILA IN SUPPORT OF THE MOTION OF BRECKENRIDGE PHARMACEUTICAL, INC. FOR A PRELIMANRY INJUNCTION

LARRY J. LAPILA declares, under penalty of perjury, that the following is true and correct:

1.     I am the Vice President of Business Development for Plaintiff Breckenridge Pharmaceutical, Inc. ("Breckenridge"), where I have been employed since 2001.  I have been engaged in the development, marketing, and sales of pharmaceutical products for more than 25 years, and am familiar with the relevant practices and terminology in the pharmaceutical industry.

2.     In 1997, Breckenridge began supplying the first alternative to the "brand name" version of prescription tablets containing esterified estrogens and methyltestosterone ("EE/MT" or the "Product").

3.     Breckenridge has thus spent more than a decade developing customer good will and establishing its reputation as a reliable source for EE/MT.

4.     This reliability as a provider able to meet its customers needs for this product is an important factor in the pharmaceutical industry in maintaining a company's business

reputation, and thus in building and maintaining customer good will.

5.      I have reviewed the data supplied by Breckenridge to Interpharm Holdings, Inc. and Interpharm, Inc. (collectively, "Interpharm") on a monthly basis pursuant to a temporary profit-sharing agreement. These monthly reports constitute a highly-valuable snapshot of Breckenridge's share of the entire EE/MT market, containing a comprehensive matrix of information regarding the total gross sales, total units, per unit pricing, chargebacks and rebates, total net sales, total profit, and other information related to each and every one of several dozen customers of Breckenridge (the "Proprietary EE/MT Sales Data").

6.      In the pharmaceutical industry, the kinds of information contained in the Proprietary EE/MT Sales Data, particularly the historical units sales volume for each customer, require considerable time, effort, and resources to gather, which is possible only after years of developing and nurturing customer relationships.

7.      Moreover, such information is not easily obtainable in any other way. Generally, a commercial buyer of pharmaceutical products will not divulge the price at which it is currently purchasing the product, because of a confidentiality agreement or established loyalty with its existing supplier, because such buyers seldom take the time to communicate in detail with new suppliers without a track record, and because any such buyers interested in switching suppliers will want any new supplier to have to bid as low as possible.

8.      Accordingly, a new competitor for supplying pharmaceutical products will usually have to submit a bid without knowing the actual price with which it is competing, and so will propose pricing it believes is lower than existing pricing but not low enough to diminish its profit.

9.      A customer's relationship with an established distributor, and the customer good will built over time by that supplier, also play a factor in a buyer's decision whether to accept

new lower pricing or to retain its existing distributor with whom it has an existing relationship.

10.     Moreover, with literally hundreds of prospective buyers in the alternative pharmaceutical market, it is practically and administratively difficult to solicit and market each and every buyer.

11.     Thus, Breckenridge's Proprietary EE/MT Sales Data are highly valuable because they constitute the exact type of information necessary for a competitor to enter the market with a competitive advantage.  They are very recent data, and they provide Interpharm with the knowledge necessary to select and pinpoint the ideal customer: high-volume customers, repeat customers, higher-paying customers, customers with minimal rebate and chargeback amounts -- or any strategic combination thereof.   In other words, the Proprietary EE/MT Sales Data provides a clear roadmap to market high-value business.

12.     Moreover, since Breckenridge provided these Proprietary EE/MT Sales Data for a year, Interpharm can also evaluate the historical trends for Breckenridge customers, *i.e.*, whether a certain customer has increased its annual volume, maintained its pricing, rebate, or chargeback levels.

13.     This information involving several dozen customers took years of relationships to develop, and would confer great commercial advantage to any new competitor entering into the EE/MT market, such as Interpharm here.

I declare under penalty of perjury, that the foregoing is true and correct.

Executed on April 18, 2008.

Larry J. Lapila
Vice President
Business Development

3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BRECKENRIDGE PHARMACEUTICAL, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 08-cv-03479 |
| ) | |
| INTERPHARM HOLDINGS, INC., and ) | |
| INTERPHARM, INC., ) | |
| ) | |
| Defendant. ) | |

### DECLARATION OF JOAN LYLE IN SUPPORT OF THE MOTION OF
### BRECKENRIDGE PHARMACEUTICAL, INC. FOR A PRELIMINARY INJUNCTION

Joan Lyle declares, under penalty of perjury, that the following is true and correct:

1.      I am the Director of National Accounts for Breckenridge Pharmaceutical, Inc. ("Breckenridge").

2.      On Friday, April 11, 2008, I received a telephone call from Mr. David Lewis, a salesman for Prasco Laboratories, a direct competitor of Breckenridge which markets (as does Breckenridge) prescription tablets that combine esterified estrogens and methyltestosterone ("EE/MT").

3.      Mr. Lewis informed me that he had heard from common customers of Breckenridge and Prasco that Breckenridge was no longer going to be selling EE/MT.

4.      As a friendly gesture, Mr. Lewis said he wanted to confirm this rumor with me first before soliciting our customers.

5.      I thanked Mr. Lewis, and assured him that this was not true, and that Breckenridge would in fact continue to be supplying EE/MT to its customers.

6.     Unfortunately, it has been my experience that not everyone in this industry is as honest and careful as Mr. Lewis, and that as long as anyone is spreading the false rumor that Breckenridge will be getting out of the EE/MT market, others will accept this as true or pass this information along without checking with us to confirm its accuracy.

I declare under penalty of perjury, that the foregoing is true and correct.

Executed on April 18, 2008.

_____
Joan Lyle

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| BRECKENRIDGE PHARMACEUTICAL, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 08-cv-03479 |
| | ) | |
| INTERPHARM HOLDINGS, INC., and | ) | |
| INTERPHARM, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**DECLARATION OF EUGENE L. KIM, ESQUIRE IN SUPPORT OF THE MOTION OF
BRECKENRIDGE PHARMACEUTICAL, INC. FOR A PRELIMINARY INJUNCTION**

Eugene L. Kim declares, under penalty of perjury, that the following is true and correct:

1.     I am the General Counsel for Plaintiff Breckenridge Pharmaceutical, Inc.
("Breckenridge"), and am in charge of all legal functions for the company.

**Background**

2.     Breckenridge develops prescription pharmaceutical products that are lower-cost
alternatives to "brand name" products, which it markets to more than one hundred different retail
chains, wholesalers, and distributors nationwide.

3.     In 1997, Breckenridge began supplying the first such alternative to the "brand
name" version of prescription tablets containing esterified estrogens and methyltestosterone
("EE/MT" or the "Product").

4.     Breckenridge has thus spent more than a decade developing customer good will
and establishing its reputation as a reliable source for EE/MT.

5.     This reliability as a provider able to meet its customers' needs for this product is

an important factor in maintaining Breckenridge's business reputation, and thus in building and maintaining customer good will.

**The Agreements with Interpharm**

6.    In May 2005, Breckenridge's affiliate, Centrix Pharmaceuticals, Inc. ("Centrix") entered into a manufacture and supply agreement with Interpharm Holdings, Inc. and Interpharm, Inc. (collectively, "Interpharm") for prescription tablets containing esterified estrogens and methyltestosterone ("EE/MT" or the "Product") (the "Supply Agreement," pertinent portion of which are attached as Exhibit A).

7.    The Assumption Agreement, by which Breckenridge concurrently became a party to the Supply Agreement, is attached as Exhibit B.

8.    In sum, Interpharm agreed to supply EE/MT to both Breckenridge and Centrix. Intending to maintain a long-term supply relationship, the parties agreed to a 10-year term for the Supply Agreement, with automatically renewing 5-year terms thereafter.  Thus, Breckenridge had intended to invest considerable time and effort in maintaining a long-term relationship with Interpharm.

9.    As in all the commercial dealings in which Breckenridge becomes involved, the Supply Agreement contained a confidentiality provision.  (Exh. A, section 8.2.)

10.    In October 2006, the parties agreed to a temporary amendment to the Supply Agreement, effective for only one year (the "Amendment").  Under this amendment, Breckenridge, Centrix, and Interpharm agreed to share profits from the sale of the Product.  After the one-year term, the original payment terms in the Supply Agreement would become effective again.

11.    Pursuant to the Amendment, in order for Interpharm to confirm its share of profit

2

from the sales of EE/MT, Breckenridge supplied to Interpharm "EEMT Net Per Unit Analysis" calculations for each month from January 2007 until December 2007 ("Proprietary EE/MT Sales Data"). These monthly reports constitute a highly valuable, succinct, and extremely comprehensive summary of Breckenridge's share of the entire EE/MT market, detailing our total gross sales, total units, per unit pricing, chargebacks and rebates, total net sales, total profit, and other information related to each and every one of several dozen EE/MT customers of Breckenridge. A copy of this report, with the actual data redacted, is attached as Exhibit D.

12.     The information contained in the Proprietary EE/MT Sales Data required considerable time, effort, and resources to create, and was the result of years of reliable and consistent supply of EE/MT and building up customer good will. This compilation of information confers great commercial advantage to any company wishing to sell EE/MT, especially a new competitor trying to enter the market, such as Interpharm.

13.     Subsequently, a dispute arose among the parties to the Supply Agreement, which was resolved and settled by the execution of a letter agreement dated March 6, 2008. (The "Letter Agreement," attached as Exhibit C.). The Letter Agreement specifically provided that the certain sections of the Supply Agreement survived, which include the confidentiality provision.

### The Protection Of Breckenridge's Trade Secrets

14.     To begin with, Breckenridge maintains a strict policy that each and every discussion we initiate with other companies concerning development, supply, manufacture, or any other facet of the pharmaceutical business is preceded by a signed confidentiality agreement to preclude the disclosure or misuse of Breckenridge's proprietary and confidential information. As General Counsel, I personally ensure that this is done for every such occasion.

3

15.    Breckenridge similarly maintains a strict policy that every employee must sign a confidentiality agreement that prevents him or her from disclosing any of Breckenridge's proprietary and confidential information not only while they are employed here but also for a period of several years thereafter.

16.    In addition, Breckenridge's internal computer network is password-protected, so that only current Breckenridge employees with a valid password may access information contained on Breckenridge's internal computer network, as well as their individual workstations.

17.    Moreover, the information contained in the Proprietary EE/MT Sales Data is not available in such an aggregated form in any one report or set of data even to Breckenridge's employees. Rather, Mr. Todd Ruonavaara, the controller of Breckenridge, spent considerable time and effort each month compiling these reports from different sources.

18.    Mr. Ruonavaara then stored this sensitive compilation of data on his own office computer, not on the Breckenridge computer network, so that even current Breckenridge employees with valid passwords could not access this report.

19.    The Proprietary EE/MT Sales Data are then made available to only one other individual within Breckenridge (its president), and to the president and controller of Centrix.

20.    In addition, because the Supply Agreement was to last at least ten years, Breckenridge provided the Proprietary EE/MT Sales Data to Interpharm for one year in 2007 with the understanding that Interpharm would not possess such sensitive data that was current when the agreement expired. Breckenridge did not anticipate that Interpharm would misuse this sensitive information in breach of the confidentiality provision, and certainly not beginning in March 2008.

**Interpharm's Financial Instability**

21.    Because Breckenridge has been engaged in commercial dealings with Interpharm, I have monitored the reports filed by Interpharm with the Securities and Exchange Commission (the "SEC").

22.    On February 5, 2008, Interpharm filed an 8-K with the SEC detailing its entry into a Forbearance Agreement with Wells Fargo Bank, National Association ("Wells Fargo") on February 5, 2008 (the "Forbearance Agreement"). These are attached as Exhibits E and F.

23.    As Interpharm has been in default under the Wells Fargo Credit Agreement since June 30, 2007, it entered into an Initial Forbearance Agreement with Wells Fargo on October 26, 2007 (attached as Exhibit G).

24.    Pursuant to the Forbearance Agreement, Interpharm acknowledged its continuing loan defaults and Wells Fargo agreed to forbear from exercising its rights against Interpharm until June 30, 2008, provided that there was no new default by Interpharm. (Exh. F, p. 9, ¶ 6.) To reach this new agreement with Wells Fargo, Interpharm was required to submit rolling budgets, engage a chief restructuring officer, grant an equity line of credit mortgage to secure a new equity line and grant a collateral mortgage to secure $7,000,000.00 of debt due under the Credit Agreement which was converted to a term obligation. (*Id.*, pp. 1-2.)

25.    On March 25, 2008, Interpharm filed an 8-K with the SEC detailing its entry into an Amended and Restated Forbearance Agreement of the same date (the "Amended Forbearance Agreement" is attached as Exhibit H, the March 25 8-K as Exhibit I). According to the Amended Forbearance Agreement, Interpharm is indebted to Wells Fargo in the amount of at least $30,928,858.02, plus interest and additional costs, including but not limited to legal fees, expenses, disbursements and additional advances made by Wells Fargo (the "Indebtedness").

The Indebtedness is secured by a "a first priority security interest in and to all of [Interpharm's] assets," as well as first, second and collateral mortgages on its real property.

26.     The Amended Forbearance Agreement provides that an event of default shall include the failure of Interpharm to send Wells Fargo "a letter of intent to purchase substantially all of the assets of [Interpharm] for an amount in excess of the outstanding balance of the Obligations owing to Wells Fargo" or a proposal letter by a third party to refinance the outstanding balance by March 31, 2008. (Exh. H, pp. 18-19.) Interpharm is also in default if it has not received a commitment to purchase or refinance substantially all of its assets by April 20, 2008, and sold or refinanced the same by June 30, 2008. (*Id.*, p. 19.)

27.     Just under three months ago, Interpharm was already lacking the cash flow necessary to run its business. As set forth in an 8-K filed on Interpharm's April 16, 2008, the American Stock Exchange ("AMEX") has notified Interpharm that it is not in compliance with listing standards of the AMEX Company Guide due to its sustained losses (attached as Exhibit J).

28.     This April 16 filing also noted that Interpharm's CEO had resigned, thus casting more uncertainty over Interpharm's stability.

29.     For these reasons, Breckenridge has a reasonable concern that Interpharm would not be able to satisfy a damages judgment in favor of Breckenridge.

I declare under penalty of perjury, that the foregoing is true and correct. Executed on April 18, 2008.

Eugene I. Kim

# EXHIBIT A

## SUPPLY AGREEMENT

THIS SUPPLY AGREEMENT ("Supply Agreement") made as of the Commencement Date (as defined below) between CENTRIX PHARMACEUTICAL, INC., an Alabama corporation having its principal place of business at 31 Inverness Center Parkway, Suite 270, Birmingham, Alabama 35242 ("CENTRIX") and INTERPHARM HOLDINGS, INC., a Delaware corporation having its principal place of business at 69 Mall Drive, Commack, New York 11725 ("INTERPHARM").

### RECITALS

A. WHEREAS, INTERPHARM is engaged in the business of developing, manufacturing, packaging and selling pharmaceutical products.

B. WHEREAS, CENTRIX is engaged in the business of developing, selling and marketing certain prescription and non-prescription pharmaceutical products.

C. WHEREAS, CENTRIX desires to retain the services of INTERPHARM to develop, manufacture, package and supply certain products as more fully set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants set forth herein, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, each intending to be legally bound, hereby agree as follows:

### ARTICLE 1 - DEFINITIONS

1.1    **After Year 1.** "After Year 1" shall mean each twelve (12) month period of the Purchase Term following Year 1.

1.2    **Approved Labeling.** "Approved Labeling" shall include all of the following : (i) the Product label to be affixed to the bottle; (ii) the Product package insert (the "Insert"); and (iii) the Product patient-information leaflet, in the form attached as Exhibit E.

1.3    **Bright Stock.** "Bright Stock" shall mean bottles of Product packaged without an external label that are *not* for commercial sale or distribution and require further processing. Bright Stock shall be shipped only to a CENTRIX facility for final processing which shall include, *inter alia*, affixing the Approved Labeling to the Bright Stock, except for the Insert, which shall be the responsibility of Interpharm. No sample tablets will be shipped Bright Stock.

1.4    **CENTRIX Trade Dress.**    "CENTRIX Trade Dress" shall mean CENTRIX's trade dress and Approved Labeling for the Product set forth in Exhibit C(2).

1.5    **Commencement Date.**    "Commencement Date" shall mean the date of the first shipment of Product by INTERPHARM.

1.6    **Commercially Reasonable.** Commercially Reasonable shall mean a Party's reasonable efforts and diligence in accordance with its normal business, economic, legal, medical and scientific judgment, taking into account the competitiveness of the marketplace, the proprietary position of a Product, other products it produces, the regulatory structure involved, the profitability of a Product, and other relevant factors including, without limitation, technical, legal, scientific, medical, economic or other related factors.

1.7    **Confidential Information.** "Confidential Information" shall mean with respect to a Party, all information of any kind whatsoever (including without limitation, data, Data (as defined in Section 2.1, compilations, formulae, models, patent disclosures, procedures, processes, projections, protocols, results of experimentation and testing, specifications, strategies and techniques), and all tangible and intangible embodiments thereof of any kind whatsoever (including without limitation, apparatus, compositions, documents, drawings, machinery, patent applications, records and reports), which is disclosed by such Party to the other Party and is marked, identified as or otherwise acknowledged to be confidential at the time of disclosure to the other Party. Notwithstanding the foregoing, Confidential Information of a party shall not include information which the other Party can establish by written documentation (a) to have been publicly known prior to disclosure of such information by the disclosing Party to the other Party, (b) to have become publicly known, without fault on the part of the other Party, subsequent to disclosure of such information by the disclosing party to the other party, (c) to have been received by the other Party at any time from a source, other than the disclosing Party, rightfully having possession of and the right to disclose such information, (d) to have been otherwise known by the other Party prior to disclosure of such information by the disclosing party to the other Party, or (e) to have been independently developed by employees or agents of the other party without the use of such information disclosed by the disclosing party to the other Party.

1.8    **The FDA.** The "FDA" shall mean the United States Food and Drug Administration, or any successor entity thereto.

1.9    **Firm Commitment.** "Firm Commitment" shall mean the total number of tablets of the Product, regardless of trade dress or configuration, that CENTRIX has committed to purchase from INTERPHARM in any one year period under this Supply Agreement, as set under the heading Firm Commitment in Exhibit A. All tablets must be ordered in increments of one hundred (100), and all tablets of Product ordered in any Year shall be deemed to be part of the Firm Commitment until the full amount of the Firm Commitment is satisfied.

1.10    **Forecast.** "Forecast" shall mean a rolling twelve (12) month forecast of CENTRIX's orders for the Product from INTERPHARM.

1.11    **Hidden Defect.** "Hidden Defect" shall mean any instance where a lot of a Product fails to conform to the applicable specifications or is otherwise defective or fails to conform to the warranties given by INTERPHARM herein, and such failure would not be

other rights pursuant to this Supply Agreement.

**7.3**    **EFFECT OF TERMINATION.**    In the event that either Party has the right to terminate this Supply Agreement (the "Terminating Party"), this Supply Agreement shall automatically terminate, unless such Party notifies the other Party that it does not wish for the Supply Agreement to terminate, and the Terminating Party shall have the rights set forth in this Supply Agreement, as well as such other rights as to which it is entitled under applicable law. In the event of a termination of this Supply Agreement, CENTRIX may not utilize, or allow another party to utilize, directly or indirectly, in any way, the Data, in order to develop the Product or make sales of the Product in the Territory or Outside Sales, or for any other purpose. In the interest of clarity, in the event this Supply Agreement is terminated, any party supplying CENTRIX with Product may not utilize the Data in any way.

**7.4**    **WAIVER.**    Failure to terminate this Supply Agreement following a breach or failure to comply with the terms and conditions of this Supply Agreement shall not be deemed a waiver of the non- breaching Party's defenses, rights or causes of action arising from such or any future breach or noncompliance.

**7.5**    **CHANGE IN CIRCUMSTANCE.**    In the event that (i) generic versions of the Product are introduced into the market; and/or (ii) there are significant regulatory changes which affect the manufacture, distribution, sale, and marketing of the Product, the Parties agree to discuss such changed circumstances, but have no obligation to vary the terms of this Supply Agreement.

## ARTICLE 8 – CONFIDENTIALITY; NON ASSIGNABILITY

**8.1**    **Non-Assignability.**    This Supply Agreement and the rights of the Parties hereunder shall not be assignable nor shall the obligations of either Party be delegable, without the prior written consent of the other Party, which consent shall not be unreasonably withheld, provided that either Party may assign its rights or delegate its duties under this Supply Agreement without obtaining such consent, to any affiliate or to a successor in interest to the assigning Party's business (whether by sale of assets, stock, merger, or otherwise). In the event either Party seeks and obtains the other party's consent to assign or delegate its rights or obligations to another Party, or in the event of an assignment or delegation to an Affiliate, or to a successor in interest, the assigning party shall remain liable for its obligations hereunder.

**8.2**    **Confidentiality.**    Except for literature and information intended for disclosure to customers, and except as may be required to obtain government approval to manufacture, sell or use a Product, or as may be required under applicable federal securities laws, each Party will treat as confidential the Confidential Information, and will take all necessary precautions to assure the confidentiality of such information. Each Party agrees to return to the other Party upon the expiration of the Purchase Term or termination of this Supply Agreement all Confidential Information acquired from such other party, except as to such



information it may be required to retain under applicable law or regulation, and except for one copy of such information to be retained by such party's legal department or outside counsel. Notwithstanding the foregoing, all Data shall be shall be returned by CENTRIX to INTERPHARM upon termination of this Supply Agreement. Neither Party shall, during the period of this Supply Agreement or for five (5) years thereafter, without the other Party's express prior written consent use or disclose any such Confidential Information for any purpose other than to carry out its obligations hereunder. Each Party, prior to disclosure of such Confidential Information to any employee, consultant or advisor shall ensure that such person is bound in writing to observe the confidentiality provisions of this Supply Agreement. The obligations of confidentiality shall not apply to information that the receiving party is required by law or regulation to disclose, provided however that the receiving party shall so notify the disclosing party of its intent and cooperate with the disclosing party on reasonable measures to protect the confidentiality of the information.

8.3    **Public Disclosure.**   Except for such disclosure as is deemed necessary, in the reasonable judgment of a Party, to comply with applicable laws, no announcement, news release, public statement, publication, or presentation relating to the existence of this Supply Agreement, the subject matter hereof, or either Party's performance hereunder will be made without the other Party's prior written approval, which approval shall not be unreasonably withheld.   The Parties agree that they will use reasonable efforts to coordinate with respect to a joint press release relating to the existence of this Supply Agreement, as well as the Form 8-K to be filed by INTERPHARM relating to the same; provided, that with respect to such press release and the Form 8-K, INTERPHARM may make any statements deemed by its counsel to be necessary under applicable law.

## ARTICLE 9 - FORCE MAJEURE

9.1    **Force Majeure.**   No failure or omission by the parties in the performance of any obligation according to this Supply Agreement shall be deemed a breach of this Supply Agreement or create any liability if the same shall arise from any cause or causes beyond the control of the party, including, but not limited to, strikes, riots, war, acts of God, invasion, fire, explosion, floods, delay of carrier, shortage or failure in the supply of materials, energy shortage and acts of government or governmental agencies or instrumentalities.

9.2    **Obligations of the Parties in case of Force Majeure.**   In the event that due to force majeure either party hereto shall be delayed or hindered in or prevented from the performance of its duties or doing acts required under the terms of this Supply Agreement, the performance of such act, except for the obligation to pay amounts due under this Supply Agreement, shall be excused for the period of the delay. Notwithstanding the aforementioned, the party subject to force majeure shall take all reasonable steps to resolve the condition(s) forming the basis of force majeure.

## ARTICLE 10 - MISCELLANEOUS

10.1 **Governing Law.** This Supply Agreement, and its enforcement, shall be governed by, and construed in accordance with, the laws of the State of New York (without regard for conflict rules thereof) and the United States.

10.2 **Severability.** Should any section, or portion, of this Supply Agreement be held invalid by reason of any law, statute or regulation existing now or in the future in any jurisdiction by any court of competent authority or by legally enforceable directive of any governmental body, then such section or portion thereof shall be validly reformed so as to approximate the intent of the parties as nearly as possible and, if unreformable, shall be deemed divisible and deleted with respect to such jurisdiction; this Supply Agreement shall not otherwise be affected.

10.3 **Waiver.** The rights and remedies of the parties to this Supply Agreement are cumulative and not alternative. Neither the failure nor any delay by any party in exercising any right, power or privilege under this Supply Agreement will operate as a waiver of any such right, power or privilege, and no single or partial exercise of any such right, power or privilege will preclude any other or further exercise of such right, power or privilege or the exercise of any other right, power or privilege.

10.4 **Notices.** All notices hereunder shall be deemed to have been delivered if by certified mail, return receipt requested, or if sent by facsimile, as follows.

If to INTERPHARM:

Name: Bob Sutaria
Title: President
75 Adams Avenue
Hauppauge, New York 11788

If to CENTRIX PHARMACEUTICAL, INC.:
Bob Booth
President
31 Inverness Center Parkway, Suite 270
Birmingham, Alabama 35242

10.5 **Survival.** The provisions of Article 4, Article 6 and Article 8 of this Supply Agreement shall survive the termination of this Supply Agreement.

10.6 **Counterparts.** This Supply Agreement may be executed in two or more counterparts, each of which will be deemed to be an original of this Supply Agreement and all of which, when taken together, shall be deemed to constitute one and the same agreement. Any party to this Supply Agreement may deliver an executed copy hereof by facsimile transmission to another party hereto and any such delivery shall have the same force and effect as any other delivery of a manually signed copy of this Supply Agreement.



# EXHIBIT B

## ASSUMPTION AGREEMENT

THIS ASSUMPTION AGREEMENT ("Agreement") made as of the Commencement Date (as defined in the Supply Agreement which is defined in Recital A below) by and among CENTRIX PHARMACEUTICAL, INC., an Alabama corporation having its principal place of business at 31 Inverness Center Parkway, Suite 270, Birmingham, Alabama 35242 ("CENTRIX"), BRECKENRIDGE PHARMACEUTICAL, INC., a Florida corporation having its principal place of business at 1141 S. Rogers Circle, Suite 3, Boca Raton, Florida 33487 ("BRECKENRIDGE") and INTERPHARM HOLDINGS, INC., a Delaware corporation having its principal place of business at 69 Mall Drive, Commack, New York 11725 ("INTERPHARM").

### RECITALS

A.  WHEREAS, INTERPHARM and CENTRIX have entered into a supply agreement dated as of the Commencement Date (the "Supply Agreement") for the purchase, sale and supply of the Product (as defined in the Supply Agreement);

B.  WHEREAS, CENTRIX and BRECKENRIDGE acknowledge that as a condition of INTERPHARM entering into the Supply Agreement, BRECKENRIDGE shall be jointly and severally liable with CENTRIX with respect to each of the obligations of CENTRIX under the Supply Agreement.

C.  WHEREAS, BRECKENRIDGE, upon and subject to the specific conditions described below, may receive the benefits negotiated by CENTRIX in the Supply Agreement.

NOW, THEREFORE, in consideration of the mutual covenants set forth herein, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, each intending to be legally bound, hereby agree as follows:

1.1  **Assumption.** BRECKENRIDGE hereby agrees that it shall, from the date of this agreement, be jointly and severally liable with CENTRIX for each and every obligation and liability of CENTRIX under the Supply Agreement as if it were a party to the Supply Agreement along with CENTRIX. Each of CENTRIX and INTERPHARM hereby consents to the assumption of liability and obligations by BRECKENRIDGE in the previous sentence.

1.2  **Default; Notice.** In the event of any default by CENTRIX under the Supply Agreement, INTERPHARM hereby agrees that it will provide any notice to BRECKENRIDGE that it is required to provide to CENTRIX and that it will not take any action against BRECKENRIDGE hereunder unless and until any applicable cure period under the Supply Agreement has expired. If BRECKENRIDGE cures a CENTRIX default within the applicable cure period under the Supply Agreement, it shall become entitled to receive the benefits to which CENTRIX would have been entitled under the Supply Agreement.



1.3   **Acknowledgement**.  CENTRIX and BRECKENRIDGE hereby acknowledge that this agreement is a material inducement for INTERPHARM to enter into the Supply Agreement, and that Interpharm would not have entered into the Supply Agreement without this Agreement.

1.4   **Miscellaneous**.        This Agreement, and its enforcement, shall be governed by, and construed in accordance with, the laws of the State of New York (without regard for conflict rules thereof) and the United States.  This agreement may be executed in two or more counterparts, each of which will be deemed to be an original of this agreement and all of which, when taken together, shall be deemed to constitute one and the same agreement.  Any party to this Agreement may deliver an executed copy hereof by facsimile transmission to another party hereto and any such delivery shall have the same force and effect as any other delivery of a manually signed copy of this Agreement.  It is understood and agreed by the Parties that each represents and warrants to the other that the individual signing this Agreement on behalf of the Party is their duly authorized representative and that such individual's signature binds the Party represented to the terms of this Agreement.  The terms and provisions contained in this Agreement, and the Supply Agreement, constitute the entire agreement between the parties and shall supersede all previous communications, representations, agreements or understandings, either oral or written, between the parties with respect to the subject matter hereof, with the exception of any confidentiality or nondisclosure agreements which may be executed prior or subsequent to execution of this Agreement.  No agreement or understanding varying or extending this Agreement shall be binding upon either party hereto, unless set forth in a writing which specifically refers to this Agreement, signed by duly authorized officers or represent representatives of the respective parties, and the provisions hereof not specifically amended thereby shall remain in full force and effect.

1.5   **Confidentiality.**   For a period of ten (10) years after termination of the Supply Agreement for any reason, the existence and terms of this Agreement shall remain confidential and shall not be disclosed to any third party, other than CENTRIX, without the express written consent of both parties; provided, however, the foregoing obligations of confidentiality shall not apply to information that is required by law or regulation to be disclosed.  In the event such disclosure is necessary, the disclosing party shall so notify the other party of its intent and cooperate with such party on reasonable measures to protect the confidentiality of the information.



IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized officers on the day and year first set forth above.

**INTERPHARM, INC.**

By: _____

Name: Bob Sutaria

Title: President

**CENTRIX PHARMACEUTICAL, INC.**

By: _____

Name:    Bob Booth

Title:    President

**BRECKENRIDGE PHARMACEUTICAL, INC.**

By: _____

Name: Laurence D. Runsdorf

Title:  President



EXHIBIT C



**Innovative Generics**

<u>VIA UPS and E-mail</u>

March 6, 2008

Mr. Laurence D. Runsdorf
President
Breckenridge Pharmaceutical, Inc.
1141 S. Rogers Circle, Suite 3
Boca Raton, FL 33487

Mr. Bob Booth
President & CEO
Centrix Pharmaceutical, Inc.
31 Inverness center parkway, Suite 270
Birmingham, Alabama 35242

Re: Termination of the EE/MT Supply Agreement

Gentlemen:

This letter agreement ("Agreement") memorializes the undersigned parties' discussions and concurrence regarding termination of the EE/MT Supply Agreement ("Supply Agreement"). Intending to be legally bound, Interpharm, Centrix and Breckenridge (collectively the "Parties") acknowledge and agree as follows:

1. <u>Termination.</u> Subject to Interpharm's receipt of the Payment in term 2 below, the Supply Agreement shall be of no further force or effect with the exception of the following sections of the Supply Agreement: 3.2, 3.4, 3.7, 5.2 and those sections enumerated in Section 10.5 <u>Survival.</u>

2. <u>Payment.</u> In full satisfaction of its obligation to share profits under the Supply Agreement, including any amendments thereto, Centrix and/or Breckenridge shall immediately pay Interpharm the sum of _____ _____ hundred dollars) ("Payment").

3. <u>Continuing Supply.</u> Notwithstanding the termination of the Supply Agreement, Interpharm shall supply a maximum of _____ bottles of EE/MT products under the terms provided in the attached purchase orders and in the following manner: a maximum of _____ bottles ( _____ bottles of each strength of the EE/MT Products in Breckenridge labeling and Interpharm trade dress) to be supplied (i) the first _____ bottles by March 31, 2008 and (ii) the second _____ bottles pursuant to Breckenridge purchase orders appended hereto. This Agreement shall not be construed in any way to limit Interpharm's sales and marketing activities of EE/MT Products to customers other than Centrix and/or Breckenridge.



**Innovative Generics**

4. **Mutual Release.** For the consideration referenced herein, this Agreement hereby resolves, settles, and waives all controversies, claims, causes of action of any kind or nature, damages and demands, known or unknown, existing or potentially existing between and among the Parties at or prior to the date of this Agreement, relating to the Supply Agreement and any amendments and related agreements thereto.

5. **Amendments.** The terms and provisions set forth in this Agreement shall modify and supersede all inconsistent terms and provisions set forth in the Supply Agreement.

6. **Headings.** The section headings contained in this Agreement are for purposes of convenience only, and shall in no way bear upon the construction or interpretation of this Agreement.

7. **Entire Agreement.** This Agreement contains the entire agreement between Interpharm, Breckenridge and Centrix and shall be binding upon and inure to the benefit of each party. Except as set forth or referenced herein, no other representations, warranties or promises have been made or relied upon by Interpharm, Breckenridge or Centrix in entering into this Agreement.

8. **Modification and Waiver.** This Agreement may not be modified or amended except by an instrument or instruments in writing signed by the parties hereto. No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of any other provisions, whether or not similar. No waiver shall be binding unless executed in writing by the party making the waiver.

9. **Counterparts.** This Agreement may be executed simultaneously in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

10. **Severability.** The provisions of this Agreement are severable, and the invalidity of any provision shall not affect the validity of any other provisions.

11. **Binding Effect.** This Agreement shall be binding upon, and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns.

12. **Governing Law.** This Agreement, its validity, interpretation and performance shall be governed by and construed in accordance with the internal laws of the State of New York without giving effect to the conflict of laws provisions thereof.



Innovative Generics

IN WITNESS WHEREOF, this Agreement has been executed and is effective as of the date first written above.

INTERPHARM HOLDINGS, INC.
INTERPHARM, INC.
(collectively "INTERPHARM")

By: _Cameron Reid_ 

Name: ~~Jeffrey Weiss~~ Cameron Reid

Title: ~~Executive Vice President~~
CEO

CENTRIX PHARMACEUTICAL, INC.
("CENTRIX"")

By: _____

Name:
Bob Booth

Title:
President

BRECKENRIDGE PHARMACEUTICAL, INC.
("BRECKENRIDGE")

By: _____

Name:
Laurence D. Runsdorf

Title:
President



## Purchase Order

**Breckenridge Pharmaceutical, Inc.**

| | | | |
|---|---|---|---|
| Number | 1000 | Date | 2/25/2008 |
| Page | 1 of 1 | | 1169  OP |
| Ordered | 2/25/2008 | Delivery | 3/1/2008 |
| Requested | 3/1/2008 | | |

**Ship From**
Interpharm, Inc.
75 Adams Ave.
Hauppauge NY 11788

**Ship To**
DDN/Obergfel
c/o Breckenridge Pharmaceutical, Inc.
4580 Mendenhall Road
Suite 101
Memphis TN 38141

| Line | Rv | Description | | UM | | Promised | | Extended Price |
|---|---|---|---|---|---|---|---|---|
| 1.000 | 0 | 51991-078-01<br>E.E.M.T. H.S. Tabs 100's<br>EEMT HS 0.625/1.25mg Tabs 100 | | EA | EA | 3/1/2008 | | |
| 2.000 | 0 | 51991-079-01<br>E.E.M.T. D.S. Tabs 100's<br>EEMT D.S. 1.25/2.5mg Tabs 100 | | EA | EA | 3/1/2008 | | 1 |
| 3.000 | 0 | PAYMENT TERMS<br>Payment Terms-see below | 1 | EA | 0.00 EA | 3/1/2008 | | |

Sales Taxable

Total:    .00

C of A, Bill of Lading, Packaging Slip and Copy of this Purchase Order must be sent to:

Payment Terms: 1

This PO cancels all previous POs from Pharmafair and/or Centrix
Label/Insert proofs must be approved by BPI Reg. Dept prior to printing.
Send proofs to:
Please note: labels imprint to be changed to the following:
--- for HS C 020 --- for DS C 019
Please provide quantity that will be in old imprint and when new imprint
will be available.



## Purchase Order

**Breckenridge Pharmaceutical, Inc.**

| Batch | 1000 | Printed | 2/25/2008 |
|---|---|---|---|
| Page | 1 of 1 | PO Number | 1170  OP |
| | 2/25/2008 | Delivery | 3/24/2008 |
| | 3/24/2008 | | |

**Ship From**
Interpharm, Inc.
75 Adams Ave.
Hauppauge NY 11788

**Ship To**
DDN/Obergfel
c/o Breckenridge Pharmaceutical, Inc.
4580 Mendenhall Road
Suite 101
Memphis TN 38141

| Line | Qty | Description | | Unit Price | UM | Promised | Extended Price |
|---|---|---|---|---|---|---|---|
| 1.000 | 0 | 51991-078-01 E.E.M.T. H.S. Tabs 100's EEMT HS 0.625/1.25mg Tabs 100 | EA | | EA | 3/24/2008 | |
| 2.000 | 0 | 51991-079-01 E.E.M.T. D.S. Tabs 100's EEMT D.S. 1.25/2.5mg Tabs 100 | EA | | EA | 3/24/2008 | |
| 3.000 | 0 | TERMS Payment Terms-See below | 1 EA | 0.00 | EA | 3/24/2008 | |

Sales Taxable

.00

Total:

Payment Terms:        Breckenridge000



# Purchase Order

## Breckenridge Pharmaceutical, Inc.

| Batch | 1000 | Printed | 2/25/2008 |
|---|---|---|---|
| Page | 1 of 1 | P.O. Number | 1169  OP |
| Ordered | 2/25/2008 | Delivery | 3/17/2008 |
| Required | 3/17/2008 | | |

**Ship From**
Interpharm, Inc.
75 Adams Ave.
Hauppauge NY 11788

**Ship To**
DDN/Obergfel
c/o Breckenridge Pharmaceutical, Inc.
4580 Mendenhall Road
Suite 101
Memphis TN 38141

| Line | rv | Description | Ordered | UOM | Unit Price | UOM | Required Ordered | Qty | Extended Price |
|---|---|---|---|---|---|---|---|---|---|
| 1.000 | 0 | 51991-076-01 E.E.M.T. H.S. Tabs 100's EEMT H.S.0.625/1.25mg Tabs 100 | | EA | | EA | 3/17/2008 3/31/08 | | |
| 2.000 | 0 | 51991-079-01 E.E.M.T. D.S. Tabs 100's EEMT D.S. 1.25/2.5mg Tabs 100 | | EA | | EA | 3/17/2008 3/31/08 | | |
| 3.000 | 0 | TERMS Payment Terms-see below | 1 | EA | 0.00 | EA | 3/17/2008 | | |

| | Sales Taxable | |
|---|---|---|
| | | .00 |
| **Total:** | | |

C of A, Bill of Lading, Packaging Slip and copy of UPC case codes must be faxed to

Payment Terms:          receipt of goods



# Purchase Order

**Breckenridge Pharmaceutical, Inc.**

| Branch | 1000 | Printed | 2/25/2008 |
|--------|------|---------|-----------|
| Page | 1 of 1 | P.O. Number | 1171  OP |
| Ordered | 2/25/2008 | Delivery | 4/15/2008 |
| Requested | 4/15/2008 | | |

**Ship From**
Interpharm, Inc.
75 Adams Ave.
Hauppauge NY 11788

**Ship To**
DDN/Obergfel
c/o Breckenridge Pharmaceutical, Inc.
4580 Mendenhall Road
Suite 101
Memphis TN 38141

| Line | | Description | | | | | Requested Delivery Date | | Extended Price |
|------|--|-------------|--|--|--|--|--|--|
| 1.000 | 0 | 51991-078-01 E.E.M.T. H.S. Tabs 100's EEMT HS 0.625/1.25mg Tabs 100 | | EA | | EA | 4/15/2008 | |
| 2.000 | 0 | 51991-079-01 E.E.M.T. D.S. Tabs 100's EEMT D.S. 1.25/2.5mg Tabs 100 | | 1 EA | | EA | 4/15/2008 | |
| 3.000 | 0 | TERMS Payment Terms-see below | | 1 EA | 0.00 | EA | 4/15/2008 | |

Sales Taxable

Total:  .00

C of A, Bill of Lading, Packaging Slip and a copy of UPC sticker is required if received.

Payment Terms: 1    Interest of 0.00%

*Delivery date not guaranteed by*
*Breckenridge — To be determined*



# Purchase Order

**Breckenridge**
**Pharmaceutical, Inc.**

| Branch | 1000 | Printed | 2/25/2008 |
|---|---|---|---|
| Page | 1 of 1 | PO Number | 1172  QP |
| Ordered | 2/25/2008 | Delivery | 4/30/2008 |
| | 4/30/2008 | | |

**Ship From**
Interpharm, Inc.
75 Adams Ave.
Hauppauge NY 11788

**Ship To**
DDN/Obergfel
c/o Breckenridge Pharmaceutical, Inc.
4580 Mendenhall Road
Suite 101
Memphis TN 38141

| Line | # | Description | | UM | Promised Delivery | To. | Extended Price |
|---|---|---|---|---|---|---|---|
| 1.000 | 0 | 51991-076-01 E.E.M.T. H.S. Tabs 100's EEMT HS 0.625/1.25mg Tabs 100 | | EA | EA | 4/30/2008 | |
| 2.000 | 0 | 51991-079-01 E.E.M.T. D.S. Tabs 100's EEMT DS. 1.25/2.5mg Tabs 100 | | EA | EA | 4/30/2008 | |
| 3.000 | 0 | TERMS Payment Terms-see below | 1 | EA | 0.00 EA | 4/30/2008 | |

Sales Taxable

.00

Total:

C of A, Bill of Lading, Packaging Slip and copy of UPC case codes must be faxed to:

Payment Terms: _____ receipt of goods

*Delivery date as required by Breckenridge To be determined*



**Purchase Order**

**Breckenridge Pharmaceutical, Inc.**

| Branch | 1000 | | 2/25/2008 |
|---|---|---|---|
| Page | 1 of 1 | P.O. Number | 1173    OP |
| Order | 2/25/2008 | Delivery | 5/15/2008 |
| | 5/15/2008 | | |

**Ship From**
Interpharm, Inc.
75 Adams Ave.
Hauppauge NY 11788

**Ship To**
DDN/Obergfel
c/o Breckenridge Pharmaceutical, Inc.
4580 Mendenhall Road
Suite 101
Memphis TN 38141

| Line | Rv | Description | | UOM | | Order Qty | | Extended Price |
|---|---|---|---|---|---|---|---|---|
| 1.000 | 0 | 51991-078-01 E.E.M.T. H.S. Tabs 100's EEMT HS 0.625/1.25mg Tabs 100 | EA | | EA | 5/15/2008 | | |
| 2.000 | 0 | 51991-079-01 E.E.M.T. D.S. Tabs 100's EEMT D.S. 1.25/2.5mg Tabs 100 | EA | | EA | 5/15/2008 | | |
| 3.000 | 0 | TERMS Payment Terms-see below | 1 EA | 0.00 | EA | 5/15/2008 | | |

Sales Taxable

.00

Total:

C of A, Bill of Lading, Packaging Slip and copy of this order/release must be included

Payment Terms _____ receipt of goods

*Delivery date will be corrected
by Breckenridge. To be followed*

# EXHIBIT E

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**

**FORM 8-K**

**CURRENT REPORT**

**Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

Date of Report (Date of earliest event reported) <u>February 5, 2008</u>

<u>Interpharm Holdings, Inc.</u>

(Exact name of Registrant as specified in charter)

| Delaware | 0-22710 | 13-3673965 |
|---|---|---|
| (State or other jurisdic-<br>tion of incorporation) | (Commission<br>File Number) | (IRS Employer<br>Identification No.) |

| 75 Adams Avenue, Hauppauge, New York | 11788 |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: <u>(631) 952 0214</u>

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 1.01 Entry into a Material Definitive Agreement**

On February 5, 2008, Interpharm Holdings, Inc. ("Holdings") and Interpharm, Inc. (the "Company") entered into a Forbearance Agreement with Wells Fargo Bank, National Association ("Wells Fargo") which, as more fully set forth below, provides Holdings and the Company with additional credit and provides for a forbearance by Wells Fargo from exercising its remedies based on previous defaults with respect to Holdings' and the Company's credit agreement with Wells Fargo (the "Wells Fargo Credit Agreement"). A copy of the Forbearance Agreement is annexed hereto as Exhibit 10.1 and the description of the Forbearance Agreement contained herein is qualified, in its entirety, by the text of the agreement itself.

In connection with its negotiation of the Forbearance Agreement, the Company completed a restructuring of its operations on January 25, 2008 and submitted a new operating plan to Wells Fargo which the Company believes will result in positive cash flow and net profits. Pursuant to the new operating plan, the Company has substantially reduced its research and development activities, reduced its payroll by approximately 20% and began a process to identify alternative financing sources for the Company's real estate, machinery and equipment, and working capital finance.

As reported on Holdings Current Report on Form 8-K filed with the Securities and Exchange Commission on January 24, 2008, Wells Fargo had informed Holdings and the Company that it was in the process of assessing the Company's eligible collateral under the Wells Fargo Credit Agreement and was providing limited credit availability for ongoing operations pending the outcome of that review. The Company had been in default under the Wells Fargo Credit Agreement since June 30, 2007.

As reported in Holdings' Current Report on Form 8-K filed with the Securities and Exchange Commission on January 29, 2008, on January 28, 2008, Wells Fargo informed the Company that it would consider providing the Company with credit availability on the condition that the Company (i) develops and implements a new operating plan focused on increasing the amount of eligible collateral and reducing costs and (ii) develop an alternative financing arrangement.

On February 5, 2008, the Company, Holdings and Wells Fargo entered into the Forbearance Agreement whereby Wells Fargo agreed to, among other things, (i) forbear from exercising its remedies arising from the Company's default under the Wells Fargo Credit Agreement until June 30, 2008 provided no further default occurs; (ii) provide a moratorium on certain principal payment; (iii) and advance the Company up to $2,999,999 under a newly granted real estate line of credit mortgage on the Company's real estate, which amounts will be due on June 30, 2008.

Under the Forbearance Agreement the Company and Holdings agreed to (i) submit to Wells Fargo, on a weekly basis, a "rolling" 13-week budget; (ii) engage a chief restructuring officer to review and oversee the budget and, in conjunction with Company management, certain financial matters; (iii) grant Wells Fargo an equity line of credit mortgage to secure its new equity line of credit and a collateral mortgage to secure certain obligations under that portion of revolving line of credit that has been converted to a term loan and (iv) pay Wells Fargo a success fee of up to $500,000 in the event the balance of the indebtedness owed to Wells Fargo is repaid from the sale of the Company's stock or substantially all of its assets prior to June 30, 2008.

The Forbearance Agreement also limits the Company's borrowing base on which certain advances are made and provides for a number of events of default, including (i) a material adverse change (ii) failure of the Company to meet certain budget items by more that 10%; (iii) failure to receive a letter of intent for the sale of the assets of the Company for an amount in excess of the Wells Fargo indebtedness by March 31, 2008; (iv) failure by the Company to receive a commitment for the sale of the assets of the Company for an amount in excess of the Wells Fargo indebtedness by April 30, 2008; (v) failure of the Company to close a transaction for the sale of the assets of the Company for an amount in excess of the Wells Fargo indebtedness by June 30, 2008; and (vi) Wells Fargo indebtedness remains outstanding on June 30, 2008.

Pursuant to the operating plan approved by Wells Fargo in connection with the Forbearance Agreement, the Company will have access to up to an additional $2,999,999 of capital to meet its ongoing working capital and operating requirements.

**Item 9.01 Financial Statements and Exhibits**

Exhibit. The following is furnished as an exhibit to this report:

| Exhibit No. | Exhibit Description |
|---|---|
| 10.1 | Forbearance Agreement dated February 5, 2008 between Wells Fargo Bank, National Association, acting through its Wells Fargo Business Credit operating division and Interpharm, Inc. and Interpharm Holdings, Inc. |

<u>Signatures</u>

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

INTERPHARM HOLDINGS, INC.

February 6, 2008

By: /s/ Peter Giallorenzo
    Peter Giallorenzo
    Chief Financial Officer and
    Chief Operating Officer

# EXHIBIT F

## FORBEARANCE AGREEMENT

**THIS FORBEARANCE AGREEMENT**, dated as of February 5, 2008, entered in by and between Wells Fargo Bank, National Association, acting through its Wells Fargo Business Credit operating division ("Wells Fargo"), having a place of business located at 119 West 40th Street, New York, New York 10018, and Interpharm, Inc. ("Borrower"), having a principal place of business located at 75 Adams Avenue, Hauppauge, NY 11725.

**WHEREAS,** Borrower and Wells Fargo entered into that certain Credit and Security Agreement dated February 9, 2006, whereby Wells Fargo agreed to make secured loans and advances to or for the benefit of Borrower, together with all amendments and modifications thereto, including but not limited to the Initial Forbearance Agreement and the Interim Forbearance Agreement, each as defined below (collectively, the "Security Agreement")[1]; and

**WHEREAS**, the Security Agreement provides for advances to be made separately as (i) Revolving Advances, as evidenced by the Revolving Note, (ii) an M&E Advance, as evidenced by the M&E Term Note, (iii) Cap Ex Advances, as evidenced by the Cap Ex Note, (iv) a Real Estate Advance, as evidenced by the Consolidated Real Estate Term Note, and (v) Real Estate Line of Credit Advances, as evidenced by the Real Estate Line of Credit Note.

**WHEREAS**, to secure the payment and performance of the Obligations (as hereinafter defined) when due, Borrower granted to Wells Fargo a first priority security interest in and to all of Borrower's assets, including, but not limited to, all of Borrower's then existing and thereafter acquired inventory, equipment, accounts, chattel paper, instruments (including but not limited to all promissory notes), goods, letter-of-credit rights, letters of credit, documents,

---

[1] Capitalized terms used herein have the meanings given to them in the Security Agreement unless otherwise specified.

deposit accounts, investment property, supporting obligations, money, other rights to payment and performance, and general intangibles (including but not limited to all software and all payment intangibles and specifically including all Abbreviated New Drug Applications ("ANDAs") filed with the United States Federal Drug Administration Center for Drug Evaluation and Research, Office of Generic Drugs (the "FDA") and all ANDAs owned by the Borrower), all fixtures and all products and proceeds (including but not limited to, all insurance payments) of or relating to the foregoing property; and

**WHEREAS**, to further secure the payment and performance of the Borrower's obligations under the Consolidated Real Estate Term Note, the Borrower granted to Wells Fargo a security interest in the Real Estate, as evidenced by that certain Demand Mortgage and Security Interest dated as of February 9, 2006, that certain Mortgage Modification, Consolidation and Extension Agreement dated as of February 9, 2006, and documents executed therewith, recorded with the clerk of the County of Suffolk on February 22, 2006 at Liber 21239 Page 931 (the "Mortgage"); and

WHEREAS, to further secure the payment and performance of the Borrower's obligations under the Real Estate Line of Credit Note, the Borrower granted to Wells Fargo a security interest in the Real Estate, as evidenced by that certain Revolving Line of Credit Mortgage dated as of February 1, 2008, and documents executed therewith, (the "Second Mortgage" and, together with the Mortgage, the "Mortgages"); and

WHEREAS, pursuant to that certain Guaranty by Corporation dated February 9, 2006, Interpharm Holdings, Inc. (the "Guarantor") guaranteed to Wells Fargo all of the obligations then owing or thereafter owing by Borrower to Wells Fargo under the Credit Agreement and otherwise (the "Guaranty"); and

410035                                                     2

**WHEREAS**, pursuant to the Security Agreement, Wells Fargo agreed to provide Borrower with certain financing; and

**WHEREAS**, certain defaults occurred under the Security Agreement; and

**WHEREAS**, Borrower and Wells Fargo entered into that certain Forbearance Agreement dated October 26, 2007 (the "Initial Forbearance Agreement"), whereby Wells Fargo agreed to forbear in commencing an action against the Borrower until December 31, 2007 pursuant to the terms and conditions contained therein; and

**WHEREAS**, as of the close of business on January 29, 2008, the Borrower was obligated to Wells Fargo under the Security Agreement in the principal amount of $30,204,496, plus interest from January 1, 2008, together with all other Obligations that may be owing by Borrower to Wells Fargo including, but not limited to its costs (legal fees, and any fees, costs, expenses, disbursements), fees, expenses and disbursements, and any and all additional advances that may be made by Wells Fargo to the Borrower whether to protect the Collateral (as that term is defined in the Security Agreement), in connection with the liquidation of Borrower's assets or otherwise (collectively, the "Obligations"); and

**WHEREAS**, Borrower remains obligated to Wells Fargo for the monies owed under the Security Agreement and otherwise; and

**WHEREAS**, certain defaults exist under the Security Agreement and the Initial Forbearance Agreement; and

**WHEREAS**, Borrower requested that Wells Fargo forbear in commencing any action against the Borrower under or pursuant to the Security Agreement and allow the Borrower a reasonable amount of time to effect a sale of its company or assets or refinance a part or all of its assets; and

410035                                                    3

**WHEREAS**, Borrower and Wells Fargo were engaged in continuing negotiations of a forbearance agreement to run through June 30, 2008 but were unable to reach a *meeting of the minds* on all salient terms and conditions; and

**WHEREAS**, the Borrower had certain immediate cash needs on February 1, 2008, and, in order to avoid irreparable injury to its business, Borrower requested certain specific immediate advances from Wells Fargo, which Wells Fargo was only willing to make upon the terms and conditions contained in that written agreement dated as of February 1, 2008, which provided, in part, for the requested advances, the grant of the Revolving Line of Credit Mortgage to secure such advances, and Wells Fargo's agreement to forbear in commencing any action against the Borrower (the "Interim Forbearance Agreement"); and

**WHEREAS**, the Borrower retained Getzler Henrich & Associates LLC as its Interim Financial Advisor (the "IFA"); and

**WHEREAS**, the Borrower has retained or is in the process of retaining the services of NachmanHaysBrownstein, Inc. as its chief restructuring officer (the "CRO); and

**WHEREAS**, the Borrower and Wells Fargo have since agreed to the terms of Wells Fargo's continued forbearance through June 30, 2008, pursuant to the terms and conditions provided for herein.

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.     All of the above recitals are hereby incorporated by reference and made part of this Agreement.

2.     Borrower hereby acknowledges that it is indebted to Wells Fargo under the Security Agreement in the amount of the Obligations.

3.    Borrower hereby acknowledges that the Borrower has defaulted under the Security Agreement and the Initial Forbearance Agreement, and that Wells Fargo may currently exercise its remedies pursuant to the Security Agreement and applicable law to recognize upon the Collateral or to otherwise proceed against the Borrower.

4.    The Borrower hereto acknowledges and represents that:

(a)    Borrower is in default under the Security Agreement and Wells Fargo has the right, subject to the provisions contained herein, at any time, to demand the amounts due and payable in full pursuant to Section 7.2 of the Security Agreement;.

(b)    The execution and delivery of this Agreement by Borrower and the compliance with the terms hereof do not violate any provision of the corporate documents of Borrower and do not violate any provision of any existing law or regulation or any writ or decree of any court or governmental instrumentality or any agreement or instrument to which Borrower is a party or which is binding upon Borrower or its assets and will not result in the creation or imposition of any lien, security interest, charge or encumbrance of any nature whatsoever. No consent of any other party and no consent, license, approval or authorization or registration or declaration with, any governmental bureau or agency is required in connection with the execution, delivery, performance, validity and enforceability of this Agreement.

(c)    Except a set forth on "Schedule 4(c)" of this Agreement there is no action, suit, proceeding or investigation pending or threatened (or any basis therefor) against Borrower which, if adversely determined, would in any case or in the aggregate, materially and adversely affect any of Borrower's properties, assets, financial condition or businesses or materially impair any of Borrower's right to carry on business substantially as now conducted or proposed to be conducted.

410035                                          5

(d)     This Forbearance Agreement is intended to supplement the Security Agreement and the rights and obligations of the parties under the Security Agreement and other loan documents shall not in any way be vacated, modified or terminated except as herein provided. All terms and conditions contained in each and every agreement or promissory note or other evidence of indebtedness of Borrower to Wells Fargo are incorporated herein by reference.

(e)     The Borrower agrees that Wells Fargo has a first priority perfected security interest in the Collateral and in the Real Estate (as each term is defined in the Security Agreement). Guarantor, by its execution hereof, consents to the terms hereof and acknowledges and affirms that the Guaranty remains in full force and effect without defense, setoff or counterclaim. The Borrower hereby acknowledges and agrees that (A) throughout its relationship with Wells Fargo in connection with the transactions described in the Security Agreement, Wells Fargo and all of its officers, directors, shareholders, employees and agents have acted in good faith in complying with the terms of the Security Agreement, and (B) there does not exist as of the date hereof any defense, claim, claim of offset, cause of action or any other claim of liability (hereinafter referred to collectively as "Claims") in favor of any party against Wells Fargo or any of its officers, directors, shareholders, employees, or agents, and in consideration of the agreement by Wells Fargo to enter into this Agreement, the Borrower and Guarantors, hereby waive, release and discharge any Claims and causes of action, if any, of any kind whatsoever, whether at law or in equity, arising on or prior to the date hereof, which each may have against Wells Fargo. Borrower and Guarantors each also agree that all waivers, releases and agreements made herein are made in consideration of, and in order to induce Wells Fargo to temporarily

forbear in the exercise or further exercise of its rights and remedies under the Security Agreement and to induce Wells Fargo to enter into this Agreement.

(f)     As of the date hereof, this Agreement has been duly authorized, executed and delivered by Borrower.

(g)     This Agreement does not contravene any law, rule or regulation applicable to Borrower or any of the terms of any indenture, agreement or undertaking to which Borrower is a party.

(h)     Borrower shall not (i) apply for or consent to the appointment of, or the taking possession by, a receiver, custodian, trustee or liquidator of all or a substantial part of their property, (ii) make a general assignment for the benefit of creditors, (iii) commence a voluntary case under any state or federal bankruptcy laws (now or hereafter in effect), (iv) file a petition or application seeking to take advantage of any law providing for the relief of debtors, (v) be subject to any petition filed against it commencing any involuntary case under such bankruptcy laws unless it obtains an order from the bankruptcy court authorizing Wells Fargo to continue to provide financing under this Agreement and the Security Agreement, or (vi) take any action for the purpose of effecting the foregoing.

(i)     In the event of the filing of any voluntary or involuntary petition in bankruptcy by or against Borrower: (i) Borrower shall not assert or request any other party to assert that the automatic stay provided by section 362 of the Bankruptcy Code shall operate or be interpreted to stay, interdict, condition, reduce or inhibit Wells Fargo from enforcing any rights it has by virtue of the Security Agreement or this Agreement or at law or in equity, or any other rights Wells Fargo has whether now or hereafter acquired, against Borrower or its successors or assigns or against the Collateral; and (ii) Borrower shall not seek any financing pursuant to

410035                                                   7

section 364(d) of the Bankruptcy Code, which grants a lender any security interest senior to the interests of Wells Fargo.

(j)    In the event of any voluntary or involuntary bankruptcy filing, Wells Fargo shall be entitled, and Borrower irrevocably consents, to an order granting relief from all stays, including the automatic stay imposed by Section 362 of the Bankruptcy Code, so as to permit Wells Fargo to foreclose upon its Collateral and to exercise any and all rights and remedies of Wells Fargo under the Security Agreement or this Agreement, or at law.

(k)    The Borrower agrees that in the event of any involuntary bankruptcy filing, the Borrower must immediately obtain an order of the Bankruptcy Court authorizing the Borrower to continue to borrow from Wells Fargo on a secured basis in accordance with the Security Agreement pending the dismissal of the involuntary petition or entry of an order for relief in form and substance acceptable to Wells Fargo.

(l)    The Borrower hereby represents and warrants that all financial statements, affidavits of financial condition and other financial information delivered or provided by Borrower to Wells Fargo are true, correct and accurate.

(m)    The Borrower hereby represents and warrants that all warranties and representations made to Wells Fargo as of the date hereof are true, correct and accurate.

5.    The Borrower hereby confirms the security interests and liens granted by the Borrower to Wells Fargo in and to the Collateral and Real Estate in accordance with the Security Agreement, Mortgages and other loan documents as security for its Obligations to Wells Fargo. The Guarantor hereby confirms the security interests and liens granted by the Guarantor to Wells Fargo in and to the Guarantor's assets as security for the Borrower's and Guarantor's obligations to Wells Fargo.

410035                                                          8

6.     Wells Fargo agrees to forbear from exercising its rights, including, but not limited to those rights pursuant to the Uniform Commercial Code against the Borrower under the Security Agreement until June 30, 2008 (the "Forbearance Period"), provided that during the Forbearance Period there is no default under this Agreement, or any new default under the Security Agreement.

7.     Borrower has provided Wells Fargo with projections of the Borrower's cash receipts and disbursements, including line item projections for weekly cash requirements, projected sales, projected inventory positions, projected loan balances and the Availability (either as a positive or negative number) for all loans for the period through April 21, 2008 (the "Budget", attached hereto as Exhibit "A"). The Borrower shall deliver to Wells Fargo an updated budget on a rolling thirteen week rolling basis, no later than every Friday of each week (each a "Revised Budget"), which Revised Budget shall be subject to the approval of Wells Fargo, in its sole discretion. The Borrower warrants and represents that Revised Budget shall include all reasonable, necessary and foreseeable expenses to be incurred with the operation of Borrower's business for the period set forth in the Revised Budget and that the Revised Budget reflects Borrower's best good faith projections for all data contained therein.

8.     The Borrower shall continue to retain the services of Getzler Henrich & Associates LLC as IFA until such time as the CRO is prepared to assume all responsibilities and duties being carried out by the IFA. The IFA or the CRO, as the case may be, shall have full authority to review the Budget and each Revised Budget with full oversight. The Borrower, through its IFA or CRO, as the case may be, shall, in conjunction with other members of the Borrower's management team: (i) prepare and timely deliver each Revised Budget (subject to Wells Fargo's consent) under which the Borrower shall operate under this Forbearance

Agreement; (ii) request advances from Wells Fargo to effect payments on the Borrower's behalf; (iii) administer the Budget and each Revised Budget; (iv) negotiate with all vendors and customers; and (v) solicit refinancing opportunities and offers to purchase all or any part of the Borrower's business.   The term "in conjunction with other members of the Borrower's management team" as used in this Forbearance Agreement is for information purposes only and shall not create any duty upon Wells Fargo to verify or confirm that the IFA or CRO, as the case may be, has actually acted together with any other member of management. Borrower hereby agrees that the IFA and the CRO, as the case may be, shall be the sole designee appointed by the Borrower on its behalf to communicate with Wells Fargo and to relay information and instruction to it and that such communications, information and instructions shall be binding upon the Borrower. The IFA and the CRO, as the case may be, shall have such additional functions as may be set forth any retention agreement by and between Borrower and such IFA and CRO, copies of which shall be provided to Wells Fargo within one day of them being entered into between such IFA and/or CRO and the Borrower.

9.      On a weekly basis, the Borrower shall provide Wells Fargo with (a) a compliance report in the same spreadsheet form as the Budget and each Revised Budget, certified in writing as true and accurate, that shows the comparison of all budget categories with the actual levels of expenditures and revenues generated for the preceding week (a "Budget Compliance Report"); (b) weekly inventory reports and (c) such other reports and financial information required by the Security Agreement in accordance with its terms.

10.     Provided that no Event of Default has occurred under this Agreement or any new Event of Default under the Security Agreement, there shall be a moratorium of principal payments under the M&E Note, CapEx Note and the Real Estate Note.

11.    Section 1.1 (Definitions) of the Security Agreement is hereby amended to delete the definitions of "Availability", "Default Rate", "Floating Rate" and "Maximum Line Amount" and replace them with the following:

"Availability" means (i) the difference between the face amount of the Real Estate Line of Credit Mortgage ($2,999,999) and the outstanding principal balance of the Real Estate Line of Credit Note; plus (ii) the amount, if any, by which the Borrowing Base exceeds the sum of (a) the outstanding principal balance of the Revolving Note and (b) the face amount of the $7MM Termed (Revolver) Note.

"'Default Rate' means an annual interest rate in effect during a Default Period or following the Termination Date, which interest rate shall be equal to three percent (3%) over the applicable Floating Rate, as such rate may change from time to time."

"'Floating Rate' means an annual interest rate equal to the sum of the Prime Rate plus two and one half of one percent (2.5%), which interest rate shall change when and as the Prime Rate changes."

"'Maximum Line Amount' means $14,883,739, which amount shall be reduced on the first day of every month in the amount of $181,000, commencing on March 1, 2008 and continuing on the first day of each month thereafter until such time as all Obligations owing to Lender have been paid in full."

12.    Section 1.1 (Definitions) of the Security Agreement is hereby amended by deleting subparagraph (b)(ii)(D) of the definition of "Borrowing Base" and replacing it with the following:

"(D) $7,000,000, plus"

13.    Section 1.1 (Definitions) of the Security Agreement is hereby amended by adding a new subparagraph (ix) to the definition of "Eligible Inventory" as follows:

"(ix) Inventory comprised of work in process to the extent such exceeds the amount of $6,718,000 ("Eligible WIP"), which Eligible WIP shall be reduced by the amount of $200,000 per week commencing the week ending February 8, 2008 until such time as the Eligible WIP is reduced to the amount of $5,518,000."

14.    Section 2.2(a) of the Security Agreement is hereby amended to delete it in its entirety and replace it with the following:

"(a)        Type of Advances.  Each Advance shall be funded as a Floating

Rate Advance."

15.     Section 2.4 of the Security Agreement is hereby amended by deleting

subparagraph (d)(ii) in its entirety and replacing it with the following:

"(ii) Repayment of Real Estate Line of Credit Advance. On the earlier of
the occurrence of an event of default under this Agreement, or June 30, 2008, the
entire unpaid principal balance of the Real Estate Line of Credit Note, and all
unpaid interest accrued thereon, shall in any event be due and payable."

16.     During the Forbearance Period, all Advances made under the Security

Agreement shall be made as a Real Estate Line of Credit Advance or as a Revolving Advance, as

determined by Wells Fargo in its sole discretion.

17.     At the Borrower's request, Wells Fargo has agreed to allow the Borrower

to decrease the current outstanding principal amount under the Revolving Note by $7,000,000.

In order to meet the Borrower's request and to provide the Borrower with additional liquidity,

Wells Fargo has agreed to *term out* part of the obligations presently covered by the Revolving

Note.  This will reduce the Revolving Note by the requested amount with the *termed out*

obligations being evidenced by a new $7MM Termed (Revolver) Note, which such $7MM

Termed (Revolver) Note shall remain secured by the Collateral as provided in Article III of the

Credit Agreement and shall also be secured by the Real Estate.  Interest on the $7MM Termed

(Revolver) Note shall accrue at the Floating Rate.  On the earlier of the Maturity Date, the

Termination Date, or June 30, 2008, the entire unpaid principal balance of the $7MM Termed

(Revolver) Note, and all unpaid interest accrued thereon, shall be due and payable.

18.     To secure the obligations under the $7MM Termed (Revolver) Note, the

Borrower shall execute and deliver to Wells Fargo that certain Mortgage Agreement in the

410035                                              12

original principal amount of $7,000,000 (the "Collateral Mortgage"), acceptable to Wells Fargo in its sole discretion, granting to Wells Fargo a security interest in and to the Real Estate. Borrower warrants and represents that it will cause to be issued to Wells Fargo an ALTA Title Insurance Policy in form and substance acceptable to Wells Fargo with respect to the property mortgaged in this paragraph, naming Wells Fargo as the insured party.

19.     Borrower hereby agrees to pay any and all mortgage taxes, recording fees, insurance premiums, and any and all costs, fees and expenses relating to the mortgages given to Wells Fargo herein.

20.     Except as specifically provided for in this Paragraph 20, Wells Fargo shall not be obligated to apply payments received from or on behalf of the Borrower towards any particular loan, and specifically shall not be obligated to apply any amounts received towards reduction of indebtedness under the Real Estate Line of Credit Note. Any amounts received by Wells Fargo may be applied against any outstanding indebtedness of the Borrower in Wells Fargo's sole discretion. Notwithstanding, in the event of any refinance, sale or sale-leaseback of the premises securing the Mortgages, the proceeds from any such refinancing, sale or sale-leaseback shall be applied as follows: (a) first to the satisfaction of the Consolidated Real Estate Term Note; then (b) to the satisfaction of the Real Estate Line of Credit Note; then (c) to the satisfaction, in part or in full, of the M&E Term Note. Upon the satisfaction in full of the Consolidated Real Estate Term Note, Real Estate Line of Credit Note and the M&E Term Note, Wells Fargo agrees to release or assign (without recourse and subject to an indemnity in favor of Wells Fargo for any claim arising out of or in connection with such assignment) the Mortgages and the Collateral Mortgage.

410035                                        13

21.    Borrower hereby waives any and all defenses, claims, setoffs and discharges of the Borrower or any other obligor pertaining to the Obligations of the Borrower to Wells Fargo except the defense of discharge by payment in full. The Borrower expressly waives notice of the sale, lease or other disposition of the Borrower's or other obligor's collateral and any right of redemption that the Borrower may have.

22.    Wells Fargo shall be entitled to perform periodic inspections of the Borrower's accounts, inventory, equipment and all other assets securing the Obligations and the Borrower agrees to fully cooperate with Wells Fargo in the performance of said inspections.

23.    Upon execution and delivery of this Agreement, the Borrower shall pay to Wells Fargo a forbearance fee in the amount of $75,000 due and payable upon the execution and delivery of this Agreement by the Borrower to Wells Fargo.

24.    In the event Borrower shall complete a sale of its stock or assets or any part thereof in an amount sufficient to pay its indebtedness to Wells Fargo, the Borrower acknowledges that such sale would be a direct result of Wells Fargo's efforts and willingness to forbear from exercising its remedies against the Collateral, and agrees and acknowledges that Wells Fargo is entitled to a fee of $500,000 (the "Success Fee"), due and payable from the proceeds of such sale. Wells Fargo agrees to reduce the Success Fee as follows: In the event the Borrower pays the entire indebtedness due to Wells Fargo on or before February 28, 2008, the Success Fee shall be reduced to $250,000; in the event the Borrower pays the entire indebtedness due to Wells Fargo on or before March 31, 2008, the Success Fee shall be reduced to $350,000; in the event the Borrower pays the entire indebtedness due to Wells Fargo on or before April 30, 2008, the Success Fee shall be reduced to $450,000. It is specifically agreed that the Success Fee

shall not be earned in the event of a refinancing unless such refinancing is related to a sale of substantially all of the Borrower's stock or assets.

25.    An Event of Default under this Agreement shall mean any of the following:

(a)    The failure of the Borrower to observe, or timely comply with, or perform any covenant or term contained in this Agreement or the Security Agreement or any other agreement by and between Wells Fargo and the Borrower;

(b)    The failure of the Borrower to pay Wells Fargo any sum when due under this Agreement or the Security Agreement;

(c)    The occurrence of a material adverse change subsequent to the date of this Agreement with respect to the Borrower's finances or property, it being specifically understood and agreed that Wells Fargo may make such determination in its sole and absolute discretion;

(d)    Any financial statements, affidavits of financial condition or other financial information delivered or provided by the Borrower or in connection with this Agreement or the Security Agreement or any other agreement by and between Wells Fargo and the Borrower is or shall be false or misleading in any material respect;

(e)    Any warranty or representation made or deemed made by the Borrower in this Agreement or the Security Agreement or any other agreement by and between Wells Fargo and the Borrower is or shall be untrue in any material respect;

(f)    The Borrower becomes a debtor in any bankruptcy proceeding;

410035                                              15

(g)     Wells Fargo, after good faith verification, discovers any act of dishonesty by any officer or director of the Borrower as determined by Wells Fargo in its sole discretion;

(h)     The Borrower exceeds cash disbursement levels set forth in the Budget or any Revised Budget by greater than ten percent (10%) on a cumulative 13-week rolling basis, it being specifically understood that the transaction costs (i.e., mortgage recording taxes, professional fees, and the fee referenced in Paragraph 23 herein) associated with this Agreement shall be in excess of the Budget or any Revised Budget, if applicable;

(i)     The Borrower fails to meet profit levels set forth in the Budget or any Revised Budget by greater than ten percent (10%) on a cumulative 13-week rolling basis;

(j)     The Borrower fails to meet sales levels set forth in the Budget or any Revised Budget by greater than ten percent (10%) on a cumulative 13-week rolling basis;

(k)     The Borrower fails to meet cash receipt levels set forth in the Budget or any Revised Budget by greater than ten percent (10%) on a cumulative 13-week rolling basis;

(l)     The Borrower fails to meet availability levels set forth in the Budget or any Revised Budget by greater than ten percent (10%) on a cumulative 13-week rolling basis;

(m)     The Borrower has not received a letter of intent to purchase substantially all of the assets of the Borrower for an amount in excess of the outstanding balance of the indebtedness to Wells Fargo on or before March 31, 2008;

410035                                                16

(n)     The Borrower has not received a commitment for the purchase of substantially all of the assets of the Borrower for an amount in excess of the outstanding balance of the indebtedness to Wells Fargo on or before April 30, 2008;

(o)     The Borrower has not closed on the sale of substantially all of the assets of the Borrower for an amount in excess of the outstanding balance of the indebtedness to Wells Fargo on or before June 30, 2008;

(p)     Any indebtedness remains outstanding from the Borrower to Wells Fargo on June 30, 2008.

26.     By executing this Agreement, the Borrower and Guarantor hereby waive, release and discharge any and all claims or causes of action, if any, of every kind and nature whatsoever, whether at law or in equity, arising at or prior to the date hereof, which it or they may have against Wells Fargo and/or its officers and employees in connection with the Security Agreement, this Agreement and all documents executed in connection therewith. Borrower also agrees that all waivers, releases and agreements made herein are made in consideration of, and in order to induce Wells Fargo to temporarily forbear the exercise or further exercise of its rights and remedies against the Borrower under the Security Agreement and to induce Wells Fargo to enter into this Agreement.

27.     This Agreement shall be construed under and in accordance with the laws of the State of New York.

28.     The Borrower hereby consents to the jurisdiction of the Supreme Court of the State of New York for a determination of any and all disputes connected with this Agreement and/or the Security Agreement, and documents executed in connection therewith and consents to service of process by overnight courier, such service to be deemed effected upon posting. This is

410035                                    17

without prejudice to Wells Fargo's right to bring an action in any other jurisdiction for a determination of any dispute connected with this Agreement and/or the Security Agreement or the documents executed in connection therewith.

29.    This Agreement represents the entire agreement between Wells Fargo and the Borrower, all other agreements between Wells Fargo and the Borrower being merged with this Agreement. The Security Agreement, the Mortgages, the Notes, and all other documents executed in connection with the foregoing, shall remain in full force and effect and modified only as specifically provided for in this Agreement. The Borrower hereby acknowledges and agrees that Wells Fargo is agreeing to forbear in commencing any action against the Borrower only for Obligations owing to Wells Fargo under the Security Agreement pursuant to the terms and conditions contained in this Agreement.

30.    The Borrower hereto shall execute all additional documents and do all acts not specifically referred to herein which are reasonably necessary to fully effectuate the intent of this Agreement.

31.    The Borrower and Guarantor acknowledge and agrees that (i) Wells Fargo is not, by virtue of this Forbearance Agreement or otherwise, waiving any Default or Event of Default under the Loan Documents and (ii) Wells Fargo is not abandoning, waiving or releasing any claim, right or remedy Wells Fargo has under any of the Loan Documents. Borrower and Guarantors agree that no delay on the part of Wells Fargo in exercising any power or right under the Loan Agreement, hereunder or any other Loan Document shall operate as a waiver of any such power or right, nor act as a consent to any departure by Borrower or Guarantors from any of the terms or conditions hereof or thereof, preclude other or further exercise thereof, or the

exercise of any other power or right. No waiver whatsoever shall be valid unless in writing signed by Wells Fargo and then only to the extent set forth therein.

32.     No executory agreement and no course of dealing between the Borrower and Wells Fargo shall be effective to change or modify this Agreement in whole or in part; nor shall any change, modification or waiver of any rights or powers of Wells Fargo be valid or effective unless in writing or signed by an authorized officer of Wells Fargo. Notwithstanding anything to the contrary contained herein, Wells Fargo does not agree to change, modify, waive, or forbear in exercising any of its rights or powers with respect to any corporation, shareholder, guarantor or individual other than the Borrower.

33.     The Borrower hereby represents and acknowledges that in connection with the negotiation of this Agreement it has been represented by its own counsel, who has reviewed this Agreement and advised it as to the legal significance and consequences of entering into this Agreement.

34.     Each individual executing this Agreement on behalf of the Borrower and Wells Fargo hereby warrants and represents that he has the requisite corporate authority to execute this Agreement.

35.     This Agreement may be executed in counterparts, each of which will be deemed an original document, but all of which together shall constitute but a single document. An executed facsimile of this Agreement shall be deemed to be a valid and binding agreement between the parties hereto.

IN WITNESS WHEREOF, the undersigned hereby agree to the terms and conditions as set forth hereinabove.

WELLS FARGO BANK, NATIONAL ASSOCIATION, acting through its Wells Fargo Business Credit operating division

By:_____
  Richard Mahtani, Vice President

INTERPHARM, INC.

By:_____
  ~~Raj Sutaria, Executive Vice President~~
  PETER GIALLORENZO
  CHIEF OPERATING OFFICER :
  CHIEF FINANCIAL OFFICER

Consented to, Agreed, and Acknowledged:

INTERPHARM HOLDINGS, INC.

By:_____
  ~~Raj Sutaria, Executive Vice President~~
  PETER GIALLORENZO
  CHIEF OPERATING OFFICER :
  CHIEF FINANCIAL OFFICER

410035

20

STATE OF NEW YORK         )
                          ) ss.:
COUNTY OF NEW YORK  )

On the 5TH day of February, in the year 2008, before me personally came Richard Mahtani, to me known, who, being by me duly sworn, did depose and say that he resides in New York, New York; that he is the Vice President of WELLS FARGO BANK, NATIONAL ASSOCIATION, acting through its Wells Fargo Business Credit operating division., the corporation described in and which executed the above instrument; and that he signed his name thereto by authority of the board of directors of said corporation.

_____

Notary Public


STATE OF NEW YORK         )
                          ) ss.:
COUNTY OF NASSAU)

On the 5TH day of February, in the year 2008, before me personally came ~~Kay Sutaria~~, to me known, who, being by me duly sworn, did depose and say that s\he resides in Melville, New York; that he is the ~~Executive Vice President~~ of INTERPHARM, INC. the corporation described in and which executed the above instrument; and that s\he signed her\his name thereto by authority of the board of directors of said corporation.

_____

Notary Public

**MICHAEL P. LICITRA**
Notary Public, State of New York
No. 01LI4899145
Qualified in Nassau County
Commission Expires June 22, 2011


STATE OF NEW YORK         )
                          ) ss.:
COUNTY OF NASSAU        )

On the 5TH day of February, in the year 2008, before me personally came ~~Kay Sutaria~~ to me known, who, being by me duly sworn, did depose and say that s\he resides in Melville, New York; that he is the ~~Executive Vice President~~ of INTERPHARM HOLDINGS, INC. the corporation described in and which executed the above instrument; and that s\he signed her\his name thereto by authority of the board of directors of said corporation.

_____

Notary Public

**MICHAEL P. LICITRA**
Notary Public, State of New York
No. 01LI4899145
Qualified in Nassau County
Commission Expires June 22, 2011

400035

## SCHEDULE 4(e)
## LITIGATIONS

Interpharm, Inc. v. Watson Laboratories, Inc., United States District Court, EDNY, Dkt No. 4600-cv-07 (Counterclaims)

Leiner Health Products v. Interpharm Holdings, Inc., Superior Court of California, Los Angeles, No. BC381396

Forest Laboratories v. Interpharm Holdings, Inc. and Interpharm, Inc., District Court of Delaware, No. 08-52

Ray Vuono v. Interpharm Holdings, Inc., New York Supreme Court, Suffolk County, Index No. 06-13985

Crane Partners v. Interpharm Holdings, Inc. and Interpharm, Inc., Superior Court of New Jersey, Law Division, Bergen County, BER-L-8474-07

Generic Pharmaceutical Services Inc.v. Interpharm Inc., New York Supreme Court, Suffolk County, Index No. 07-39101

Maria D. Amaya v. Interpharm, Inc., New York State Div. Of Human Rights, Case No. 10117146

Threatened Claims:

Possible claim by a female "MR" - January 18, 2008 letter threatening action for pain and suffering in connection with use of a prescribed Interpharm product.

## Exhibit A
### Budget

# EXHIBIT G

8-K 1 v094028.htm

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

## FORM 8-K

## CURRENT REPORT

**Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

Date of Report (Date of earliest event reported) <u>November 7, 2007</u>

<u>Interpharm Holdings, Inc.</u>
(Exact name of Registrant as specified in charter)

| <u>Delaware</u> | <u>0-22710</u> | <u>13-3673965</u> |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

<u>75 Adams Avenue, Hauppauge, New York 11788</u>
(Address of principal executive offices)   (Zip Code)

Registrant's telephone number, including area code: <u>(631) 952 0214</u>

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)
☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)
☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR240.14d-2(b))
☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Items 1.01 Entry into a Material Definitive Agreement**

On October 25, 2007, the Company and Wells Fargo Business Credit finalized a Forbearance Agreement that terminates on December 31, 2007 (the "Forbearance Period"), which was subsequently amended on November 13, 2007. As of June 30, 2007, the Company had defaulted under the Senior Credit Agreement with respect to (i) financial reporting obligations, including the submission of its annual audited financial statements for the fiscal year ending on or about June 30, 2007, and (ii) financial covenants related to minimum net cash flow, maximum allowable total capital expenditures, leverage and unfinanced capital expenditures for the fiscal year ended June 30, 2007 (collectively, the "Existing Defaults"). WFBC agreed to waive the Existing Defaults based upon the Borrower's consummation and receipt of $8,000,000 related to the issuance of subordinated debt described below. The parties have agreed to establish financial covenants for fiscal year 2008 prior to the conclusion of the Forbearance Period.

On November 7, 2007 and November 14, 2007, as required by the Forbearance Agreement, the Company received a total of $8,000,000 in gross proceeds from the issuance and sale of subordinated debt.

On November 7, 2007, Dr. Maganlal K. Sutaria, the Chairman of the Company's Board of Directors, and Vimla M. Sutaria, his wife, loaned $3,000,000 to the Company pursuant to a Junior Subordinated Secured 12% Promissory Note due 2010 (the "Sutaria Note"). Interest of 12% per annum on the Sutaria Note is payable quarterly in arrears, and for the first 12 months of the note's term, may be paid in cash, or additional notes ("PIK Notes"), at the option of the Company. Thereafter, the Company is required to pay at least 8% interest in cash, and the balance, at its option, in cash or PIK Notes.

Repayment of the Sutaria Notes is secured by liens on substantially all of the Company's property and real estate. Pursuant to intercreditor agreements, the Sutaria Notes are subordinated to the liens held by WFBC and the holders of the STAR Notes described below.

On November 14, 2007, the Company issued and sold an aggregate of $5,000,000 of Secured 12% Promissory Notes Due 2009 (the "STAR Notes") in the following amounts to the following parties:

| | |
|---|---|
| Tullis-Dickerson Capital Focus III, L.P. ("TD III") | $ 833,333 |
| Aisling Capital II, L.P. ("Aisling") | $ 833,333 |
| Cameron Reid ("Reid") | $ 833,333 |
| Sutaria Family Realty, LLC ("SFR") | $2,500,000 |

TD III is an investor in the Company and the holder of its Series B-1 Convertible Preferred Stock. Aisling is also an investor in the Company and the holder of its Series C-1 Convertible Preferred Stock.

Reid is the Company's Chief Executive Officer and SFR is owned by Company shareholders who control approximately 45% of the Company's voting stock (the "Major Shareholders"), including Raj Sutaria, who is a Company Executive Vice President.

Interest of 12% per annum on the STAR Notes is payable quarterly in arrears, and may be paid, at the option of the Company, in cash or PIK Notes. Upon the Company obtaining stockholder approval and ratification of the issuance of the STAR Note financing and making the necessary filings with the SEC in connection therewith (the "Stockholder Approval"), which is to occur no earlier than January 18, 2008 and no later than the later of February 28, 2008 or such later date as may be necessary to address SEC comments on the Company's Information Statement on Schedule 14C, the STAR Notes shall be exchanged for:

• Secured Convertible 12% Promissory Notes due 2009 (the "Convertible Notes") in the original principal amount equal to the principal and accrued interest on the STAR Notes through the date of exchange. The conversion price of the Convertible Notes is to be $0.95 per share and interest is to be payable quarterly, in arrears, in either cash or PIK Notes, at the option of the Company;

• Warrants to acquire an aggregate of 1,842,103 shares of Common Stock (the "Warrants") with an exercise price of $0.95 per share.

Each of the Convertible Notes and Warrants are to have anti-dilution protection with respect to issuances of Common Stock, or common stock equivalents at less than $0.95 per share such that their conversion or exercise price shall be reset to a price equal to 90% of the price at which shares of Common Stock or equivalents are deemed to have been issued.

The repayment of the STAR and Convertible Notes is secured by a second priority lien on substantially all of the Company's property and real estate. Pursuant to intercreditor agreements, the STAR Note financing liens are subordinate to those of WFBC, but ahead, in priority, of the Sutaria Notes.

Also, upon the Company obtaining the Stockholder Approval, the Series B-1 and Series C-1 Convertible Preferred Stock held by TD III and Aisling shall be exchangeable for shares of a new Series D-1 Convertible Preferred Stock, which shall be substantially similar to the B-1 and C-1 Convertible Preferred Stock other than the Conversion price which is to be $0.95 per share instead of $1.5338 per share.

Pursuant to the terms of the Securities Purchase Agreements for the Company's Series B-1 and C-1 Convertible Preferred Stock, the consent of TD III and Aisling was required for the issuance of the Sutaria Notes and for the STAR Note financing. On November 7, 2007, we entered into a Waiver and Consent Agreement (the "Waiver") with TD III, Aisling and the Parties to the Financing which provided us with the necessary consent from Tullis and Aisling. In addition, the pursuant to the Waiver, Perry Sutaria, P&K Holdings I, LLC, Rametra Holdings I, LLC, Rajs Holdings I, LLC and Raj Sutaria, the holders of 45.2% of our issued and outstanding common stock (the "Proxy Shares") agreed to, and did give a voting proxy to a committee comprised of Perry Sutaria and a representative from each of TD III and Aisling to vote the Proxy Shares:

1. For the election of directors; and
2. With respect to any changes in the Company by-laws.

In addition, the holders of the Proxy Shares gave TD III and Aisling tag along rights on the Proxy Shares such that in the event of any sale, other than certain exempted sales, of the Proxy Shares, the holders of the Proxy Shares will have an obligation to have the buyer purchase a proportionate number of shares held by TD III and Aisling.

As consideration for the Waiver, the conversion price of the Series B-1 and C-1 Preferred Stock was reduced from $1.5338 to $0.95 and the exercise price of an aggregate of 4,563,828 warrants held by TD III and Aisling was reduced from $1.63 to $0.95.

<u>Signatures</u>

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

INTERPHARM HOLDINGS, INC.

November 14, 2007

By: /s/ Peter Giallorenzo
Peter Giallorenzo
Chief Financial Officer and Chief Operating Officer

# EXHIBIT I

8-K 1 v108743_8k.htm

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

## FORM 8-K

## CURRENT REPORT

**Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

Date of Report (Date of earliest event reported) <u>March 25, 2008</u>

<u>Interpharm Holdings, Inc.</u>

(Exact name of Registrant as specified in charter)

| Delaware | 0-22710 | 13-3673965 |
|---|---|---|
| (State or other jurisdic-<br>tion of incorporation) | (Commission<br>File Number) | (IRS Employer<br>Identification No.) |

| 75 Adams Avenue, Hauppauge, New York | 11788 |
|---|---|
| (Address of principal executive offices)    (Zip Code) | |

Registrant's telephone number, including area code: <u>(631) 952 0214</u>

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)
☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)
☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR240.14d-2(b))
☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

## Item 1.01  Entry into a Material Definitive Agreement

As set forth in its Current Report on Form 8-K filed with the Securities and Exchange Commission on February 6, 2008, on February 5, 2008, Interpharm Holdings, Inc. ("Holdings") and Interpharm, Inc. (the "Company") entered into a Forbearance Agreement (the "Forbearance Agreement") with Wells Fargo Bank, National Association ("Wells Fargo") which, provided Holdings and the Company with additional credit and provided for a forbearance by Wells Fargo from exercising its remedies based on previous defaults with respect to Holdings' and the Company's credit agreement with Wells Fargo (the "Wells Fargo Credit Agreement").

On March 25, 2008, Holdings and the Company entered into an Amended and Restated Forbearance Agreement with Wells Fargo (the "Amended Forbearance Agreement"). Pursuant to the Amended Forbearance Agreement, in exchange for a $250,000 payment and other consideration, Wells Fargo agreed to provide the Company with additional borrowing availability through: (i) increasing the cap on the Company's revolving credit line by approximately $2.3 million; (ii) increasing the percentage of inventory which is eligible as collateral for borrowing; and (iii) adding eligible receivables against which to borrow.

In addition to the foregoing, the Amended Forbearance Agreement provides that it will be an event of default if the Company has not received a letter of intent for a purchase of substantially all of its assets for an amount in excess of the amounts owing to Wells Fargo or a proposal to refinance the amounts owing to Wells Fargo by March 31, 2008. The Company has already received a refinancing proposal.

The foregoing description of the Amended Forbearance Agreement is qualified, in its entirety, by the text of the agreement itself, which is annexed hereto as Exhibit 10.1.

## Item 9.01  Financial Statements and Exhibits

Exhibit. The following is furnished as an exhibit to this report:

| Exhibit No. | Exhibit Description |
|---|---|
| 10.1 | Amended and Restated Forbearance Agreement dated March 25, 2008 among Wells Fargo Bank, National Association, acting through its Wells Fargo Business Credit operating division and Interpharm, Inc. and Interpharm Holdings, Inc. |

<u>Signatures</u>

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

INTERPHARM HOLDINGS, INC.

March 31, 2008

By: <u>/s/ Peter Giallorenzo</u>
Peter Giallorenzo
Chief Financial Officer and
Chief Operating Officer

# EXHIBIT J

8-K 1 v110912_8k.htm

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

## FORM 8-K

## CURRENT REPORT

**Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

Date of Report (Date of earliest event reported) <u>April 16, 2008</u>

<u>Interpharm Holdings, Inc.</u>

(Exact name of Registrant as specified in charter)

| Delaware | 0-22710 | 13-3673965 |
|---|---|---|
| (State or other jurisdic-<br>tion of incorporation) | (Commission<br>File Number) | (IRS Employer<br>Identification No.) |

| 75 Adams Avenue, Hauppauge, New York | 11788 |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: <u>(631) 952 0214</u>

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 3.01          Notice of Failure to Satisfy a Continued Listing Rule**

On April 10, 2008, Interpharm Holdings, Inc. (the "Company") received notice from the American Stock Exchange ("AMEX") that the Company is not in compliance with the following continuing listing standards contained in the AMEX Company Guide:

1. Section 1003(a)(i) because of stockholders equity less than $2,000,000 and losses from continuing operations and net losses in two out of its three most recent fiscal years;
2. Section 1003(a)(ii) because of stockholders equity of less than $4,000,000 and losses from continuing operations and net losses in three out of its four most recent fiscal years; and
3. Section 1003(a)(iv) because of sustained losses.

In response to the AMEX letter, the Company plans to submit a plan of operations demonstrating how it will regain compliance with AMEX continuing listing standards.

**Item 5.02 Departure of Directors or principal Officers; Election of Directors, Appointment of Principal Officers**

On April 10, 2008, the Company's Board of Directors accepted the resignation of the Company's Chief Executive Officer, Cameron Reid. Mr. Reid is continuing in his service to the Company as a consultant assisting in the management of the Company's business.

**Item 9.01          Financial Statements and Exhibits**

Exhibit 99.1                        Press release, dated April 16, 2008.

<u>Signatures</u>

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

INTERPHARM HOLDINGS, INC.

April 16, 2008                        By: /s/ Peter Giallorenzo.
                                              Peter Giallorenzo
                                              Chief Financial Officer and
                                              Chief Operating Officer

# EXHIBIT H

## AMENDED AND RESTATED FORBEARANCE AGREEMENT

**THIS AMENDED AND RESTATED FORBEARANCE AGREEMENT,** dated as of March 25, 2008, entered in by and between Wells Fargo Bank, National Association, acting through its Wells Fargo Business Credit operating division ("Wells Fargo"), having a place of business located at 119 West 40th Street, New York, New York 10018, and Interpharm, Inc. ("Borrower"), having a principal place of business located at 75 Adams Avenue, Hauppauge, NY 11725, amends and restates that certain Forbearance Agreement dated as of February 5, 2008.

**WHEREAS,** Borrower and Wells Fargo entered into that certain Credit and Security Agreement dated February 9, 2006, whereby Wells Fargo agreed to make secured loans and advances to or for the benefit of Borrower, together with all amendments and modifications thereto, including but not limited to the Initial Forbearance Agreement, the Interim Forbearance Agreement, and the Forbearance Agreement, each as defined below (collectively, the "Security Agreement")[1]; and

**WHEREAS,** the Security Agreement provides for advances to be made separately as (i) Revolving Advances, as evidenced by the Revolving Note and the $7MM Termed (Revolver) Note, (ii) an M&E Advance, as evidenced by the M&E Note, (iii) Cap Ex Advances, as evidenced by the Cap Ex Note, (iv) a Real Estate Advance, as evidenced by the Real Estate Note, and (v) Real Estate Line of Credit Advances, as evidenced by the Real Estate Line of Credit Note.

**WHEREAS,** to secure the payment and performance of the Obligations (as hereinafter defined) when due, Borrower granted to Wells Fargo a first priority security interest

---

[1] Capitalized terms used herein have the meanings given to them in the Security Agreement unless otherwise specified.

in and to all of Borrower's assets, including, but not limited to, all of Borrower's then existing and thereafter acquired inventory, equipment, accounts, chattel paper, instruments (including but not limited to all promissory notes), goods, letter-of-credit rights, letters of credit, documents, deposit accounts, investment property, supporting obligations, money, other rights to payment and performance, and general intangibles (including but not limited to all software and all payment intangibles and specifically including all Abbreviated New Drug Applications ("ANDAs") filed with the United States Federal Drug Administration Center for Drug Evaluation and Research, Office of Generic Drugs (the "FDA") and all ANDAs owned by the Borrower), all fixtures and all products and proceeds (including but not limited to, all insurance payments) of or relating to the foregoing property; and

**WHEREAS**, to further secure the payment and performance of the Borrower's obligations under the Real Estate Note, the Borrower granted to Wells Fargo a security interest in the Real Estate, as evidenced by that certain Demand Mortgage and Security Interest dated as of February 9, 2006, that certain Mortgage Modification, Consolidation and Extension Agreement dated as of February 9, 2006, and documents executed therewith, recorded with the clerk of the County of Suffolk on February 22, 2006 at Liber 21239 Page 931 (the "Mortgage"); and

**WHEREAS**, to further secure the payment and performance of the Borrower's obligations under the Real Estate Line of Credit Note, the Borrower granted to Wells Fargo a security interest in the Real Estate, as evidenced by that certain Revolving Line of Credit Mortgage dated as of February 1, 2008, and documents executed therewith, (the "Second Mortgage" and, together with the Mortgage, the "Mortgages"); and

**WHEREAS**, to further secure the payment and performance of the Borrower's obligations under the $7MM Termed (Revolver) Note, the Borrower granted to Wells Fargo a

2

security interest in the Real Estate, as evidenced by that certain Mortgage Agreement dated as of February 5, 2008, and documents executed therewith, (the "Collateral Mortgage" and, together with the Mortgage and the Second Mortgage, the "Mortgages"); and

**WHEREAS**, pursuant to that certain Guaranty by Corporation dated February 9, 2006, Interpharm Holdings, Inc. (the "Guarantor") guaranteed to Wells Fargo all of the obligations then owing or thereafter owing by Borrower to Wells Fargo under the Credit Agreement and otherwise (the "Guaranty"); and

**WHEREAS**, pursuant to the Security Agreement, Wells Fargo agreed to provide Borrower with certain financing; and

**WHEREAS**, certain defaults occurred under the Security Agreement; and

**WHEREAS**, Borrower and Wells Fargo entered into that certain Forbearance Agreement dated October 26, 2007 (the "Initial Forbearance Agreement"), whereby Wells Fargo agreed to forbear in commencing an action against the Borrower until December 31, 2007 pursuant to the terms and conditions contained therein; and

**WHEREAS**, certain defaults existed under the Security Agreement and the Initial Forbearance Agreement; and

**WHEREAS**, Borrower requested that Wells Fargo forbear in commencing any action against the Borrower under or pursuant to the Security Agreement and allow the Borrower a reasonable amount of time to effect a sale of its company or assets or refinance a part or all of its assets; and

**WHEREAS**, the Borrower had certain immediate cash needs on February 1, 2008, and, in order to avoid irreparable injury to its business, Borrower requested certain specific immediate advances from Wells Fargo, which Wells Fargo was only willing to make upon the

3

terms and conditions contained in that written agreement dated as of February 1, 2008, which provided, in part, for the requested advances, the grant of the Revolving Line of Credit Mortgage to secure such advances, and Wells Fargo's agreement to forbear in commencing any action against the Borrower (the "Interim Forbearance Agreement"); and

WHEREAS, Borrower and Wells Fargo entered into that certain Forbearance Agreement dated February 5, 2008 (the "Forbearance Agreement"), whereby Wells Fargo agreed to forbear in commencing an action against the Borrower until June 30, 2008 pursuant to the terms and conditions contained therein; and

WHEREAS, as per that certain engagement letter by and between the Borrower and Getzler Henrich & Associates LLC, on or about March 17, 2008, Getzler Henrich & Associates LLC was retained as Borrower's Chief Restructuring Officer ("CRO") in place of NachmanHaysBrownstein Inc.; and

WHEREAS, as a result of the Inventory Valuation, dated March 5, 2008, prepared by Hilco Appraisal Services, LLC in the ordinary course of the existing financing, Wells Fargo deems it necessary to adjust the inventory advance rates under the existing financing arrangement; and

WHEREAS, the Borrower has cash needs in excess of the amounts presently available under the existing financing arrangement; and

WHEREAS, as of the close of business on March 24, 2008, the Borrower was obligated to Wells Fargo under the Security Agreement in the principal amount of $30,928,858.02, plus interest from March 1, 2008, together with all other Obligations that may be owing by Borrower to Wells Fargo including, but not limited to its costs (legal fees, and any fees, costs, expenses, disbursements), fees, expenses and disbursements, and any and all

4

additional advances that may be made by Wells Fargo to the Borrower whether to protect the Collateral (as that term is defined in the Security Agreement), in connection with the liquidation of Borrower's assets or otherwise (collectively, the "Obligations"); and

**WHEREAS**, Borrower remains obligated to Wells Fargo for the monies owed under the Security Agreement and otherwise; and

**WHEREAS**, the Borrower and Wells Fargo have agreed to the terms of Wells Fargo's continued forbearance through June 30, 2008, pursuant to the terms and conditions provided for herein.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.      All of the above recitals are hereby incorporated by reference and made part of this Agreement.

2.      Borrower hereby acknowledges that it is indebted to Wells Fargo under the Security Agreement in the amount of the Obligations.

3.      Borrower hereby acknowledges that the Borrower has defaulted under the Security Agreement, and that Wells Fargo may currently exercise its remedies pursuant to the Security Agreement and applicable law to recognize upon the Collateral or to otherwise proceed against the Borrower.

4.      The Borrower hereto acknowledges and represents that:

(a)     Borrower is in default under the Security Agreement and Wells Fargo has the right, subject to the provisions contained herein, at any time, to demand the amounts due and payable in full pursuant to Section 7.2 of the Security Agreement;.

(b)     The execution and delivery of this Agreement by Borrower and the compliance with the terms hereof do not violate any provision of the corporate documents of Borrower and do not violate any provision of any existing law or regulation or any writ or decree of any court or governmental instrumentality or any agreement or instrument to which Borrower is a party or which is binding upon Borrower or its assets and will not result in the creation or imposition of any lien, security interest, charge or encumbrance of any nature whatsoever. No consent of any other party and no consent, license, approval or authorization or registration or declaration with, any governmental bureau or agency is required in connection with the execution, delivery, performance, validity and enforceability of this Agreement.

(c)     Except a set forth on "Schedule 4(c)" of this Agreement there is no action, suit, proceeding or investigation pending or threatened (or any basis therefor) against Borrower which, if adversely determined, would in any case or in the aggregate, materially and adversely affect any of Borrower's properties, assets, financial condition or businesses or materially impair any of Borrower's right to carry on business substantially as now conducted or proposed to be conducted.

(d)     This Forbearance Agreement is intended to supplement the Security Agreement and the rights and obligations of the parties under the Security Agreement and other loan documents shall not in any way be vacated, modified or terminated except as herein provided. All terms and conditions contained in each and every agreement or promissory note or other evidence of indebtedness of Borrower to Wells Fargo are incorporated herein by reference.

6

(e)    The Borrower agrees that Wells Fargo has a first priority perfected security interest in the Collateral and in the Real Estate (as each term is defined in the Security Agreement). Guarantor, by its execution hereof, consents to the terms hereof and acknowledges and affirms that the Guaranty remains in full force and effect without defense, setoff or counterclaim. The Borrower hereby acknowledges and agrees that (A) throughout its relationship with Wells Fargo in connection with the transactions described in the Security Agreement, Wells Fargo and all of its officers, directors, shareholders, employees and agents have acted in good faith in complying with the terms of the Security Agreement, and (B) there does not exist as of the date hereof any defense, claim, claim of offset, cause of action or any other claim of liability (hereinafter referred to collectively as "Claims") in favor of any party against Wells Fargo or any of its officers, directors, shareholders, employees, or agents, and in consideration of the agreement by Wells Fargo to enter into this Agreement, the Borrower and Guarantors, hereby waive, release and discharge any Claims and causes of action, if any, of any kind whatsoever, whether at law or in equity, arising on or prior to the date hereof, which each may have against Wells Fargo.  Borrower and Guarantors each also agree that all waivers, releases and agreements made herein are made in consideration of, and in order to induce Wells Fargo to temporarily forbear in the exercise or further exercise of its rights and remedies under the Security Agreement and to induce Wells Fargo to enter into this Agreement.

(f)    As of the date hereof, this Agreement has been duly authorized, executed and delivered by Borrower.

7

(g)     This Agreement does not contravene any law, rule or regulation applicable to Borrower or any of the terms of any indenture, agreement or undertaking to which Borrower is a party.

(h)     Borrower shall not (i) apply for or consent to the appointment of, or the taking possession by, a receiver, custodian, trustee or liquidator of all or a substantial part of their property, (ii) make a general assignment for the benefit of creditors, (iii) commence a voluntary case under any state or federal bankruptcy laws (now or hereafter in effect), (iv) file a petition or application seeking to take advantage of any law providing for the relief of debtors, (v) be subject to any petition filed against it commencing any involuntary case under such bankruptcy laws unless it obtains an order from the bankruptcy court authorizing Wells Fargo to continue to provide financing under this Agreement and the Security Agreement, or (vi) take any action for the purpose of effecting the foregoing.

(i)     In the event of the filing of any voluntary or involuntary petition in bankruptcy by or against Borrower: (i) Borrower shall not assert or request any other party to assert that the automatic stay provided by section 362 of the Bankruptcy Code shall operate or be interpreted to stay, interdict, condition, reduce or inhibit Wells Fargo from enforcing any rights it has by virtue of the Security Agreement or this Agreement or at law or in equity, or any other rights Wells Fargo has whether now or hereafter acquired, against Borrower or its successors or assigns or against the Collateral; and (ii) Borrower shall not seek any financing pursuant to section 364(d) of the Bankruptcy Code, which grants a lender any security interest senior to the interests of Wells Fargo.

8

(j)      In the event of any voluntary or involuntary bankruptcy filing, Wells Fargo shall be entitled, and Borrower irrevocably consents, to an order granting relief from all stays, including the automatic stay imposed by Section 362 of the Bankruptcy Code, so as to permit Wells Fargo to foreclose upon its Collateral and to exercise any and all rights and remedies of Wells Fargo under the Security Agreement or this Agreement, or at law.

(k)      The Borrower agrees that in the event of any involuntary bankruptcy filing, the Borrower must immediately obtain an order of the Bankruptcy Court authorizing the Borrower to continue to borrow from Wells Fargo on a secured basis in accordance with the Security Agreement pending the dismissal of the involuntary petition or entry of an order for relief in form and substance acceptable to Wells Fargo.

(l)      The Borrower hereby represents and warrants that all financial statements, affidavits of financial condition and other financial information delivered or provided by Borrower to Wells Fargo are true, correct and accurate.

(m)      The Borrower hereby represents and warrants that all warranties and representations made to Wells Fargo as of the date hereof are true, correct and accurate.

5.      The Borrower hereby confirms the security interests and liens granted by the Borrower to Wells Fargo in and to the Collateral and Real Estate in accordance with the Security Agreement, Mortgages and other loan documents as security for its Obligations to Wells Fargo. The Guarantor hereby confirms the security interests and liens granted by the Guarantor to Wells Fargo in and to the Guarantor's assets as security for the Borrower's and Guarantor's obligations to Wells Fargo.

6.      Wells Fargo agrees to forbear from exercising its rights, including, but not limited to those rights pursuant to the Uniform Commercial Code against the Borrower under the Security Agreement until June 30, 2008 (the "Forbearance Period"), provided that during the Forbearance Period there is no default under this Agreement, or any new default under the Security Agreement.

7.      Borrower has provided Wells Fargo with projections of the Borrower's cash receipts and disbursements, including line item projections for weekly cash requirements, projected sales, projected inventory positions, projected loan balances and the Availability (either as a positive or negative number) for all loans for the period through June 6, 2008 (the "Budget", attached hereto as Exhibit "A"). The Borrower shall deliver to Wells Fargo an updated budget on a rolling thirteen week rolling basis, no later than every Monday of each week by 5:00 p.m. (each a "Revised Budget"), which Revised Budget shall be subject to the approval of Wells Fargo, in its sole discretion. The Borrower warrants and represents that Revised Budget shall include all reasonable, necessary and foreseeable expenses to be incurred with the operation of Borrower's business for the period set forth in the Revised Budget and that the Revised Budget reflects Borrower's best good faith projections for all data contained therein.

8.      The CRO shall have full authority to review the Budget and each Revised Budget with full oversight. The Borrower, through its CRO shall, in conjunction with other members of the Borrower's management team: (i) prepare and timely deliver each Revised Budget (subject to Wells Fargo's consent) under which the Borrower shall operate under this Forbearance Agreement; (ii) request advances from Wells Fargo to effect payments on the Borrower's behalf; (iii) administer the Budget and each Revised Budget; (iv) negotiate with all vendors and customers; and (v) solicit refinancing opportunities and offers to purchase all or any part of the

10

Borrower's business. The term "in conjunction with other members of the Borrower's management team" as used in this Forbearance Agreement is for information purposes only and shall not create any duty upon Wells Fargo to verify or confirm that the CRO has actually acted together with any other member of management. Borrower hereby agrees that the CRO shall be the sole designee appointed by the Borrower on its behalf to communicate with Wells Fargo and to relay information and instruction to it and that such communications, information and instructions shall be binding upon the Borrower. The CRO shall have such additional functions as may be set forth any retention agreement by and between Borrower and such CRO, copies of which shall be provided to Wells Fargo within one day of them being entered into between such CRO and the Borrower.

9.    No later than 5:00 p.m. on each Monday hereafter, the Borrower shall provide Wells Fargo with (a) a compliance report in the same spreadsheet form as the Budget and each Revised Budget, certified in writing as true and accurate, that shows the comparison of all budget categories with the actual levels of expenditures and revenues generated for the preceding week (a "Budget Compliance Report"); (b) weekly inventory reports and (c) such other reports and financial information required by the Security Agreement in accordance with its terms.

10.    Provided that no Event of Default has occurred under this Agreement or any new Event of Default under the Security Agreement, there shall be a moratorium of principal payments under the M&E Note, Cap Ex Note and the Real Estate Note.

11.    Section 1.1 (Definitions) of the Security Agreement is hereby amended to delete the definitions of "Availability", "Borrowing Base", "Default Rate", "Floating Rate", and "Maximum Line Amount" and replace them with the following:

"'Availability' means the amount, if any, by which the Borrowing Base exceeds the sum of (a) the outstanding principal balance of the Revolving Note,

11

(b) the face amount of the $7MM Termed (Revolver) Note, and (c) and the outstanding principal balance of the Real Estate Line of Credit Note."

"Borrowing Base" means at any time the lesser of:

      (a)    The Maximum Line Amount less the outstanding principal balance of (a) the Real Estate Note; (b) the Cap Ex Note; and (c) the M&E Note; or

      (b)    Subject to change from time to time in the Lender's reasonable discretion, the sum of:

            (i)    The product of the Accounts Advance Rate times Eligible Accounts, plus

            (ii)    The lesser of (A) the product of the Inventory Advance Rate times Eligible Inventory, or (B) 85% (or such lesser rate as the Lender in its commercially reasonable discretion may deem appropriate from time to time) of the Net Orderly Liquidation Value of Eligible Inventory, or (C) 100% (or such lesser rate as the Lender in its reasonable discretion may deem appropriate from time to time) of the amount of availability from b(i) above, or (D) $7,000,000, less

            (iii)    The face amount of the Real Estate Line of Credit Mortgage ($2,999,999); less

            (iv)    The Borrowing Base Reserve, less

            (v)    Obligations that the Borrower owes to the Lender that have not yet been advanced on the Revolving Note, and the dollar amount that the Lender in its discretion believes is a reasonable determination of the Borrower's credit exposure with respect to Wells Fargo Affiliate Obligations and obligations owed to Wells Fargo Merchant Services, LLC.

"'Default Rate' means an annual interest rate in effect during a Default Period or following the Termination Date, which interest rate shall be equal to three percent (3%) over the applicable Floating Rate, as such rate may change from time to time."

"'Floating Rate' means an annual interest rate equal to the sum of the Prime Rate plus two and one half of one percent (2.5%), which interest rate shall change when and as the Prime Rate changes."

"'Maximum Line Amount' means $35,151,500.33."

12.    Section 1.1 (Definitions) of the Security Agreement is hereby amended by

deleting subparagraph (xvii) to the definition of "Eligible Accounts", and replacing it with new

subparagraphs (xvii) and (xviii) as follows:

"(xvii)        Accounts owed by AmeriSource Bergen, McKesson, Cardinal
Health, or any other wholesaler (except Watson Pharmaceutical), to the extent accrued
after January 21, 2008;"

"(xviii)       Accounts owed by Watson Pharmaceutical, to the extent such
accounts exceed $1,100,000;"

13.    Section 1.1 (Definitions) of the Security Agreement is hereby amended by adding

a new subparagraph (ix) to the definition of "Eligible Inventory" as follows:

"(ix)  Inventory comprised of work in process to the extent such
exceeds the amount of $6,718,000 ("Eligible WIP"), which Eligible WIP
shall be reduced by the amount of $200,000 per week commencing the week
ending February 8, 2008 until such time as the Eligible WIP is reduced to
the amount of $5,518,000."

14.    Section 1.1 (Definitions) of the Security Agreement is hereby amended by adding

a definition for "Inventory Advance Rate" as follows:

"'Inventory Advance Rate' means up to forty-nine percent (49%), or
such lesser rate as the Lender in its sole discretion may deem appropriate
from time to time. Notwithstanding anything to the contrary stated herein,
the Inventory Advance Rate shall be reduced by one percentage point (1%)
per week commencing on March 31, 2008 and each Monday thereafter until
such time that the Borrower has obtained (i) a commitment from a third
party to refinance at least $30,000,000 of the Obligations and (ii) a proposal,
accepted by the Borrower, from a third party to refinance the balance of the
Obligations, each satisfactory to Wells Fargo in its sole discretion. In the
event (a) the Borrower has not refinanced the Obligations in full by April
30, 2008 or (b) an event of default has occurred under this Agreement,
Inventory Advance Rate shall mean up to thirty-nine percent (39%), or such
lesser rate as the Lender in its reasonable discretion may deem appropriate
from time to time."

15.    Section 2.2(a) of the Security Agreement is hereby amended to delete it in its

entirety and replace it with the following:

13

"(a)    Type of Advances.    Each Advance shall be funded as a Floating Rate Advance."

16.    Section 2.4 of the Security Agreement is hereby amended by deleting subparagraph (d)(ii) in its entirety and replacing it with the following:

"(ii) Repayment of Real Estate Line of Credit Advance. On the earlier of the occurrence of an event of default under this Agreement, or June 30, 2008, the entire unpaid principal balance of the Real Estate Line of Credit Note, and all unpaid interest accrued thereon, shall in any event be due and payable."

17.    During the Forbearance Period, all Advances made under the Security Agreement shall be made as a Real Estate Line of Credit Advance or as a Revolving Advance, as determined by Wells Fargo in its sole discretion.

18.    At the Borrower's request, Wells Fargo agreed to allow the Borrower to decrease the outstanding principal amount under the Revolving Note by $7,000,000. In order to meet the Borrower's request and to provide the Borrower with additional liquidity, Wells Fargo agreed to *term out* part of the obligations presently covered by the Revolving Note. This reduced the Revolving Note by the requested amount with the *termed out* obligations being evidenced by a new $7MM Termed (Revolver) Note, which such $7MM Termed (Revolver) Note shall remain secured by the Collateral as provided in Article III of the Credit Agreement and shall also be secured by the Real Estate. Interest on the $7MM Termed (Revolver) Note shall accrue at the Floating Rate. On the earlier of the Maturity Date, the Termination Date, or June 30, 2008, the entire unpaid principal balance of the $7MM Termed (Revolver) Note, and all unpaid interest accrued thereon, shall be due and payable.

19.    To secure the obligations under the $7MM Termed (Revolver) Note, the Borrower executed and delivered to Wells Fargo that certain Mortgage Agreement in the original

14

principal amount of $7,000,000 (the "Collateral Mortgage"), granting to Wells Fargo a security interest in and to the Real Estate. Borrower caused to be issued to Wells Fargo an ALTA Title Insurance Policy with respect to the property mortgaged in this paragraph, naming Wells Fargo as the insured party.

20.    Borrower hereby agrees to pay any and all mortgage taxes, recording fees, insurance premiums, and any and all costs, fees and expenses relating to the mortgages given to Wells Fargo herein.

21.    Except as specifically provided for in this Paragraph 21, Wells Fargo shall not be obligated to apply payments received from or on behalf of the Borrower towards any particular loan, and specifically shall not be obligated to apply any amounts received towards reduction of indebtedness under the Real Estate Line of Credit Note. Any amounts received by Wells Fargo may be applied against any outstanding indebtedness of the Borrower in Wells Fargo's sole discretion. Notwithstanding, in the event of any refinance, sale or sale-leaseback of the premises securing the Mortgages, the proceeds from any such refinancing, sale or sale-leaseback shall be applied as follows: (a) first to the satisfaction of the Real Estate Note; then (b) to the satisfaction of the Real Estate Line of Credit Note; then (c) to the satisfaction, in part or in full, of the M&E Note. Upon the satisfaction in full of the Real Estate Note, Real Estate Line of Credit Note and the M&E Note, Wells Fargo agrees to release or assign (without recourse and subject to an indemnity in favor of Wells Fargo for any claim arising out of or in connection with such assignment) the Mortgages and the Collateral Mortgage.

22.    Borrower hereby waives any and all defenses, claims, setoffs and discharges of the Borrower or any other obligor pertaining to the Obligations of the Borrower to Wells Fargo except the defense of discharge by payment in full. The Borrower expressly waives notice of the

15

sale, lease or other disposition of the Borrower's or other obligor's collateral and any right of redemption that the Borrower may have.

23.    Wells Fargo shall be entitled to perform periodic inspections of the Borrower's accounts, inventory, equipment and all other assets securing the Obligations and the Borrower agrees to fully cooperate with Wells Fargo in the performance of said inspections.

24.    Upon execution and delivery of this Amended and Restated Forbearance Agreement, the Borrower shall be obligated to Wells Fargo, in addition to all other fees previously paid to Wells Fargo, in the amount of $250,000, such amount to then be immediately due and owing but payable on the Termination Date.

25.    In the event Borrower shall complete a sale of its stock or assets or any part thereof in an amount sufficient to pay the outstanding balance of the Obligations owing to Wells Fargo, the Borrower acknowledges that such sale would be a direct result of Wells Fargo's efforts and willingness to forbear from exercising its remedies against the Collateral, and agrees and acknowledges that Wells Fargo is entitled to a fee of $500,000 (the "Success Fee"), due and payable from the proceeds of such sale. Wells Fargo agrees to reduce the Success Fee as follows: In the event the Borrower pays the outstanding balance of the Obligations owing to Wells Fargo on or before February 28, 2008, the Success Fee shall be reduced to $250,000; in the event the Borrower pays the entire indebtedness due to Wells Fargo on or before March 31, 2008, the Success Fee shall be reduced to $350,000; in the event the Borrower pays the outstanding balance of the Obligations owing to Wells Fargo on or before April 30, 2008, the Success Fee shall be reduced to $450,000. It is specifically agreed that the Success Fee shall not be earned in the event of a refinancing unless such refinancing is related to a sale of substantially all of the Borrower's stock or assets.

16

26.     At the time Borrower requests that Wells Fargo release any of its liens (whether in connection of a payoff of the Obligations or otherwise), and as inducement to Wells Fargo for it to do so, Borrower agrees (and shall be obligated) to waive, release and discharge any and all claims or causes of action, if any, of every kind and nature whatsoever, whether at law or in equity, arising at or prior to the date thereof, which it may have against Wells Fargo and/or any of its officers, employees, agents and/or representatives.

27.     An Event of Default under this Agreement shall mean any of the following:

(a)     The failure of the Borrower to observe, or timely comply with, or perform any covenant or term contained in this Agreement or the Security Agreement or any other agreement by and between Wells Fargo and the Borrower;

(b)     The failure of the Borrower to pay Wells Fargo any sum when due under this Agreement or the Security Agreement;

(c)     The occurrence of a material adverse change subsequent to the date of this Agreement with respect to the Borrower's finances or property, it being specifically understood and agreed that Wells Fargo may make such determination in its sole and absolute discretion;

(d)     Any financial statements, affidavits of financial condition or other financial information delivered or provided by the Borrower or in connection with this Agreement or the Security Agreement or any other agreement by and between Wells Fargo and the Borrower is or shall be false or misleading in any material respect;

(e)     Any warranty or representation made or deemed made by the Borrower in this Agreement or the Security Agreement or any other agreement by and between Wells Fargo and the Borrower is or shall be untrue in any material respect;

17

(f)    The Borrower becomes a debtor in any bankruptcy proceeding;

(g)    Wells Fargo, after good faith verification, discovers any act of dishonesty by any officer or director of the Borrower as determined by Wells Fargo in its sole discretion;

(h)    The Borrower exceeds cash disbursement levels set forth in the Budget or any Revised Budget by greater than ten percent (10%) on a cumulative 13-week rolling basis, it being specifically understood that the transaction costs (i.e., mortgage recording taxes, professional fees, and the fee referenced in Paragraph 23 herein) associated with this Agreement shall be in excess of the Budget or any Revised Budget, if applicable;

(i)    The Borrower fails to meet profit levels set forth in the Budget or any Revised Budget by greater than ten percent (10%) on a cumulative 13-week rolling basis, tested on a monthly basis against the financial statements provided in accordance with the Credit Agreement;

(j)    The Borrower fails to meet sales levels set forth in the Budget or any Revised Budget by greater than ten percent (10%) on a cumulative 13-week rolling basis;

(k)    The Borrower fails to meet cash receipt levels set forth in the Budget or any Revised Budget by greater than ten percent (10%) on a cumulative 13-week rolling basis;

(l)    The Borrower fails to meet availability levels set forth in the Budget or any Revised Budget by greater than ten percent (10%) on a cumulative 13-week rolling basis;

(m)    The Borrower has not received either (i) a letter of intent to purchase substantially all of the assets of the Borrower for an amount in excess of the outstanding

18

balance of the Obligations owing to Wells Fargo or (ii) a proposal letter(s) from a third party(ies) to refinance the outstanding balance of the Obligations owing to Wells Fargo executed by the Borrower and such third party(ies), on or before March 31, 2008;

(n)     The Borrower has not received either (i) a commitment for the purchase of substantially all of the assets of the Borrower for an amount in excess of the outstanding balance of the Obligations owing to Wells Fargo or (ii) both (x) a commitment from a third party to refinance at least $30,000,000 of the Obligations and (y) a proposal, accepted by Borrower, from a third party to refinance the balance of the Obligations, each satisfactory to Wells Fargo in its sole discretion, on or before April 30, 2008;

(o)     The Borrower has not either (i) closed on the sale of substantially all of the assets of the Borrower for an amount in excess of the outstanding balance of the Obligations owing to Wells Fargo or (ii) closed on the refinancing by a third party of the outstanding balance of the Obligations owing to Wells Fargo, on or before June 30, 2008;

(p)     Any indebtedness remains outstanding from the Borrower to Wells Fargo on June 30, 2008.

28.     By executing this Agreement, the Borrower and Guarantor hereby waive, release and discharge any and all claims or causes of action, if any, of every kind and nature whatsoever, whether at law or in equity, arising at or prior to the date hereof, which it or they may have against Wells Fargo and/or its officers and employees in connection with the Security Agreement, this Agreement and all documents executed in connection therewith. Borrower also agrees that all waivers, releases and agreements made herein are made in consideration of, and in order to induce Wells Fargo to temporarily forbear the exercise or further exercise of its rights

19

and remedies against the Borrower under the Security Agreement and to induce Wells Fargo to enter into this Agreement.

29.    This Agreement shall be construed under and in accordance with the laws of the State of New York.

30.    The Borrower hereby consents to the jurisdiction of the Supreme Court of the State of New York for a determination of any and all disputes connected with this Agreement and/or the Security Agreement, and documents executed in connection therewith and consents to service of process by overnight courier, such service to be deemed effected upon posting. This is without prejudice to Wells Fargo's right to bring an action in any other jurisdiction for a determination of any dispute connected with this Agreement and/or the Security Agreement or the documents executed in connection therewith.

31.    This Agreement represents the entire agreement between Wells Fargo and the Borrower, all other agreements between Wells Fargo and the Borrower being merged with this Agreement. The Security Agreement, the Mortgages, the Notes, and all other documents executed in connection with the foregoing, shall remain in full force and effect and modified only as specifically provided for in this Agreement. The Borrower hereby acknowledges and agrees that Wells Fargo is agreeing to forbear in commencing any action against the Borrower only for Obligations owing to Wells Fargo under the Security Agreement pursuant to the terms and conditions contained in this Agreement.

32.    The Borrower hereto shall execute all additional documents and do all acts not specifically referred to herein which are reasonably necessary to fully effectuate the intent of this Agreement.

33. The Borrower and Guarantor acknowledge and agrees that (i) Wells Fargo is not, by virtue of this Forbearance Agreement or otherwise, waiving any Default or Event of Default under the Loan Documents and (ii) Wells Fargo is not abandoning, waiving or releasing any claim, right or remedy Wells Fargo has under any of the Loan Documents. Borrower and Guarantors agree that no delay on the part of Wells Fargo in exercising any power or right under the Loan Agreement, hereunder or any other Loan Document shall operate as a waiver of any such power or right, nor act as a consent to any departure by Borrower or Guarantors from any of the terms or conditions hereof or thereof, preclude other or further exercise thereof, or the exercise of any other power or right. No waiver whatsoever shall be valid unless in writing signed by Wells Fargo and then only to the extent set forth therein.

34. No executory agreement and no course of dealing between the Borrower and Wells Fargo shall be effective to change or modify this Agreement in whole or in part; nor shall any change, modification or waiver of any rights or powers of Wells Fargo be valid or effective unless in writing or signed by an authorized officer of Wells Fargo. Notwithstanding anything to the contrary contained herein, Wells Fargo does not agree to change, modify, waive, or forbear in exercising any of its rights or powers with respect to any corporation, shareholder, guarantor or individual other than the Borrower.

35. The Borrower hereby represents and acknowledges that in connection with the negotiation of this Agreement it has been represented by its own counsel, who has reviewed this Agreement and advised it as to the legal significance and consequences of entering into this Agreement.

21

36.    Each individual executing this Agreement on behalf of the Borrower and Wells Fargo hereby warrants and represents that he has the requisite corporate authority to execute this Agreement.

37.    This Agreement may be executed in counterparts, each of which will be deemed an original document, but all of which together shall constitute but a single document.    An executed facsimile of this Agreement shall be deemed to be a valid and binding agreement between the parties hereto.

IN WITNESS WHEREOF, the undersigned hereby agree to the terms and conditions as set forth hereinabove.

WELLS FARGO BANK, NATIONAL
ASSOCIATION, acting through its Wells Fargo
Business Credit operating division

By:_____
      Richard Mahtani, Vice President

INTERPHARM, INC.

By:_____
~~Cameron Reid, Chief Executive Officer~~
PETER GIARLLORENZO
CHIEF OPERATING OFFICER AND
CHIEF FINANCIAL OFFICER

Consented to, Agreed, and Acknowledged:

INTERPHARM HOLDINGS, INC.

By:_____
~~Cameron Reid, Chief Executive Officer~~
PETER GIARLLORENZO
CHIEF OPERATING OFFICER AND
CHIEF FINANCIAL OFFICER

CHERYL RIEPPEL
Notary Public - State of New York
NO. 01RI6160426
Qualified in Suffolk County
My Commission Expires _____

22

STATE OF NEW YORK      )
                       ) ss.:
COUNTY OF NEW YORK  )

On the ___ day of March, in the year 2008, before me personally came Richard Mahtani, to me known, who, being by me duly sworn, did depose and say that he resides in New York, New York; that he is the Vice President of WELLS FARGO BANK, NATIONAL ASSOCIATION, acting through its Wells Fargo Business Credit operating division., the corporation described in and which executed the above instrument; and that he signed his name thereto by authority of the board of directors of said corporation.

_____

Notary Public

STATE OF NEW YORK      )
                       ) ss.:
COUNTY OF              )

On the ___ day of March, in the year 2008, before me personally came Cameron Reid, to me known, who, being by me duly sworn, did depose and say that s\he resides in _____: that he is the Chief Executive Officer of INTERPHARM, INC. the corporation described in and which executed the above instrument; and that s\he signed her\his name thereto by authority of the board of directors of said corporation.

_____

Notary Public

STATE OF NEW YORK      )
                       ) ss.:
COUNTY OF              )

On the ___ day of March, in the year 2008, before me personally came Raj Sutaria to me known, who, being by me duly sworn, did depose and say that s\he resides in Melville, New York; that he is the Chief Executive Officer of INTERPHARM HOLDINGS, INC. the corporation described in and which executed the above instrument; and that s\he signed her\his name thereto by authority of the board of directors of said corporation.

_____

Notary Public

414629

36.     Each individual executing this Agreement on behalf of the Borrower and Wells Fargo hereby warrants and represents that he has the requisite corporate authority to execute this Agreement.

37.     This Agreement may be executed in counterparts, each of which will be deemed an original document, but all of which together shall constitute but a single document. An executed facsimile of this Agreement shall be deemed to be a valid and binding agreement between the parties hereto.

IN WITNESS WHEREOF, the undersigned hereby agree to the terms and conditions as set forth hereinabove.

WELLS FARGO BANK, NATIONAL
ASSOCIATION, acting through its Wells Fargo
Business Credit operating division

By: _____
        Richard Mahtani, Vice President

INTERPHARM, INC.

By: _____
        Cameron Reid, Chief Executive Officer

Consented to, Agreed, and Acknowledged:

INTERPHARM HOLDINGS, INC.

By: _____
        Cameron Reid, Chief Executive Officer

STATE OF NEW YORK      )
                       ) ss.:
COUNTY OF NEW YORK  )

      On the _25_ day of March, in the year 2008, before me personally came Richard Mahtani, to me known, who, being by me duly sworn, did depose and say that he resides in New York, New York; that he is the Vice President of WELLS FARGO BANK, NATIONAL ASSOCIATION, acting through its Wells Fargo Business Credit operating division., the corporation described in and which executed the above instrument; and that he signed his name thereto by authority of the board of directors of said corporation.

_____
Notary Public

STATE OF NEW YORK      )
                       ) ss.:
COUNTY OF              )

ROBINA MCEWEN
Notary Public - State of New York
NO. 01MC6166374
Qualified in Kings County
My Commission Expires _____ 2011

      On the ___ day of March, in the year 2008, before me personally came Cameron Reid, to me known, who, being by me duly sworn, did depose and say that s\he resides in _____; that he is the Chief Executive Officer of INTERPHARM, INC. the corporation described in and which executed the above instrument; and that s\he signed her\his name thereto by authority of the board of directors of said corporation.

_____
Notary Public

STATE OF NEW YORK      )
                       ) ss.:
COUNTY OF              )

      On the ___ day of March, in the year 2008, before me personally came Raj Sutaria to me known, who, being by me duly sworn, did depose and say that s\he resides in Melville, New York; that he is the Chief Executive Officer of INTERPHARM HOLDINGS, INC. the corporation described in and which executed the above instrument; and that s\he signed her\his name thereto by authority of the board of directors of said corporation.

_____
Notary Public

## SCHEDULE 4(e)
## LITIGATIONS

Interpharm, Inc. v. Watson Laboratories, Inc., United States District Court, EDNY, Dkt No. 4600-cv-07 (Counterclaims)

Leiner Health Products v. Interpharm Holdings, Inc., Superior Court of California, Los Angeles, No. BC381396

Forest Laboratories v. Interpharm Holdings, Inc. and Interpharm, Inc., District Court of Delaware, No. 08-52

Ray Vuono v. Interpharm Holdings, Inc., New York Supreme Court, Suffolk County, Index No. 06-13985

Crane Partners v. Interpharm Holdings, Inc. and Interpharm, Inc., Superior Court of New Jersey, Law Division, Bergen County, BER-L-8474-07

Generic Pharmaceutical Services Inc.v. Interpharm Inc., New York Supreme Court, Suffolk County, Index No. 07-39101

Maria D. Amaya v. Interpharm, Inc., New York State Div. Of Human Rights, Case No. 10117146

Threatened Claims:

Possible claim by a female "MR" - January 18, 2008 letter threatening action for pain and suffering in connection with use of a prescribed Interpharm product.

**Exhibit A**
**Budget**

## DECLARATION OF STEVEN BURNS

I, Steven Burns, declare as follows:

1.      I am the RX/HBC Purchasing Manager for Kinray Inc., the largest privately held distributor of pharmaceutical products.

2.      Breckenridge Pharmaceutical, Inc. is a long-standing supplier of prescription pharmaceutical products to Kinray Inc., including tablets containing esterified estrogens and methyltestosterone ("EE/MT").

3.      I was sent the attached by a representative of Interpharm Holdings, Inc. and/or Interpharm, Inc.

I declare under penalty of perjury that the foregoing is true and correct.

April 16, 2008.

Steven Burns
Steven Burns

# EXHIBIT A

Here is a little background of what is happening. Many customers have been purchasing Interpharm's EEMT product through a third party. Interpharm is transitioning these customers to go direct this translates into a tremendous cost savings. . This will be a very easy transition at the pharmacy level.

On top of this very aggressive offer Interpharm will allow a one time 10% buy in on Estrogen and Methyltestosterone .625mg/ 1.25mg and 1.25mg/2.5mg as a bill back on the first purchase order.

The HDMA Sheets are also attached

75 Adams Avenue, Hauppauge, NY 11788

Phone: (631)-952-0214  Fax: (631)-299-3994

INTER-PHARM

| GENERIC PRODUCT NAME | BRAND NAME COMPARISON | STRENGTHS | PKG SIZE | NDC # | WAC | AWP | Contract price | Accept |
|---|---|---|---|---|---|---|---|---|
| Estrogen and Methyltestosterone | Estratest® | .625mg/ 1.25mg | 100 | 53748-077-01 | $112.00 | $167.95 | | |
| Estrogen and Methyltestosterone | Estratest® | 1.25mg/2.5mg | 100 | 53746-078-01 | $135.00 | $192.95 | | |

Signature: _____
Price Proposal Accepted by: _____
Title: _____

**Note:**
Interpharm will allow a one time 10% buy in on Estrogen and Methyltestosterone as a bill back on the first purchases order.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BRECKENRIDGE PHARMACEUTICAL, INC., ) <br><br> Plaintiff, ) <br> v. ) <br><br> INTERPHARM HOLDINGS, INC., and ) <br> INTERPHARM, INC., ) <br><br> Defendant. ) | Civil Action No. 08-cv-03479 |

## DECLARATION OF PHILIP GOLDSTEIN IN SUPPORT OF THE MOTION OF BRECKENRIDGE PHARMACEUTICAL, INC. FOR A PRELIMINARY INJUNCTION

Philip Goldstein declares, under penalty of perjury, that the following is true and correct:

1.      I am the National Accounts Sales Manager for Plaintiff Breckenridge Pharmaceutical, Inc. ("Breckenridge"), where I have been employed since 2002.

2.      In this capacity, I have invested significant time and effort for more than five years developing relationships with certain customers to whom I sell pharmaceutical products on behalf of Breckenridge.

3.      Among the products that I sell to our customers is a prescription product containing esterified estrogens and methyltestosterone ("EE/MT"). Breckenridge has been supplying EE/MT for more than a decade, which is a particularly strong track record in this industry.

4.      Beginning in late March or early April 2008, I began to hear from some of my customers that they had been informed by sales representatives of Interpharm Holdings, Inc. and/or Interpharm, Inc. (collectively "Interpharm") that Interpharm would no long be supplying EE/MT to Breckenridge and that Breckenridge had no more than a 20 day supply of EE/MT.

5.    My customers understood Interpharm's statements to mean that Breckenridge would soon be unable to fulfil orders for EE/MT, and that these customers would have to order EE/MT directly from Interpharm in order to keep receiving sufficient quantities of EE/MT to supply their needs.    One of my customers who informed me of this was Hannaford, a supermarket and pharmacy chain.  (see Exhibit "A").

6.    As a result of Interpharm's statements, I had to assure Hannaford and my other customers that Breckenridge would indeed be able to continue to supply sufficient EE/MT to meet their needs, in order to try to prevent these statements from undermining the customer good will and the reputation for reliability that I have worked hard to establish over the years on behalf of Breckenridge.

7.    Because this has just recently occurred, and continues to occur, I am still unclear whether these issues are resolved and whether Interpharm may contact my other customers.

8.    At the same time as making these statements concerning Breckenridge's inability to provide EE/MT in the future, Interpharm was also submitting proposals to my customers to sell EE/MT to them at prices lower than Breckenridge's prices.

9.    As a result of Interpharm's statements to my customers, Breckenridge has thus far been forced to reduce pricing for at least three customers.    The alternative to matching Interpharm's pricing would be to lose those accounts altogether.

I declare under penalty of perjury, that the foregoing is true and correct.

Executed on April 15, 2008.

_____
Philip Goldstein

2

# EXHIBIT A

Phil Goldstein
National Accounts Sales Manager
Breckenridge Pharmaceutical, Inc.
PH: 973-808-6899 -ext 252
e-FAX: 973-833-0437
pgoldstein@bpirx.com

*********************************************************************

-----Original Message-----
From: smcbreairty@hannaford.com [mailto:smcbreairty@hannaford.com]
Sent: Thursday, April 03, 2008 11:54 AM
To: pgoldstein@bpirx.com
Subject: EEMT - Gonzo?


Phil,

I hear Interpharm will no longer supply Breckenridge on the EEMT
product?

FYI,

Shawn McBreairty
Category Manager - Pharmacy
Delhaize America
(Hannaford, Sweetbay, Food Lion)
207-885-3645 - Phone
207-396-3645 - Fax
Mail Sort Code - 3000

# EXHIBIT D



EEMT Net Per Unit Analysis for

| Crestwood / Breckenridge | Customer | Product | Lot # | Reporting Month Gross Sales | Reporting Month Units | Avrg Gross Price Per Unit | Estimated Credit % | 2007 Sales Estimated Per Unit Chargebacks and Rebates | Estimated Per Unit Net | Reporting Month Net Sales | =NM43% Centrix Mktg Exp COGS at sliding scale | Profit | Interpharm ROI / unit | Reporting Month Units | Interpharm $ Realized | Total Reporting Month Net Sales | Centrix $ Realized |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Amerisource | | EEMT | HM00106 | | | | | | | | | | | | | | |
| Amerisource | | EEMT | HM00106 | | | | | | | | | | | | | | |
| Havard | | EEMT-HS | HB11607 | | | | | | | | | | | | | | |
| Havard | | EEMT | HB11607 | | | | | | | | | | | | | | |
| Kinry | | EEMT-HS | HB11607 | | | | | | | | | | | | | | |
| Cellsource | | EEMT | HM00106 | | | | | | | | | | | | | | |
| Cellsource | | EEMT | HM00106 | | | | | | | | | | | | | | |
| Cellsource | | EEMT-HS | HB11607 | | | | | | | | | | | | | | |
| Ahold | | EEMT-HS | HC00007-L | | | | | | | | | | | | | | |
| Amerisource | | EEMT-HS | HC10707-L | | | | | | | | | | | | | | |
| Amerisource | | EEMT-HS | HC10707-L | | | | | | | | | | | | | | |
| ANDA | | EEMT-HS | HC10707-L | | | | | | | | | | | | | | |
| Associated Pharma | | EEMT-HS | HC00007-L | | | | | | | | | | | | | | |
| Bartow Hospital | | EEMT-HS | HC10707-L | | | | | | | | | | | | | | |
| Bartow Hospital | | EEMT-HS | HC00007-L | | | | | | | | | | | | | | |
| Cardinal | | EEMT-HS | HC00007-L | | | | | | | | | | | | | | |
| Cardinal | | EEMT-HS | HC10707-L | | | | | | | | | | | | | | |
| CVS | | EEMT-HS | HC00007-L | | | | | | | | | | | | | | |
| CVS | | EEMT-HS | HC00007-L | | | | | | | | | | | | | | |
| Drogoana Balances | | EEMT-HS | HC00007-L | | | | | | | | | | | | | | |
| HD Smith | | EEMT-HS | HC10707-L | | | | | | | | | | | | | | |
| Hannaford | | EEMT-HS | HC00007-L | | | | | | | | | | | | | | |
| HE Butt | | EEMT-HS | HC00007-L | | | | | | | | | | | | | | |
| Hannaford | | EEMT-HS | HC00007-L | | | | | | | | | | | | | | |
| McKesson | | EEMT-HS | HC10707-L | | | | | | | | | | | | | | |
| McKesson | | EEMT-HS | HC00007-L | | | | | | | | | | | | | | |
| Kinry | | EEMT-HS | HC10707-L | | | | | | | | | | | | | | |
| Kelser | | EEMT-HS | HC10707-L | | | | | | | | | | | | | | |
| Medco Health | | EEMT-HS | HC00007-L | | | | | | | | | | | | | | |
| Medco Health | | EEMT-HS | HC04907-L | | | | | | | | | | | | | | |
| RDC | | EEMT-HS | HC10707-L | | | | | | | | | | | | | | |
| Schnuck | | EEMT-HS | HC04907-L | | | | | | | | | | | | | | |
| Schnuck | | EEMT-HS | HC00007-L | | | | | | | | | | | | | | |
| Public | | EEMT-HS | HC04807-L | | | | | | | | | | | | | | |
| Public | | EEMT-HS | HC10707-L | | | | | | | | | | | | | | |
| Quest Pharma | | EEMT-HS | HC04907-L | | | | | | | | | | | | | | |
| RDC | | EEMT-HS | HC10707-L | | | | | | | | | | | | | | |
| Value Drug Company | | EEMT-HS | HC10707-L | | | | | | | | | | | | | | |
| Valley Wholesale | | EEMT-HS | HC10707-L | | | | | | | | | | | | | | |
| Walgreens | | EEMT-HS | HC00007-L | | | | | | | | | | | | | | |
| Walgreens | | EEMT-HS | HC00007-L | | | | | | | | | | | | | | |
| Walgreens | | EEMT-HS | HC00007-L | | | | | | | | | | | | | | |
| Wal-Mart | | EEMT-HS | HC10707-L | | | | | | | | | | | | | | |
| Wal-Mart | | EEMT-HS | HC10707-L | | | | | | | | | | | | | | |
| Wal-Mart | | EEMT-HS | HC10707-L | | | | | | | | | | | | | | |
| Amerisource | | EEMT-CDS | HM00506-L | | | | | | | | | | | | | | |
| Amerisource | | EEMT-CDS | HM00506-L | | | | | | | | | | | | | | |
| ANDA | | EEMT-CDS | HM00506-L | | | | | | | | | | | | | | |
| Associated Pharmacies | | EEMT-CDS | HM00506-L | | | | | | | | | | | | | | |
| Bartow Hospital | | EEMT-CDS | HM00506-L | | | | | | | | | | | | | | |
| Cardinal | | EEMT-CDS | HM00506-L | | | | | | | | | | | | | | |
| Cardinal | | EEMT-CDS | HM00506-L | | | | | | | | | | | | | | |
| CVS | | EEMT-CDS | HM00506-L | | | | | | | | | | | | | | |
| CVS | | EEMT-CDS | HM00506-L | | | | | | | | | | | | | | |
| Drogoana Balances | | EEMT-CDS | HM00506-L | | | | | | | | | | | | | | |
| HD Smith | | EEMT-CDS | HM00506-L | | | | | | | | | | | | | | |
| Hannaford | | EEMT-CDS | HM00506-L | | | | | | | | | | | | | | |
| McKesson | | EEMT-CDS | HM00506-L | | | | | | | | | | | | | | |
| McKesson | | EEMT-CDS | HM00506-L | | | | | | | | | | | | | | |
| McKesson | | EEMT-CDS | HM00506-L | | | | | | | | | | | | | | |
| Medco | | EEMT-CDS | HM00506-L | | | | | | | | | | | | | | |
| Medco | | EEMT-CDS | HM00506-L | | | | | | | | | | | | | | |
| Public | | EEMT-CDS | HM00506-L | | | | | | | | | | | | | | |
| Public | | EEMT-CDS | HM00506-L | | | | | | | | | | | | | | |
| RDC | | EEMT-CDS | HM00506-L | | | | | | | | | | | | | | |
| Super Value | | EEMT-CDS | HM00506-L | | | | | | | | | | | | | | |
| Value Drug | | EEMT-CDS | HM00506-L | | | | | | | | | | | | | | |
| Walgreens | | EEMT-CDS | HM00506-L | | | | | | | | | | | | | | |
| Walgreens | | EEMT-CDS | HM00506-L | | | | | | | | | | | | | | |
| Walgreens | | EEMT-CDS | HM00506-L | | | | | | | | | | | | | | |
| Wal-Mart | | EEMT-CDS | HM00506-L | | | | | | | | | | | | | | |
| Wal-Mart | | EEMT-CDS | HM00506-L | | | | | | | | | | | | | | |
| Wal-Mart | | EEMT-CDS | HM00506-L | | | | | | | | | | | | | | |