**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BRECKENRIDGE PHARMACEUTICAL, INC., ) | |
| ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 08-cv-03479 |
| ) | |
| INTERPHARM HOLDINGS, INC., and ) | |
| INTERPHARM, INC., ) | |
| ) | |
| Defendant. ) | |

**DECLARATION OF EUGENE L. KIM, ESQUIRE IN SUPPORT OF THE MOTION OF
BRECKENRIDGE PHARMACEUTICAL, INC. FOR A PRELIMINARY INJUNCTION**

Eugene L. Kim declares, under penalty of perjury, that the following is true and correct:

1.    I am the General Counsel for Plaintiff Breckenridge Pharmaceutical, Inc.

("Breckenridge"), and am in charge of all legal functions for the company.

**Background**

2.    Breckenridge develops prescription pharmaceutical products that are lower-cost

alternatives to "brand name" products, which it markets to more than one hundred different retail

chains, wholesalers, and distributors nationwide.

3.    In 1997, Breckenridge began supplying the first such alternative to the "brand

name" version of prescription tablets containing esterified estrogens and methyltestosterone

("EE/MT" or the "Product").

4.    Breckenridge has thus spent more than a decade developing customer good will

and establishing its reputation as a reliable source for EE/MT.

5.    This reliability as a provider able to meet its customers' needs for this product is

an important factor in maintaining Breckenridge's business reputation, and thus in building and maintaining customer good will.

### The Agreements with Interpharm

6.    In May 2005, Breckenridge's affiliate, Centrix Pharmaceuticals, Inc. ("Centrix") entered into a manufacture and supply agreement with Interpharm Holdings, Inc. and Interpharm, Inc. (collectively, "Interpharm") for prescription tablets containing esterified estrogens and methyltestosterone ("EE/MT" or the "Product") (the "Supply Agreement," pertinent portion of which are attached as Exhibit A).

7.    The Assumption Agreement, by which Breckenridge concurrently became a party to the Supply Agreement, is attached as Exhibit B.

8.    In sum, Interpharm agreed to supply EE/MT to both Breckenridge and Centrix. Intending to maintain a long-term supply relationship, the parties agreed to a 10-year term for the Supply Agreement, with automatically renewing 5-year terms thereafter.   Thus, Breckenridge had intended to invest considerable time and effort in maintaining a long-term relationship with Interpharm.

9.    As in all the commercial dealings in which Breckenridge becomes involved, the Supply Agreement contained a confidentiality provision.  (Exh. A, section 8.2.)

10.    In October 2006, the parties agreed to a temporary amendment to the Supply Agreement, effective for only one year (the "Amendment").   Under this amendment, Breckenridge, Centrix, and Interpharm agreed to share profits from the sale of the Product.  After the one-year term, the original payment terms in the Supply Agreement would become effective again.

11.    Pursuant to the Amendment, in order for Interpharm to confirm its share of profit

2

from the sales of EE/MT, Breckenridge supplied to Interpharm "EEMT Net Per Unit Analysis"
calculations for each month from January 2007 until December 2007 ("Proprietary EE/MT Sales
Data"). These monthly reports constitute a highly valuable, succinct, and extremely
comprehensive summary of Breckenridge's share of the entire EE/MT market, detailing our total
gross sales, total units, per unit pricing, chargebacks and rebates, total net sales, total profit, and
other information related to each and every one of several dozen EE/MT customers of
Breckenridge. A copy of this report, with the actual data redacted, is attached as Exhibit D.

12.    The information contained in the Proprietary EE/MT Sales Data required
considerable time, effort, and resources to create, and was the result of years of reliable and
consistent supply of EE/MT and building up customer good will. This compilation of
information confers great commercial advantage to any company wishing to sell EE/MT,
especially a new competitor trying to enter the market, such as Interpharm.

13.    Subsequently, a dispute arose among the parties to the Supply Agreement, which
was resolved and settled by the execution of a letter agreement dated March 6, 2008. (The
"Letter Agreement," attached as Exhibit C.). The Letter Agreement specifically provided that
the certain sections of the Supply Agreement survived, which include the confidentiality
provision.

**The Protection Of Breckenridge's Trade Secrets**

14.    To begin with, Breckenridge maintains a strict policy that each and every
discussion we initiate with other companies concerning development, supply, manufacture, or
any other facet of the pharmaceutical business is preceded by a signed confidentiality agreement
to preclude the disclosure or misuse of Breckenridge's proprietary and confidential information.
As General Counsel, I personally ensure that this is done for every such occasion.

15.     Breckenridge similarly maintains a strict policy that every employee must sign a confidentiality agreement that prevents him or her from disclosing any of Breckenridge's proprietary and confidential information not only while they are employed here but also for a period of several years thereafter.

16.     In addition, Breckenridge's internal computer network is password-protected, so that only current Breckenridge employees with a valid password may access information contained on Breckenridge's internal computer network, as well as their individual workstations.

17.     Moreover, the information contained in the Proprietary EE/MT Sales Data is not available in such an aggregated form in any one report or set of data even to Breckenridge's employees. Rather, Mr. Todd Ruonavaara, the controller of Breckenridge, spent considerable time and effort each month compiling these reports from different sources.

18.     Mr. Ruonavaara then stored this sensitive compilation of data on his own office computer, not on the Breckenridge computer network, so that even current Breckenridge employees with valid passwords could not access this report.

19.     The Proprietary EE/MT Sales Data are then made available to only one other individual within Breckenridge (its president), and to the president and controller of Centrix.

20.     In addition, because the Supply Agreement was to last at least ten years, Breckenridge provided the Proprietary EE/MT Sales Data to Interpharm for one year in 2007 with the understanding that Interpharm would not possess such sensitive data that was current when the agreement expired. Breckenridge did not anticipate that Interpharm would misuse this sensitive information in breach of the confidentiality provision, and certainly not beginning in March 2008.

**Interpharm's Financial Instability**

21.    Because Breckenridge has been engaged in commercial dealings with Interpharm, I have monitored the reports filed by Interpharm with the Securities and Exchange Commission (the "SEC").

22.    On February 5, 2008, Interpharm filed an 8-K with the SEC detailing its entry into a Forbearance Agreement with Wells Fargo Bank, National Association ("Wells Fargo") on February 5, 2008 (the "Forbearance Agreement"). These are attached as Exhibits E and F.

23.    As Interpharm has been in default under the Wells Fargo Credit Agreement since June 30, 2007, it entered into an Initial Forbearance Agreement with Wells Fargo on October 26, 2007 (attached as Exhibit G).

24.    Pursuant to the Forbearance Agreement, Interpharm acknowledged its continuing loan defaults and Wells Fargo agreed to forbear from exercising its rights against Interpharm until June 30, 2008, provided that there was no new default by Interpharm. (Exh. F, p. 9, ¶ 6.) To reach this new agreement with Wells Fargo, Interpharm was required to submit rolling budgets, engage a chief restructuring officer, grant an equity line of credit mortgage to secure a new equity line and grant a collateral mortgage to secure $7,000,000.00 of debt due under the Credit Agreement which was converted to a term obligation. (*Id.*, pp. 1-2.)

25.    On March 25, 2008, Interpharm filed an 8-K with the SEC detailing its entry into an Amended and Restated Forbearance Agreement of the same date (the "Amended Forbearance Agreement" is attached as Exhibit H, the March 25 8-K as Exhibit I). According to the Amended Forbearance Agreement, Interpharm is indebted to Wells Fargo in the amount of at least $30,928,858.02, plus interest and additional costs, including but not limited to legal fees, expenses, disbursements and additional advances made by Wells Fargo (the "Indebtedness").

5

The Indebtedness is secured by a "a first priority security interest in and to all of [Interpharm's] assets," as well as first, second and collateral mortgages on its real property.

26.    The Amended Forbearance Agreement provides that an event of default shall include the failure of Interpharm to send Wells Fargo "a letter of intent to purchase substantially all of the assets of [Interpharm] for an amount in excess of the outstanding balance of the Obligations owing to Wells Fargo" or a proposal letter by a third party to refinance the outstanding balance by March 31, 2008. (Exh. H, pp. 18-19.) Interpharm is also in default if it has not received a commitment to purchase or refinance substantially all of its assets by April 20, 2008, and sold or refinanced the same by June 30, 2008. (*Id.*, p. 19.)

27.    Just under three months ago, Interpharm was already lacking the cash flow necessary to run its business. As set forth in an 8-K filed on Interpharm's April 16, 2008, the American Stock Exchange ("AMEX") has notified Interpharm that it is not in compliance with listing standards of the AMEX Company Guide due to its sustained losses (attached as Exhibit J).

28.    This April 16 filing also noted that Interpharm's CEO had resigned, thus casting more uncertainty over Interpharm's stability.

29.    For these reasons, Breckenridge has a reasonable concern that Interpharm would not be able to satisfy a damages judgment in favor of Breckenridge.

I declare under penalty of perjury, that the foregoing is true and correct. Executed on April 18, 2008.

Eugene I. Kim

6

# EXHIBIT A

# SUPPLY AGREEMENT

THIS SUPPLY AGREEMENT ("Supply Agreement") made as of the Commencement Date (as defined below) between CENTRIX PHARMACEUTICAL, INC., an Alabama corporation having its principal place of business at 31 Inverness Center Parkway, Suite 270, Birmingham, Alabama 35242 ("CENTRIX") and INTERPHARM HOLDINGS, INC., a Delaware corporation having its principal place of business at 69 Mall Drive, Commack, New York 11725 ("INTERPHARM").

## RECITALS

A. WHEREAS, INTERPHARM is engaged in the business of developing, manufacturing, packaging and selling pharmaceutical products.

B. WHEREAS, CENTRIX is engaged in the business of developing, selling and marketing certain prescription and non-prescription pharmaceutical products.

C. WHEREAS, CENTRIX desires to retain the services of INTERPHARM to develop, manufacture, package and supply certain products as more fully set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants set forth herein, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, each intending to be legally bound, hereby agree as follows:

## ARTICLE 1 - DEFINITIONS

1.1    **After Year 1.** "After Year 1" shall mean each twelve (12) month period of the Purchase Term following Year 1.

1.2    **Approved Labeling.** "Approved Labeling" shall include all of the following : (i) the Product label to be affixed to the bottle; (ii) the Product package insert (the "Insert"); and (iii) the Product patient-information leaflet, in the form attached as Exhibit E.

1.3    **Bright Stock.** "Bright Stock" shall mean bottles of Product packaged without an external label that are *not* for commercial sale or distribution and require further processing. Bright Stock shall be shipped only to a CENTRIX facility for final processing which shall include, *inter alia*, affixing the Approved Labeling to the Bright Stock, except for the Insert, which shall be the responsibility of Interpharm. No sample tablets will be shipped Bright Stock.

1.4    **CENTRIX Trade Dress.**    "CENTRIX Trade Dress" shall mean CENTRIX's trade dress and Approved Labeling for the Product set forth in Exhibit C(2).

1.5    **Commencement Date.**    "Commencement Date" shall mean the date of the first shipment of Product by INTERPHARM.

1.6 **Commercially Reasonable.** Commercially Reasonable shall mean a Party's reasonable efforts and diligence in accordance with its normal business, economic, legal, medical and scientific judgment, taking into account the competitiveness of the marketplace, the proprietary position of a Product, other products it produces, the regulatory structure involved, the profitability of a Product, and other relevant factors including, without limitation, technical, legal, scientific, medical, economic or other related factors.

1.7 **Confidential Information.** "Confidential Information" shall mean with respect to a Party, all information of any kind whatsoever (including without limitation, data, Data (as defined in Section 2.1, compilations, formulae, models, patent disclosures, procedures, processes, projections, protocols, results of experimentation and testing, specifications, strategies and techniques), and all tangible and intangible embodiments thereof of any kind whatsoever (including without limitation, apparatus, compositions, documents, drawings, machinery, patent applications, records and reports), which is disclosed by such Party to the other Party and is marked, identified as or otherwise acknowledged to be confidential at the time of disclosure to the other Party. Notwithstanding the foregoing, Confidential Information of a party shall not include information which the other Party can establish by written documentation (a) to have been publicly known prior to disclosure of such information by the disclosing Party to the other Party, (b) to have become publicly known, without fault on the part of the other Party, subsequent to disclosure of such information by the disclosing party to the other party, (c) to have been received by the other Party at any time from a source, other than the disclosing Party, rightfully having possession of and the right to disclose such information, (d) to have been otherwise known by the other Party prior to disclosure of such information by the disclosing party to the other Party, or (e) to have been independently developed by employees or agents of the other party without the use of such information disclosed by the disclosing party to the other Party.

1.8 **The FDA.** The "FDA" shall mean the United States Food and Drug Administration, or any successor entity thereto.

1.9 **Firm Commitment.** "Firm Commitment" shall mean the total number of tablets of the Product, regardless of trade dress or configuration, that CENTRIX has committed to purchase from INTERPHARM in any one year period under this Supply Agreement, as set under the heading Firm Commitment in Exhibit A. All tablets must be ordered in increments of one hundred (100), and all tablets of Product ordered in any Year shall be deemed to be part of the Firm Commitment until the full amount of the Firm Commitment is satisfied.

1.10 **Forecast.** "Forecast" shall mean a rolling twelve (12) month forecast of CENTRIX's orders for the Product from INTERPHARM.

1.11 **Hidden Defect.** "Hidden Defect" shall mean any instance where a lot of a Product fails to conform to the applicable specifications or is otherwise defective or fails to conform to the warranties given by INTERPHARM herein, and such failure would not be

May 24 2005 6:24PM    Interpharm Holdings, Inc    631-952-9585    p.17

other rights pursuant to this Supply Agreement.

7.3 **EFFECT OF TERMINATION.** In the event that either Party has the right to terminate this Supply Agreement (the "Terminating Party"), this Supply Agreement shall automatically terminate, unless such Party notifies the other Party that it does not wish for the Supply Agreement to terminate, and the Terminating Party shall have the rights set forth in this Supply Agreement, as well as such other rights as to which it is entitled under applicable law. In the event of a termination of this Supply Agreement, CENTRIX may not utilize, or allow another party to utilize, directly or indirectly, in any way, the Data, in order to develop the Product or make sales of the Product in the Territory or Outside Sales, or for any other purpose. In the interest of clarity, in the event this Supply Agreement is terminated, any party supplying CENTRIX with Product may not utilize the Data in any way.

7.4 **WAIVER.** Failure to terminate this Supply Agreement following a breach or failure to comply with the terms and conditions of this Supply Agreement shall not be deemed a waiver of the non- breaching Party's defenses, rights or causes of action arising from such or any future breach or noncompliance.

7.5 **CHANGE IN CIRCUMSTANCE.** In the event that (i) generic versions of the Product are introduced into the market; and/or (ii) there are significant regulatory changes which affect the manufacture, distribution, sale, and marketing of the Product, the Parties agree to discuss such changed circumstances, but have no obligation to vary the terms of this Supply Agreement.

## ARTICLE 8 – CONFIDENTIALITY; NON ASSIGNABILITY

8.1 **Non-Assignability.** This Supply Agreement and the rights of the Parties hereunder shall not be assignable nor shall the obligations of either Party be delegable, without the prior written consent of the other Party, which consent shall not be unreasonably withheld, provided that either Party may assign its rights or delegate its duties under this Supply Agreement without obtaining such consent, to any affiliate or to a successor in interest to the assigning Party's business (whether by sale of assets, stock, merger, or otherwise). In the event either Party seeks and obtains the other party's consent to assign or delegate its rights or obligations to another Party, or in the event of an assignment or delegation to an Affiliate, or to a successor in interest, the assigning party shall remain liable for its obligations hereunder.

8.2 **Confidentiality.** Except for literature and information intended for disclosure to customers, and except as may be required to obtain government approval to manufacture, sell or use a Product, or as may be required under applicable federal securities laws, each Party will treat as confidential the Confidential Information, and will take all necessary precautions to assure the confidentiality of such information. Each Party agrees to return to the other Party upon the expiration of the Purchase Term or termination of this Supply Agreement all Confidential Information acquired from such other party, except as to such



information it may be required to retain under applicable law or regulation, and except for one copy of such information to be retained by such party's legal department or outside counsel. Notwithstanding the foregoing, all Data shall be shall be returned by CENTRIX to INTERPHARM upon termination of this Supply Agreement. Neither Party shall, during the period of this Supply Agreement or for five (5) years thereafter, without the other Party's express prior written consent use or disclose any such Confidential Information for any purpose other than to carry out its obligations hereunder. Each Party, prior to disclosure of such Confidential Information to any employee, consultant or advisor shall ensure that such person is bound in writing to observe the confidentiality provisions of this Supply Agreement. The obligations of confidentiality shall not apply to information that the receiving party is required by law or regulation to disclose, provided however that the receiving party shall so notify the disclosing party of its intent and cooperate with the disclosing party on reasonable measures to protect the confidentiality of the information.

8.3    **Public Disclosure.**  Except for such disclosure as is deemed necessary, in the reasonable judgment of a Party, to comply with applicable laws, no announcement, news release, public statement, publication, or presentation relating to the existence of this Supply Agreement, the subject matter hereof, or either Party's performance hereunder will be made without the other Party's prior written approval, which approval shall not be unreasonably withheld.  The Parties agree that they will use reasonable efforts to coordinate with respect to a joint press release relating to the existence of this Supply Agreement, as well as the Form 8-K to be filed by INTERPHARM relating to the same; provided, that with respect to such press release and the Form 8-K, INTERPHARM may make any statements deemed by its counsel to be necessary under applicable law.

### ARTICLE 9 - FORCE MAJEURE

9.1    **Force Majeure.**  No failure or omission by the parties in the performance of any obligation according to this Supply Agreement shall be deemed a breach of this Supply Agreement or create any liability if the same shall arise from any cause or causes beyond the control of the party, including, but not limited to, strikes, riots, war, acts of God, invasion, fire, explosion, floods, delay of carrier, shortage or failure in the supply of materials, energy shortage and acts of government or governmental agencies or instrumentalities.

9.2    **Obligations of the Parties in case of Force Majeure.**  In the event that due to force majeure either party hereto shall be delayed or hindered in or prevented from the performance of its duties or doing acts required under the terms of this Supply Agreement, the performance of such act, except for the obligation to pay amounts due under this Supply Agreement, shall be excused for the period of the delay. Notwithstanding the aforementioned, the party subject to force majeure shall take all reasonable steps to resolve the condition(s) forming the basis of force majeure.

### ARTICLE 10 - MISCELLANEOUS

10.1    **Governing Law.**  This Supply Agreement, and its enforcement, shall be governed by, and construed in accordance with, the laws of the State of New York (without regard for conflict rules thereof) and the United States.

10.2    **Severability.**  Should any section, or portion, of this Supply Agreement be held invalid by reason of any law, statute or regulation existing now or in the future in any jurisdiction by any court of competent authority or by legally enforceable directive of any governmental body, then such section or portion thereof shall be validly reformed so as to approximate the intent of the parties as nearly as possible and, if unreformable, shall be deemed divisible and deleted with respect to such jurisdiction; this Supply Agreement shall not otherwise be affected.

10.3    Waiver.  The rights and remedies of the parties to this Supply Agreement are cumulative and not alternative.  Neither the failure nor any delay by any party in exercising any right, power or privilege under this Supply Agreement will operate as a waiver of any such right, power or privilege, and no single or partial exercise of any such right, power or privilege will preclude any other or further exercise of such right, power or privilege or the exercise of any other right, power or privilege.

10.4    **Notices.**    All notices hereunder shall be deemed to have been delivered if by certified mail, return receipt requested, or if sent by facsimile, as follows.

If to INTERPHARM:

Name: Bob Sutaria
Title:  President
75 Adams Avenue
Hauppauge, New York 11788

If to CENTRIX PHARMACEUTICAL, INC.:
Bob Booth
President
31 Inverness Center Parkway, Suite 270
Birmingham, Alabama 35242

10.5    **Survival.**  The provisions of Article 4, Article 6 and Article 8 of this Supply Agreement shall survive the termination of this Supply Agreement.

10.6    **Counterparts.**  This Supply Agreement may be executed in two or more counterparts, each of which will be deemed to be an original of this Supply Agreement and all of which, when taken together, shall be deemed to constitute one and the same agreement. Any party to this Supply Agreement may deliver an executed copy hereof by facsimile transmission to another party hereto and any such delivery shall have the same force and effect as any other delivery of a manually signed copy of this Supply Agreement.



# EXHIBIT B

## ASSUMPTION AGREEMENT

THIS ASSUMPTION AGREEMENT ("Agreement") made as of the Commencement Date (as defined in the Supply Agreement which is defined in Recital A below) by and among CENTRIX PHARMACEUTICAL, INC., an Alabama corporation having its principal place of business at 31 Inverness Center Parkway, Suite 270, Birmingham, Alabama 35242 ("CENTRIX"), BRECKENRIDGE PHARMACEUTICAL, INC., a Florida corporation having its principal place of business at 1141 S. Rogers Circle, Suite 3, Boca Raton, Florida 33487 ("BRECKENRIDGE") and INTERPHARM HOLDINGS, INC., a Delaware corporation having its principal place of business at 69 Mall Drive, Commack, New York 11725 ("INTERPHARM").

### RECITALS

A. WHEREAS, INTERPHARM and CENTRIX have entered into a supply agreement dated as of the Commencement Date (the "Supply Agreement") for the purchase, sale and supply of the Product (as defined in the Supply Agreement);

B. WHEREAS, CENTRIX and BRECKENRIDGE acknowledge that as a condition of INTERPHARM entering into the Supply Agreement, BRECKENRIDGE shall be jointly and severally liable with CENTRIX with respect to each of the obligations of CENTRIX under the Supply Agreement.

C. WHEREAS, BRECKENRIDGE, upon and subject to the specific conditions described below, may receive the benefits negotiated by CENTRIX in the Supply Agreement.

NOW, THEREFORE, in consideration of the mutual covenants set forth herein, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, each intending to be legally bound, hereby agree as follows:

1.1    **Assumption.** BRECKENRIDGE hereby agrees that it shall, from the date of this agreement, be jointly and severally liable with CENTRIX for each and every obligation and liability of CENTRIX under the Supply Agreement as if it were a party to the Supply Agreement along with CENTRIX. Each of CENTRIX and INTERPHARM hereby consents to the assumption of liability and obligations by BRECKENRIDGE in the previous sentence.

1.2    **Default; Notice.**    In the event of any default by CENTRIX under the Supply Agreement, INTERPHARM hereby agrees that it will provide any notice to BRECKENRIDGE that it is required to provide to CENTRIX and that it will not take any action against BRECKENRIDGE hereunder unless and until any applicable cure period under the Supply Agreement has expired. If BRECKENRIDGE cures a CENTRIX default within the applicable cure period under the Supply Agreement, it shall become entitled to receive the benefits to which CENTRIX would have been entitled under the Supply Agreement.



pg 1 of 3

May 24 2005 6:16PM    Interpharm Holdings, Inc    631-952-9595    p.22

1.3     **Acknowledgement**. CENTRIX and BRECKENRIDGE hereby acknowledge that this agreement is a material inducement for INTERPHARM to enter into the Supply Agreement, and that Interpharm would not have entered into the Supply Agreement without this Agreement.

1.4     **Miscellaneous.**     This Agreement, and its enforcement, shall be governed by, and construed in accordance with, the laws of the State of New York (without regard for conflict rules thereof) and the United States. This agreement may be executed in two or more counterparts, each of which will be deemed to be an original of this agreement and all of which, when taken together, shall be deemed to constitute one and the same agreement. Any party to this Agreement may deliver an executed copy hereof by facsimile transmission to another party hereto and any such delivery shall have the same force and effect as any other delivery of a manually signed copy of this Agreement. It is understood and agreed by the Parties that each represents and warrants to the other that the individual signing this Agreement on behalf of the Party is their duly authorized representative and that such individual's signature binds the Party represented to the terms of this Agreement. The terms and provisions contained in this Agreement, and the Supply Agreement, constitute the entire agreement between the parties and shall supersede all previous communications, representations, agreements or understandings, either oral or written, between the parties with respect to the subject matter hereof, with the exception of any confidentiality or nondisclosure agreements which may be executed prior or subsequent to execution of this Agreement. No agreement or understanding varying or extending this Agreement shall be binding upon either party hereto, unless set forth in a writing which specifically refers to this Agreement, signed by duly authorized officers or represent representatives of the respective parties, and the provisions hereof not specifically amended thereby shall remain in full force and effect.

1.5     **Confidentiality.**    For a period of ten (10) years after termination of the Supply Agreement for any reason, the existence and terms of this Agreement shall remain confidential and shall not be disclosed to any third party, other than CENTRIX, without the express written consent of both parties; provided, however, the foregoing obligations of confidentiality shall not apply to information that is required by law or regulation to be disclosed. In the event such disclosure is necessary, the disclosing party shall so notify the other party of its intent and cooperate with such party on reasonable measures to protect the confidentiality of the information.



    IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized officers on the day and year first set forth above.

**INTERPHARM, INC.**

By: _____

Name: Bob Sutaria

Title: President

**CENTRIX PHARMACEUTICAL, INC.**

By: _____

Name:    Bob Booth

Title:    President

**BRECKENRIDGE PHARMACEUTICAL, INC.**

By: _____

Name: Laurence D. Runsdorf

Title:  President



EXHIBIT C



Innovative Generics

**VIA UPS and E-mail**

March 6, 2008

Mr. Laurence D. Runsdorf
President
Breckenridge Pharmaceutical, Inc.
1141 S. Rogers Circle, Suite 3
Boca Raton, FL 33487

Mr. Bob Booth
President & CEO
Centrix Pharmaceutical, Inc.
31 Inverness center parkway, Suite 270
Birmingham, Alabama 35242

Re: Termination of the EE/MT Supply Agreement

Gentlemen:

This letter agreement ("Agreement") memorializes the undersigned parties' discussions and concurrence regarding termination of the EE/MT Supply Agreement ("Supply Agreement"). Intending to be legally bound, Interpharm, Centrix and Breckenridge (collectively the "Parties") acknowledge and agree as follows:

1. **Termination.** Subject to Interpharm's receipt of the Payment in term 2 below, the Supply Agreement shall be of no further force or effect with the exception of the following sections of the Supply Agreement: 3.2, 3.4, 3.7, 5.2 and those sections enumerated in Section 10.5 **Survival.**

2. **Payment.** In full satisfaction of its obligation to share profits under the Supply Agreement, including any amendments thereto, Centrix and/or Breckenridge shall immediately pay Interpharm the sum of _____ (_____ hundred dollars) ("Payment").

3. **Continuing Supply.** Notwithstanding the termination of the Supply Agreement, Interpharm shall supply a maximum of _____ bottles of EE/MT products under the terms provided in the attached purchase orders and in the following manner: a maximum of _____ bottles ( _____ bottles of each strength of the EE/MT Products in Breckenridge labeling and Interpharm trade dress) to be supplied (i) the first _____ bottles by March 31, 2008 and (ii) the second _____ bottles pursuant to Breckenridge purchase orders appended hereto. This Agreement shall not be construed in any way to limit Interpharm's sales and marketing activities of EE/MT Products to customers other than Centrix and/or Breckenridge.



Innovative Generics

4. **Mutual Release.** For the consideration referenced herein, this Agreement hereby resolves, settles, and waives all controversies, claims, causes of action of any kind or nature, damages and demands, known or unknown, existing or potentially existing between and among the Parties at or prior to the date of this Agreement, relating to the Supply Agreement and any amendments and related agreements thereto.

5. **Amendments.** The terms and provisions set forth in this Agreement shall modify and supersede all inconsistent terms and provisions set forth in the Supply Agreement.

6. **Headings.** The section headings contained in this Agreement are for purposes of convenience only, and shall in no way bear upon the construction or interpretation of this Agreement.

7. **Entire Agreement.** This Agreement contains the entire agreement between Interpharm, Breckenridge and Centrix and shall be binding upon and inure to the benefit of each party. Except as set forth or referenced herein, no other representations, warranties or promises have been made or relied upon by Interpharm, Breckenridge or Centrix in entering into this Agreement.

8. **Modification and Waiver.** This Agreement may not be modified or amended except by an instrument or instruments in writing signed by the parties hereto. No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of any other provisions, whether or not similar. No waiver shall be binding unless executed in writing by the party making the waiver.

9. **Counterparts.** This Agreement may be executed simultaneously in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

10. **Severability.** The provisions of this Agreement are severable, and the invalidity of any provision shall not affect the validity of any other provisions.

11. **Binding Effect.** This Agreement shall be binding upon, and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns.

12. **Governing Law.** This Agreement, its validity, interpretation and performance shall be governed by and construed in accordance with the internal laws of the State of New York without giving effect to the conflict of laws provisions thereof.



INTER PHARM

Innovative Generics

IN WITNESS WHEREOF, this Agreement has been executed and is effective as of the date first written above.

INTERPHARM HOLDINGS, INC.
INTERPHARM, INC.
(collectively "INTERPHARM")

By: _Cameron Reid_

Name: ~~Jeffrey Weiss~~ Cameron Reid

Title: ~~Executive Vice President~~
CEO

CENTRIX PHARMACEUTICAL, INC.
("CENTRIX")

By: _____

Name:
Bob Booth

Title:
President

BRECKENRIDGE PHARMACEUTICAL, INC.
("BRECKENRIDGE")

By: _____

Name:
Laurence D. Runsdorf

Title:
President

75 Adams Avenue p Hauppauge, NY 11788
Phone: (516) 952-0214 p Fax: (516) 952-9587



# Purchase Order
## Breckenridge
## Pharmaceutical, Inc.

| | | | |
|---|---|---|---|
| Branch | 1000 | | 2/25/2008 |
| Page | 1 of 1 | | 1168   OP |
| Ordered | 2/25/2008 | Delivery | 3/1/2008 |
| Requested | 3/1/2008 | | |

**Ship From**
Interpharm, Inc.
75 Adams Ave.
Hauppauge NY 11788

**Ship To**
DDN/Obergfel
c/o Breckenridge Pharmaceutical, Inc.
4580 Mendenhall Road
Suite 101
Memphis TN 38141

| Line | Description | | Unit | | Promised | | Extended Price |
|---|---|---|---|---|---|---|---|
| 1.000  0 | 51991-078-01 E.E.M.T. H.S. Tabs 100's EEMT HS 0.625/1.25mg Tabs 100 | | EA | EA | 3/1/2008 | | |
| 2.000  0 | 51991-079-01 E.E.M.T. D.S. Tabs 100's EEMT D.S. 1.25/2.5mg Tabs 100 | | EA | EA | 3/1/2008 | | |
| 3.000  0 | PAYMENT TERMS Payment Terms-see below | 1 | EA | 0.00  EA | 3/1/2008 | | |

Sales Taxable

Total:     .00

C of A, Bill of Lading, Packaging Slip and Copy of this Purchase Order must be given to

Payment Terms: 1

This PO cancels all previous POs from Pharmaceutical and/or Centrix
Label/Insert proofs must be approved by BPI Reg Dept prior to printing
Send proofs to:
Please note, labels imprint to be changed to the following:
--- for HS C 020 --- for DS C 019
Please provide quantity that will be in old imprint and when new imprint
will be available.

# Purchase Order

**Breckenridge Pharmaceutical, Inc.**

| | | | |
|---|---|---|---|
| Branch | 1000 | Printed | 2/25/2008 |
| Page | 1 of 1 | PO Number | 1170  OP |
| Order Date | 2/25/2008 | Delivery | 3/24/2008 |
| Requested | 3/24/2008 | | |

**Ship From**
Interpharm, Inc.
75 Adams Ave.
Hauppauge NY 11788

**Ship To**
DDN/Obergfel
c/o Breckenridge Pharmaceutical, Inc.
4580 Mendenhall Road
Suite 101
Memphis TN 38141

| Line | Qty | Description | Quantity Ordered | Price | U/M | Promised | Order | Extended Price |
|---|---|---|---|---|---|---|---|---|
| 1.000 | 0 | 51991-075-01<br>E.E.M.T. H.S. Tabs 100's<br>EEMT HS 0.625/1.25mg Tabs 100 | | EA | | EA | 3/24/2008 | |
| 2.000 | 0 | 51991-079-01<br>E.E.M.T. D.S. Tabs 100's<br>EEMT D.S. 1.25/2.5mg Tabs 100 | 1 | EA | | EA | 3/24/2008 | |
| 3.000 | 0 | TERMS<br>Payment Terms-See below | 1 | EA | 0.00 | EA | 3/24/2008 | |

| | | |
|---|---|---|
| | Sales Taxable | |
| | | .00 |
| | Total: | |

Payment Terms:                    Breckenridge does



# Purchase Order
## Breckenridge
## Pharmaceutical, Inc.

| Batch | 1000 | Printed | 2/25/2008 |
|---|---|---|---|
| Page | 1 of 1 | P.O. Number | 1169  OP |
| Ordered | 2/25/2008 | Delivery | 3/17/2008 |
| Required | 3/17/2008 | | |

**Ship From**
Interpharm, Inc.
75 Adams Ave.
Hauppauge NY 11788

**Ship To**
DDN/Obergfel
c/o Breckenridge Pharmaceutical, Inc.
4580 Mendenhall Road
Suite 101
Memphis TN 38141

| Line | rk | Description | Ordered | UOM | Unit Price | UOM | Scheduled Qty | Qty | Extended Price |
|---|---|---|---|---|---|---|---|---|---|
| 1.000 | 0 | 51991-076-01 E.E.M.T. H.S. Tabs 100's EEMT HS 0.625/1.25mg Tabs 100 | | EA | | EA | 3/17/2008 3/31/08 | | |
| 2.000 | 0 | 51991-079-01 E.E.M.T. D.S. Tabs 100's EEMT D.S. 1.25/2.5mg Tabs 100 | | EA | | EA | 3/17/2008 3/31/08 | | |
| 3.000 | 0 | TERMS Payment Terms-see below | 1 | EA | 0.00 | EA | 3/17/2008 | | |

Sales Taxable

.00

Total:

C of A, Bill of Lading, Packaging Slip and copy of UPC case codes must be faxed to

Payment Terms:    receipt of goods

Please provide detailed payment terms as applicable



# Purchase Order

**Breckenridge Pharmaceutical, Inc.**

| Branch | 1000 | Printed | 2/25/2008 |
|---|---|---|---|
| Page | 1 of 1 | P.O. Number | 1171 OP |
| Ordered | 2/25/2008 | Delivery | 4/15/2008 |
| Requested | 4/15/2008 | | |

**Ship From**
Interpharm, Inc.
75 Adams Ave.
Hauppauge NY 11788

**Ship To**
DDN/Obergfel
c/o Breckenridge Pharmaceutical, Inc.
4580 Mendenhall Road
Suite 101
Memphis TN 38141

| Line | | Description | | | | | | | Extended Price |
|---|---|---|---|---|---|---|---|---|---|
| 1.000 | 0 | 51991-078-01 E.E.M.T. H.S. Tabs 100's EEMT HS 0.625/1.25mg Tabs 100 | | EA | | EA | 4/15/2008 | | |
| 2.000 | 0 | 51991-079-01 E.E.M.T. D.S. Tabs 100's EEMT D.S. 1.25/2.5mg Tabs 100 | | 1 EA | | EA | 4/15/2008 | | |
| 3.000 | 0 | TERMS Payment Terms-see below | | 1 EA | 0.00 | EA | 4/15/2008 | | |

Sales Taxable

.00

Total:

C of A, Bill of Lading, Packaging Slip and a copy of UPC/Case/Bottle must be received

Payment Terms: 1    Interpharm Orders

*Delivery date not impacted by*
*Breckenridge — To be determined*



# Purchase Order

**Breckenridge Pharmaceutical, Inc.**

| Branch | 1000 | Printed | 2/25/2008 |
|---|---|---|---|
| Page | 1 of 1 | PO Number | 1172 OP |
| Ordered | 2/25/2008 | Delivery | 4/30/2008 |
| | 4/30/2008 | | |

**Ship From**
Interpharm, Inc.
75 Adams Ave.
Hauppauge NY 11788

**Ship To**
DDN/Obergfel
c/o Breckenridge Pharmaceutical, Inc.
4580 Mendenhall Road
Suite 101
Memphis TN 38141

| Line | # | Description | | UM | UM | Promised Date | To | Extended Price |
|---|---|---|---|---|---|---|---|---|
| 1.000 | 0 | 51991-078-01 E.E.M.T. H.S. Tabs 100's EEMT HS 0.625/1.25mg Tabs 100 | | EA | EA | 4/30/2008 | | |
| 2.000 | 0 | 51991-079-01 E.E.M.T. D.S. Tabs 100's EEMT D.S. 1.25/2.5mg Tabs 100 | | EA | EA | 4/30/2008 | | |
| 3.000 | 0 | TERMS Payment Terms-see below | 1 | EA | 0.00 EA | 4/30/2008 | | |

Sales Taxable

Total: .00

C of A, Bill of Lading, Packaging Slip and copy of UPC case codes must be faxed to:

Payment Terms: _____ receipt of goods

*Delivery date as requested by Breckenridge. To be determined*



## Purchase Order

**Breckenridge Pharmaceutical, Inc.**

| Branch | 1000 | Print Date | 2/25/2008 |
|---|---|---|---|
| Page | 1 of 1 | P.O. Number | 1173    OP |
| Created | 2/25/2008 | Delivery | 5/15/2008 |
| Required | 5/15/2008 | | |

**Ship From**

Interpharm, Inc.
75 Adams Ave.
Hauppauge NY 11788

**Ship To**

DDN/Oberg[el]
c/o Breckenridge Pharmaceutical, Inc.
4580 Mendenhall Road
Suite 101
Memphis TN 38141

| Line | Rv | Description | Required Quantity | PO UOM | Promised Delivery | Order No. | A | Extended Price |
|---|---|---|---|---|---|---|---|---|
| 1.000 | 0 | 51991-078-01<br>E.E.M.T. H.S. Tabs 100's<br>EEMT HS 0.625/1.25mg Tabs 100 | | EA | EA | 5/15/2008 | | |
| 2.000 | 0 | 51991-079-01<br>E.E.M.T. D.S. Tabs 100's<br>EEMT D.S. 1.25/2.5mg Tabs 100 | | EA | EA | 5/15/2008 | | |
| 3.000 | 0 | TERMS<br>Payment Terms-see below | 1 EA | EA | 0.00 | 5/15/2008 | | |

Sales Taxable

.00

Total:

C of A, Bill of Lading, Packaging Slip and copy of Unit dose package must be included

Payment Terms _____ receipt of goods

*Delivery date will be corrected*
*by Breckenridge. To be followed*

# EXHIBIT D

| Cmkt/wood | Customer | Product | Lot # | EEMT Net Per Unit Analysis for | | | | 2007 Sales | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Reporting Month Gross Sales | Reporting Month Units | Ave Gross Price Per Unit | Estimated Credit % | Estimated Per Unit Chargebacks and Rebates | Estimated Per Unit Net | Reporting Month Units | Reporting Month Net Sales | +NI43% Centrix Mktng Exp | COGS at sliding scale | Profit | Interpharm ROI / unit | Reporting Month Units | Interpharm $ Realized | Total Reporting Month Net Sales | Centrix $ Realized |
| Amerisource | Amerisource | EEMT | HM00106 | | | | | | | | | | | | | | | |
| Amerisource | Amerisource | EEMT | HM00106 | | | | | | | | | | | | | | | |
| Haward | Haward | EEMT-HS | HB11607 | | | | | | | | | | | | | | | |
| Haward | Haward | EEMT | HM00106 | | | | | | | | | | | | | | | |
| Kinny | Kinny | EEMT-HS | HB11607 | | | | | | | | | | | | | | | |
| Cellsource | Cellsource | EEMT-HS | HB11607 | | | | | | | | | | | | | | | |
| Cellsource | Cellsource | EEMT | HM00106 | | | | | | | | | | | | | | | |
| Cellsource | Cellsource | EEMT | HM02106 | | | | | | | | | | | | | | | |
| Cellsource | Cellsource | EEMT-HS | HB11607 | | | | | | | | | | | | | | | |
| Ahold | Amerisource | EEMT-HS | HC06007-L | | | | | | | | | | | | | | | |
| Amerisource | Amerisource | EEMT-HS | HC06007-L | | | | | | | | | | | | | | | |
| Amerisource | ANDA | EEMT-HS | HC10701-L | | | | | | | | | | | | | | | |
| ANDA | Dropseca Balances | EEMT-HS | HC10701-L | | | | | | | | | | | | | | | |
| Associated Pharma | HD Smith | EEMT-HS | HC06007-L | | | | | | | | | | | | | | | |
| HE Butt | Associated Pharma | EEMT-HS | HC06007-L | | | | | | | | | | | | | | | |
| Bentover Hospital | Hannaford | EEMT-HS | HC10701-L | | | | | | | | | | | | | | | |
| Bentover Hospital | HE Butt | EEMT-HS | HC06007-L | | | | | | | | | | | | | | | |
| Cardinal | Cardinal | EEMT-HS | HC06007-L | | | | | | | | | | | | | | | |
| Cardinal | McKesson | EEMT-HS | HC10701-L | | | | | | | | | | | | | | | |
| CVS | Kinny | EEMT-HS | HC10701-L | | | | | | | | | | | | | | | |
| CVS | McKesson | EEMT-HS | HC06007-L | | | | | | | | | | | | | | | |
| Dropseca Balances | Medco Health | EEMT-HS | HC10701-L | | | | | | | | | | | | | | | |
| HD Smith | RDC | EEMT-HS | HC06007-L | | | | | | | | | | | | | | | |
| Hannaford | Medco Health | EEMT-HS | HC10701-L | | | | | | | | | | | | | | | |
| Hannaford | Public | EEMT-HS | HC06007-L | | | | | | | | | | | | | | | |
| McKesson | Public | EEMT-HS | HC06007-L | | | | | | | | | | | | | | | |
| McKesson | Quest Pharma | EEMT-HS | HC10701-L | | | | | | | | | | | | | | | |
| McKesson | RDC | EEMT-HS | HC06007-L | | | | | | | | | | | | | | | |
| McKesson | Schnuck | EEMT-HS | HC04807-L | | | | | | | | | | | | | | | |
| McKesson | Schnuck | EEMT-HS | HC10701-L | | | | | | | | | | | | | | | |
| Walgreens | Valley Wholesale | EEMT-HS | HC10701-L | | | | | | | | | | | | | | | |
| Walgreens | Value Drug Company | EEMT-HS | HC04807-L | | | | | | | | | | | | | | | |
| Walgreens | Walgreens | EEMT-HS | HC06007-L | | | | | | | | | | | | | | | |
| Wal-Mart | Walgreens | EEMT-HS | HC06007-L | | | | | | | | | | | | | | | |
| Wal-Mart | Wal-Mart | EEMT-HS | HC06007-L | | | | | | | | | | | | | | | |
| Wal-Mart | Wal-Mart | EEMT-HS | HC10701-L | | | | | | | | | | | | | | | |
| Amerisource | Amerisource | EEMT-CS | HM05906-L | | | | | | | | | | | | | | | |
| Amerisource | ANDA | EEMT-CS | HM05906-L | | | | | | | | | | | | | | | |
| ANDA | Dropseca Balances | EEMT-CS | HM05906-L | | | | | | | | | | | | | | | |
| Associated Pharmacies | HD Smith | EEMT-CS | HM05906-L | | | | | | | | | | | | | | | |
| Bentover Hospital | Hannaford | EEMT-CS | HM05906-L | | | | | | | | | | | | | | | |
| Cardinal | McKesson | EEMT-CS | HM05906-L | | | | | | | | | | | | | | | |
| Cardinal | Medco | EEMT-CS | HM05906-L | | | | | | | | | | | | | | | |
| CVS | Medco | EEMT-CS | HM05906-L | | | | | | | | | | | | | | | |
| CVS | McKesson | EEMT-CS | HM05906-L | | | | | | | | | | | | | | | |
| Dropseca Balances | Public | EEMT-CS | HM05906-L | | | | | | | | | | | | | | | |
| HD Smith | Public | EEMT-CS | HM05906-L | | | | | | | | | | | | | | | |
| Hannaford | RDC | EEMT-CS | HM05906-L | | | | | | | | | | | | | | | |
| McKesson | Super Value | EEMT-CS | HM05906-L | | | | | | | | | | | | | | | |
| McKesson | Value Drug | EEMT-CS | HM05906-L | | | | | | | | | | | | | | | |
| McKesson | Walgreens | EEMT-CS | HM05906-L | | | | | | | | | | | | | | | |
| McKesson | Walgreens | EEMT-CS | HM05906-L | | | | | | | | | | | | | | | |
| Public | Wal-Mart | EEMT-CS | HM05906-L | | | | | | | | | | | | | | | |
| Public | Wal-Mart | EEMT-CS | HM05906-L | | | | | | | | | | | | | | | |



# EXHIBIT E

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**

**FORM 8-K**

**CURRENT REPORT**

**Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

Date of Report (Date of earliest event reported) <u>February 5, 2008</u>

<u>Interpharm Holdings, Inc.</u>

(Exact name of Registrant as specified in charter)

| Delaware | 0-22710 | 13-3673965 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

| 75 Adams Avenue, Hauppauge, New York | 11788 |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: <u>(631) 952 0214</u>

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 1.01 Entry into a Material Definitive Agreement**

On February 5, 2008, Interpharm Holdings, Inc. ("Holdings") and Interpharm, Inc. (the "Company") entered into a Forbearance Agreement with Wells Fargo Bank, National Association ("Wells Fargo") which, as more fully set forth below, provides Holdings and the Company with additional credit and provides for a forbearance by Wells Fargo from exercising its remedies based on previous defaults with respect to Holdings' and the Company's credit agreement with Wells Fargo (the "Wells Fargo Credit Agreement"). A copy of the Forbearance Agreement is annexed hereto as Exhibit 10.1 and the description of the Forbearance Agreement contained herein is qualified, in its entirety, by the text of the agreement itself.

In connection with its negotiation of the Forbearance Agreement, the Company completed a restructuring of its operations on January 25, 2008 and submitted a new operating plan to Wells Fargo which the Company believes will result in positive cash flow and net profits. Pursuant to the new operating plan, the Company has substantially reduced its research and development activities, reduced its payroll by approximately 20% and began a process to identify alternative financing sources for the Company's real estate, machinery and equipment, and working capital finance.

As reported on Holdings Current Report on Form 8-K filed with the Securities and Exchange Commission on January 24, 2008, Wells Fargo had informed Holdings and the Company that it was in the process of assessing the Company's eligible collateral under the Wells Fargo Credit Agreement and was providing limited credit availability for ongoing operations pending the outcome of that review. The Company had been in default under the Wells Fargo Credit Agreement since June 30, 2007.

As reported in Holdings' Current Report on Form 8-K filed with the Securities and Exchange Commission on January 29, 2008, on January 28, 2008, Wells Fargo informed the Company that it would consider providing the Company with credit availability on the condition that the Company (i) develops and implements a new operating plan focused on increasing the amount of eligible collateral and reducing costs and (ii) develop an alternative financing arrangement.

On February 5, 2008, the Company, Holdings and Wells Fargo entered into the Forbearance Agreement whereby Wells Fargo agreed to, among other things, (i) forbear from exercising its remedies arising from the Company's default under the Wells Fargo Credit Agreement until June 30, 2008 provided no further default occurs; (ii) provide a moratorium on certain principal payment; (iii) and advance the Company up to $2,999,999 under a newly granted real estate line of credit mortgage on the Company's real estate, which amounts will be due on June 30, 2008.

Under the Forbearance Agreement the Company and Holdings agreed to (i) submit to Wells Fargo, on a weekly basis, a "rolling" 13-week budget; (ii) engage a chief restructuring officer to review and oversee the budget and, in conjunction with Company management, certain financial matters; (iii) grant Wells Fargo an equity line of credit mortgage to secure its new equity line of credit and a collateral mortgage to secure certain obligations under that portion of revolving line of credit that has been converted to a term loan and (iv) pay Wells Fargo a success fee of up to $500,000 in the event the balance of the indebtedness owed to Wells Fargo is repaid from the sale of the Company's stock or substantially all of its assets prior to June 30, 2008.

The Forbearance Agreement also limits the Company's borrowing base on which certain advances are made and provides for a number of events of default, including (i) a material adverse change (ii) failure of the Company to meet certain budget items by more that 10%; (iii) failure to receive a letter of intent for the sale of the assets of the Company for an amount in excess of the Wells Fargo indebtedness by March 31, 2008; (iv) failure by the Company to receive a commitment for the sale of the assets of the Company for an amount in excess of the Wells Fargo indebtedness by April 30, 2008; (v) failure of the Company to close a transaction for the sale of the assets of the Company for an amount in excess of the Wells Fargo indebtedness by June 30, 2008; and (vi) Wells Fargo indebtedness remains outstanding on June 30, 2008.

Pursuant to the operating plan approved by Wells Fargo in connection with the Forbearance Agreement, the Company will have access to up to an additional $2,999,999 of capital to meet its ongoing working capital and operating requirements.

**Item 9.01 Financial Statements and Exhibits**

Exhibit. The following is furnished as an exhibit to this report:

| Exhibit No. | Exhibit Description |
| --- | --- |
| 10.1 | Forbearance Agreement dated February 5, 2008 between Wells Fargo Bank, National Association, acting through its Wells Fargo Business Credit operating division and Interpharm, Inc. and Interpharm Holdings, Inc. |

<u>Signatures</u>

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

INTERPHARM HOLDINGS, INC.

February 6, 2008

By: /s/ Peter Giallorenzo
     Peter Giallorenzo
     Chief Financial Officer and
     Chief Operating Officer

# EXHIBIT F

## FORBEARANCE AGREEMENT

THIS **FORBEARANCE AGREEMENT**, dated as of February 5, 2008, entered in by and between Wells Fargo Bank, National Association, acting through its Wells Fargo Business Credit operating division ("Wells Fargo"), having a place of business located at 119 West 40th Street, New York, New York 10018, and Interpharm, Inc. ("Borrower"), having a principal place of business located at 75 Adams Avenue, Hauppauge, NY 11725.

WHEREAS, Borrower and Wells Fargo entered into that certain Credit and Security Agreement dated February 9, 2006, whereby Wells Fargo agreed to make secured loans and advances to or for the benefit of Borrower, together with all amendments and modifications thereto, including but not limited to the Initial Forbearance Agreement and the Interim Forbearance Agreement, each as defined below (collectively, the "Security Agreement")[1]; and

WHEREAS, the Security Agreement provides for advances to be made separately as (i) Revolving Advances, as evidenced by the Revolving Note, (ii) an M&E Advance, as evidenced by the M&E Term Note, (iii) Cap Ex Advances, as evidenced by the Cap Ex Note, (iv) a Real Estate Advance, as evidenced by the Consolidated Real Estate Term Note, and (v) Real Estate Line of Credit Advances, as evidenced by the Real Estate Line of Credit Note.

WHEREAS, to secure the payment and performance of the Obligations (as hereinafter defined) when due, Borrower granted to Wells Fargo a first priority security interest in and to all of Borrower's assets, including, but not limited to, all of Borrower's then existing and thereafter acquired inventory, equipment, accounts, chattel paper, instruments (including but not limited to all promissory notes), goods, letter-of-credit rights, letters of credit, documents,

---

[1] Capitalized terms used herein have the meanings given to them in the Security Agreement unless otherwise specified.

deposit accounts, investment property, supporting obligations, money, other rights to payment and performance, and general intangibles (including but not limited to all software and all payment intangibles and specifically including all Abbreviated New Drug Applications ("ANDAs") filed with the United States Federal Drug Administration Center for Drug Evaluation and Research, Office of Generic Drugs (the "FDA") and all ANDAs owned by the Borrower), all fixtures and all products and proceeds (including but not limited to, all insurance payments) of or relating to the foregoing property; and

**WHEREAS**, to further secure the payment and performance of the Borrower's obligations under the Consolidated Real Estate Term Note, the Borrower granted to Wells Fargo a security interest in the Real Estate, as evidenced by that certain Demand Mortgage and Security Interest dated as of February 9, 2006, that certain Mortgage Modification, Consolidation and Extension Agreement dated as of February 9, 2006, and documents executed therewith, recorded with the clerk of the County of Suffolk on February 22, 2006 at Liber 21239 Page 931 (the "Mortgage"); and

WHEREAS, to further secure the payment and performance of the Borrower's obligations under the Real Estate Line of Credit Note, the Borrower granted to Wells Fargo a security interest in the Real Estate, as evidenced by that certain Revolving Line of Credit Mortgage dated as of February 1, 2008, and documents executed therewith, (the "Second Mortgage" and, together with the Mortgage, the "Mortgages"); and

WHEREAS, pursuant to that certain Guaranty by Corporation dated February 9, 2006, Interpharm Holdings, Inc. (the "Guarantor") guaranteed to Wells Fargo all of the obligations then owing or thereafter owing by Borrower to Wells Fargo under the Credit Agreement and otherwise (the "Guaranty"); and

410035                                                                    2

**WHEREAS**, pursuant to the Security Agreement, Wells Fargo agreed to provide Borrower with certain financing; and

**WHEREAS**, certain defaults occurred under the Security Agreement; and

**WHEREAS**, Borrower and Wells Fargo entered into that certain Forbearance Agreement dated October 26, 2007 (the "Initial Forbearance Agreement"), whereby Wells Fargo agreed to forbear in commencing an action against the Borrower until December 31, 2007 pursuant to the terms and conditions contained therein; and

**WHEREAS**, as of the close of business on January 29, 2008, the Borrower was obligated to Wells Fargo under the Security Agreement in the principal amount of $30,204,496, plus interest from January 1, 2008, together with all other Obligations that may be owing by Borrower to Wells Fargo including, but not limited to its costs (legal fees, and any fees, costs, expenses, disbursements), fees, expenses and disbursements, and any and all additional advances that may be made by Wells Fargo to the Borrower whether to protect the Collateral (as that term is defined in the Security Agreement), in connection with the liquidation of Borrower's assets or otherwise (collectively, the "Obligations"); and

**WHEREAS**, Borrower remains obligated to Wells Fargo for the monies owed under the Security Agreement and otherwise; and

**WHEREAS**, certain defaults exist under the Security Agreement and the Initial Forbearance Agreement; and

**WHEREAS**, Borrower requested that Wells Fargo forbear in commencing any action against the Borrower under or pursuant to the Security Agreement and allow the Borrower a reasonable amount of time to effect a sale of its company or assets or refinance a part or all of its assets; and

**WHEREAS**, Borrower and Wells Fargo were engaged in continuing negotiations of a forbearance agreement to run through June 30, 2008 but were unable to reach a *meeting of the minds* on all salient terms and conditions; and

**WHEREAS**, the Borrower had certain immediate cash needs on February 1, 2008, and, in order to avoid irreparable injury to its business, Borrower requested certain specific immediate advances from Wells Fargo, which Wells Fargo was only willing to make upon the terms and conditions contained in that written agreement dated as of February 1, 2008, which provided, in part, for the requested advances, the grant of the Revolving Line of Credit Mortgage to secure such advances, and Wells Fargo's agreement to forbear in commencing any action against the Borrower (the "Interim Forbearance Agreement"); and

**WHEREAS**, the Borrower retained Getzler Henrich & Associates LLC as its Interim Financial Advisor (the "IFA"); and

**WHEREAS**, the Borrower has retained or is in the process of retaining the services of NachmanHaysBrownstein, Inc. as its chief restructuring officer (the "CRO); and

**WHEREAS**, the Borrower and Wells Fargo have since agreed to the terms of Wells Fargo's continued forbearance through June 30, 2008, pursuant to the terms and conditions provided for herein.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.      All of the above recitals are hereby incorporated by reference and made part of this Agreement.

2.      Borrower hereby acknowledges that it is indebted to Wells Fargo under the Security Agreement in the amount of the Obligations.

3. Borrower hereby acknowledges that the Borrower has defaulted under the Security Agreement and the Initial Forbearance Agreement, and that Wells Fargo may currently exercise its remedies pursuant to the Security Agreement and applicable law to recognize upon the Collateral or to otherwise proceed against the Borrower.

4. The Borrower hereto acknowledges and represents that:

(a) Borrower is in default under the Security Agreement and Wells Fargo has the right, subject to the provisions contained herein, at any time, to demand the amounts due and payable in full pursuant to Section 7.2 of the Security Agreement;.

(b) The execution and delivery of this Agreement by Borrower and the compliance with the terms hereof do not violate any provision of the corporate documents of Borrower and do not violate any provision of any existing law or regulation or any writ or decree of any court or governmental instrumentality or any agreement or instrument to which Borrower is a party or which is binding upon Borrower or its assets and will not result in the creation or imposition of any lien, security interest, charge or encumbrance of any nature whatsoever. No consent of any other party and no consent, license, approval or authorization or registration or declaration with, any governmental bureau or agency is required in connection with the execution, delivery, performance, validity and enforceability of this Agreement.

(c) Except a set forth on "Schedule 4(c)" of this Agreement there is no action, suit, proceeding or investigation pending or threatened (or any basis therefor) against Borrower which, if adversely determined, would in any case or in the aggregate, materially and adversely affect any of Borrower's properties, assets, financial condition or businesses or materially impair any of Borrower's right to carry on business substantially as now conducted or proposed to be conducted.

410035                                                                                                   5

(d)      This Forbearance Agreement is intended to supplement the Security Agreement and the rights and obligations of the parties under the Security Agreement and other loan documents shall not in any way be vacated, modified or terminated except as herein provided. All terms and conditions contained in each and every agreement or promissory note or other evidence of indebtedness of Borrower to Wells Fargo are incorporated herein by reference.

(e)      The Borrower agrees that Wells Fargo has a first priority perfected security interest in the Collateral and in the Real Estate (as each term is defined in the Security Agreement). Guarantor, by its execution hereof, consents to the terms hereof and acknowledges and affirms that the Guaranty remains in full force and effect without defense, setoff or counterclaim. The Borrower hereby acknowledges and agrees that (A) throughout its relationship with Wells Fargo in connection with the transactions described in the Security Agreement, Wells Fargo and all of its officers, directors, shareholders, employees and agents have acted in good faith in complying with the terms of the Security Agreement, and (B) there does not exist as of the date hereof any defense, claim, claim of offset, cause of action or any other claim of liability (hereinafter referred to collectively as "Claims") in favor of any party against Wells Fargo or any of its officers, directors, shareholders, employees, or agents, and in consideration of the agreement by Wells Fargo to enter into this Agreement, the Borrower and Guarantors, hereby waive, release and discharge any Claims and causes of action, if any, of any kind whatsoever, whether at law or in equity, arising on or prior to the date hereof, which each may have against Wells Fargo. Borrower and Guarantors each also agree that all waivers, releases and agreements made herein are made in consideration of, and in order to induce Wells Fargo to temporarily

410035                                                    6

forbear in the exercise or further exercise of its rights and remedies under the Security Agreement and to induce Wells Fargo to enter into this Agreement.

(f)     As of the date hereof, this Agreement has been duly authorized, executed and delivered by Borrower.

(g)     This Agreement does not contravene any law, rule or regulation applicable to Borrower or any of the terms of any indenture, agreement or undertaking to which Borrower is a party.

(h)     Borrower shall not (i) apply for or consent to the appointment of, or the taking possession by, a receiver, custodian, trustee or liquidator of all or a substantial part of their property, (ii) make a general assignment for the benefit of creditors, (iii) commence a voluntary case under any state or federal bankruptcy laws (now or hereafter in effect), (iv) file a petition or application seeking to take advantage of any law providing for the relief of debtors, (v) be subject to any petition filed against it commencing any involuntary case under such bankruptcy laws unless it obtains an order from the bankruptcy court authorizing Wells Fargo to continue to provide financing under this Agreement and the Security Agreement, or (vi) take any action for the purpose of effecting the foregoing.

(i)     In the event of the filing of any voluntary or involuntary petition in bankruptcy by or against Borrower: (i) Borrower shall not assert or request any other party to assert that the automatic stay provided by section 362 of the Bankruptcy Code shall operate or be interpreted to stay, interdict, condition, reduce or inhibit Wells Fargo from enforcing any rights it has by virtue of the Security Agreement or this Agreement or at law or in equity, or any other rights Wells Fargo has whether now or hereafter acquired, against Borrower or its successors or assigns or against the Collateral; and (ii)  Borrower shall not seek any financing pursuant to

section 364(d) of the Bankruptcy Code, which grants a lender any security interest senior to the interests of Wells Fargo.

(j)    In the event of any voluntary or involuntary bankruptcy filing, Wells Fargo shall be entitled, and Borrower irrevocably consents, to an order granting relief from all stays, including the automatic stay imposed by Section 362 of the Bankruptcy Code, so as to permit Wells Fargo to foreclose upon its Collateral and to exercise any and all rights and remedies of Wells Fargo under the Security Agreement or this Agreement, or at law.

(k)    The Borrower agrees that in the event of any involuntary bankruptcy filing, the Borrower must immediately obtain an order of the Bankruptcy Court authorizing the Borrower to continue to borrow from Wells Fargo on a secured basis in accordance with the Security Agreement pending the dismissal of the involuntary petition or entry of an order for relief in form and substance acceptable to Wells Fargo.

(l)    The Borrower hereby represents and warrants that all financial statements, affidavits of financial condition and other financial information delivered or provided by Borrower to Wells Fargo are true, correct and accurate.

(m)    The Borrower hereby represents and warrants that all warranties and representations made to Wells Fargo as of the date hereof are true, correct and accurate.

5.    The Borrower hereby confirms the security interests and liens granted by the Borrower to Wells Fargo in and to the Collateral and Real Estate in accordance with the Security Agreement, Mortgages and other loan documents as security for its Obligations to Wells Fargo. The Guarantor hereby confirms the security interests and liens granted by the Guarantor to Wells Fargo in and to the Guarantor's assets as security for the Borrower's and Guarantor's obligations to Wells Fargo.

6.    Wells Fargo agrees to forbear from exercising its rights, including, but not limited to those rights pursuant to the Uniform Commercial Code against the Borrower under the Security Agreement until June 30, 2008 (the "Forbearance Period"), provided that during the Forbearance Period there is no default under this Agreement, or any new default under the Security Agreement.

7.    Borrower has provided Wells Fargo with projections of the Borrower's cash receipts and disbursements, including line item projections for weekly cash requirements, projected sales, projected inventory positions, projected loan balances and the Availability (either as a positive or negative number) for all loans for the period through April 21, 2008 (the "Budget", attached hereto as Exhibit "A"). The Borrower shall deliver to Wells Fargo an updated budget on a rolling thirteen week rolling basis, no later than every Friday of each week (each a "Revised Budget"), which Revised Budget shall be subject to the approval of Wells Fargo, in its sole discretion. The Borrower warrants and represents that Revised Budget shall include all reasonable, necessary and foreseeable expenses to be incurred with the operation of Borrower's business for the period set forth in the Revised Budget and that the Revised Budget reflects Borrower's best good faith projections for all data contained therein.

8.    The Borrower shall continue to retain the services of Getzler Henrich & Associates LLC as IFA until such time as the CRO is prepared to assume all responsibilities and duties being carried out by the IFA. The IFA or the CRO, as the case may be, shall have full authority to review the Budget and each Revised Budget with full oversight. The Borrower, through its IFA or CRO, as the case may be, shall, in conjunction with other members of the Borrower's management team: (i) prepare and timely deliver each Revised Budget (subject to Wells Fargo's consent) under which the Borrower shall operate under this Forbearance

Agreement; (ii) request advances from Wells Fargo to effect payments on the Borrower's behalf; (iii) administer the Budget and each Revised Budget; (iv) negotiate with all vendors and customers; and (v) solicit refinancing opportunities and offers to purchase all or any part of the Borrower's business.     The term "in conjunction with other members of the Borrower's management team" as used in this Forbearance Agreement is for information purposes only and shall not create any duty upon Wells Fargo to verify or confirm that the IFA or CRO, as the case may be, has actually acted together with any other member of management.  Borrower hereby agrees that the IFA and the CRO, as the case may be, shall be the sole designee appointed by the Borrower on its behalf to communicate with Wells Fargo and to relay information and instruction to it and that such communications, information and instructions shall be binding upon the Borrower.  The IFA and the CRO, as the case may be, shall have such additional functions as may be set forth any retention agreement by and between Borrower and such IFA and CRO, copies of which shall be provided to Wells Fargo within one day of them being entered into between such IFA and/or CRO and the Borrower.

9.     On a weekly basis, the Borrower shall provide Wells Fargo with (a) a compliance report in the same spreadsheet form as the Budget and each Revised Budget, certified in writing as true and accurate, that shows the comparison of all budget categories with the actual levels of expenditures and revenues generated for the preceding week (a "Budget Compliance Report"); (b) weekly inventory reports and (c) such other reports and financial information required by the Security Agreement in accordance with its terms.

10.     Provided that no Event of Default has occurred under this Agreement or any new Event of Default under the Security Agreement, there shall be a moratorium of principal payments under the M&E Note, CapEx Note and the Real Estate Note.

11.    Section 1.1 (Definitions) of the Security Agreement is hereby amended to

delete the definitions of "Availability", "Default Rate", "Floating Rate" and "Maximum Line

Amount" and replace them with the following:

"Availability" means (i) the difference between the face amount of the Real Estate Line of Credit Mortgage ($2,999,999) and the outstanding principal balance of the Real Estate Line of Credit Note; plus (ii) the amount, if any, by which the Borrowing Base exceeds the sum of (a) the outstanding principal balance of the Revolving Note and (b) the face amount of the $7MM Termed (Revolver) Note.

"'Default Rate' means an annual interest rate in effect during a Default Period or following the Termination Date, which interest rate shall be equal to three percent (3%) over the applicable Floating Rate, as such rate may change from time to time."

"'Floating Rate' means an annual interest rate equal to the sum of the Prime Rate plus two and one half of one percent (2.5%), which interest rate shall change when and as the Prime Rate changes."

"'Maximum Line Amount' means $14,883,739, which amount shall be reduced on the first day of every month in the amount of $181,000, commencing on March 1, 2008 and continuing on the first day of each month thereafter until such time as all Obligations owing to Lender have been paid in full."

12.    Section 1.1 (Definitions) of the Security Agreement is hereby amended by

deleting subparagraph (b)(ii)(D) of the definition of "Borrowing Base" and replacing it with the

following:

"(D) $7,000,000, plus"

13.    Section 1.1 (Definitions) of the Security Agreement is hereby amended by

adding a new subparagraph (ix) to the definition of "Eligible Inventory" as follows:

"(ix) Inventory comprised of work in process to the extent such exceeds the amount of $6,718,000 ("Eligible WIP"), which Eligible WIP shall be reduced by the amount of $200,000 per week commencing the week ending February 8, 2008 until such time as the Eligible WIP is reduced to the amount of $5,518,000."

14.    Section 2.2(a) of the Security Agreement is hereby amended to delete it in

its entirety and replace it with the following:

410035                                                11

"(a)        Type of Advances.  Each Advance shall be funded as a Floating

Rate Advance."

15.     Section 2.4 of the Security Agreement is hereby amended by deleting

subparagraph (d)(ii) in its entirety and replacing it with the following:

"(ii) Repayment of Real Estate Line of Credit Advance. On the earlier of
the occurrence of an event of default under this Agreement, or June 30, 2008, the
entire unpaid principal balance of the Real Estate Line of Credit Note, and all
unpaid interest accrued thereon, shall in any event be due and payable."

16.     During the Forbearance Period, all Advances made under the Security

Agreement shall be made as a Real Estate Line of Credit Advance or as a Revolving Advance, as

determined by Wells Fargo in its sole discretion.

17.     At the Borrower's request, Wells Fargo has agreed to allow the Borrower

to decrease the current outstanding principal amount under the Revolving Note by $7,000,000.

In order to meet the Borrower's request and to provide the Borrower with additional liquidity,

Wells Fargo has agreed to *term out* part of the obligations presently covered by the Revolving

Note.  This will reduce the Revolving Note by the requested amount with the *termed out*

obligations being evidenced by a new $7MM Termed (Revolver) Note, which such $7MM

Termed (Revolver) Note shall remain secured by the Collateral as provided in Article III of the

Credit Agreement and shall also be secured by the Real Estate.  Interest on the $7MM Termed

(Revolver) Note shall accrue at the Floating Rate.  On the earlier of the Maturity Date, the

Termination Date, or June 30, 2008, the entire unpaid principal balance of the $7MM Termed

(Revolver) Note, and all unpaid interest accrued thereon, shall be due and payable.

18.     To secure the obligations under the $7MM Termed (Revolver) Note, the

Borrower shall execute and deliver to Wells Fargo that certain Mortgage Agreement in the

410035                              12

shall not be earned in the event of a refinancing unless such refinancing is related to a sale of substantially all of the Borrower's stock or assets.

25.    An Event of Default under this Agreement shall mean any of the following:

(a)    The failure of the Borrower to observe, or timely comply with, or perform any covenant or term contained in this Agreement or the Security Agreement or any other agreement by and between Wells Fargo and the Borrower;

(b)    The failure of the Borrower to pay Wells Fargo any sum when due under this Agreement or the Security Agreement;

(c)    The occurrence of a material adverse change subsequent to the date of this Agreement with respect to the Borrower's finances or property, it being specifically understood and agreed that Wells Fargo may make such determination in its sole and absolute discretion;

(d)    Any financial statements, affidavits of financial condition or other financial information delivered or provided by the Borrower or in connection with this Agreement or the Security Agreement or any other agreement by and between Wells Fargo and the Borrower is or shall be false or misleading in any material respect;

(e)    Any warranty or representation made or deemed made by the Borrower in this Agreement or the Security Agreement or any other agreement by and between Wells Fargo and the Borrower is or shall be untrue in any material respect;

(f)    The Borrower becomes a debtor in any bankruptcy proceeding;

410035                                                  15

"(a)    Type of Advances. Each Advance shall be funded as a Floating Rate Advance."

15.    Section 2.4 of the Security Agreement is hereby amended by deleting subparagraph (d)(ii) in its entirety and replacing it with the following:

"(ii) Repayment of Real Estate Line of Credit Advance. On the earlier of the occurrence of an event of default under this Agreement, or June 30, 2008, the entire unpaid principal balance of the Real Estate Line of Credit Note, and all unpaid interest accrued thereon, shall in any event be due and payable."

16.    During the Forbearance Period, all Advances made under the Security Agreement shall be made as a Real Estate Line of Credit Advance or as a Revolving Advance, as determined by Wells Fargo in its sole discretion.

17.    At the Borrower's request, Wells Fargo has agreed to allow the Borrower to decrease the current outstanding principal amount under the Revolving Note by $7,000,000. In order to meet the Borrower's request and to provide the Borrower with additional liquidity, Wells Fargo has agreed to *term out* part of the obligations presently covered by the Revolving Note. This will reduce the Revolving Note by the requested amount with the *termed out* obligations being evidenced by a new $7MM Termed (Revolver) Note, which such $7MM Termed (Revolver) Note shall remain secured by the Collateral as provided in Article III of the Credit Agreement and shall also be secured by the Real Estate. Interest on the $7MM Termed (Revolver) Note shall accrue at the Floating Rate. On the earlier of the Maturity Date, the Termination Date, or June 30, 2008, the entire unpaid principal balance of the $7MM Termed (Revolver) Note, and all unpaid interest accrued thereon, shall be due and payable.

18.    To secure the obligations under the $7MM Termed (Revolver) Note, the Borrower shall execute and deliver to Wells Fargo that certain Mortgage Agreement in the

410035                                    12

original principal amount of $7,000,000 (the "Collateral Mortgage"), acceptable to Wells Fargo in its sole discretion, granting to Wells Fargo a security interest in and to the Real Estate. Borrower warrants and represents that it will cause to be issued to Wells Fargo an ALTA Title Insurance Policy in form and substance acceptable to Wells Fargo with respect to the property mortgaged in this paragraph, naming Wells Fargo as the insured party.

    19. Borrower hereby agrees to pay any and all mortgage taxes, recording fees, insurance premiums, and any and all costs, fees and expenses relating to the mortgages given to Wells Fargo herein.

    20. Except as specifically provided for in this Paragraph 20, Wells Fargo shall not be obligated to apply payments received from or on behalf of the Borrower towards any particular loan, and specifically shall not be obligated to apply any amounts received towards reduction of indebtedness under the Real Estate Line of Credit Note. Any amounts received by Wells Fargo may be applied against any outstanding indebtedness of the Borrower in Wells Fargo's sole discretion. Notwithstanding, in the event of any refinance, sale or sale-leaseback of the premises securing the Mortgages, the proceeds from any such refinancing, sale or sale-leaseback shall be applied as follows: (a) first to the satisfaction of the Consolidated Real Estate Term Note; then (b) to the satisfaction of the Real Estate Line of Credit Note; then (c) to the satisfaction, in part or in full, of the M&E Term Note. Upon the satisfaction in full of the Consolidated Real Estate Term Note, Real Estate Line of Credit Note and the M&E Term Note, Wells Fargo agrees to release or assign (without recourse and subject to an indemnity in favor of Wells Fargo for any claim airising out of or in connection with such assignment) the Mortgages and the Collateral Mortgage.

21.    Borrower hereby waives any and all defenses, claims, setoffs and discharges of the Borrower or any other obligor pertaining to the Obligations of the Borrower to Wells Fargo except the defense of discharge by payment in full. The Borrower expressly waives notice of the sale, lease or other disposition of the Borrower's or other obligor's collateral and any right of redemption that the Borrower may have.

22.    Wells Fargo shall be entitled to perform periodic inspections of the Borrower's accounts, inventory, equipment and all other assets securing the Obligations and the Borrower agrees to fully cooperate with Wells Fargo in the performance of said inspections.

23.    Upon execution and delivery of this Agreement, the Borrower shall pay to Wells Fargo a forbearance fee in the amount of $75,000 due and payable upon the execution and delivery of this Agreement by the Borrower to Wells Fargo.

24.    In the event Borrower shall complete a sale of its stock or assets or any part thereof in an amount sufficient to pay its indebtedness to Wells Fargo, the Borrower acknowledges that such sale would be a direct result of Wells Fargo's efforts and willingness to forbear from exercising its remedies against the Collateral, and agrees and acknowledges that Wells Fargo is entitled to a fee of $500,000 (the "Success Fee"), due and payable from the proceeds of such sale. Wells Fargo agrees to reduce the Success Fee as follows: In the event the Borrower pays the entire indebtedness due to Wells Fargo on or before February 28, 2008, the Success Fee shall be reduced to $250,000; in the event the Borrower pays the entire indebtedness due to Wells Fargo on or before March 31, 2008, the Success Fee shall be reduced to $350,000; in the event the Borrower pays the entire indebtedness due to Wells Fargo on or before April 30, 2008, the Success Fee shall be reduced to $450,000. It is specifically agreed that the Success Fee

shall not be earned in the event of a refinancing unless such refinancing is related to a sale of substantially all of the Borrower's stock or assets.

25.   An Event of Default under this Agreement shall mean any of the following:

(a)   The failure of the Borrower to observe, or timely comply with, or perform any covenant or term contained in this Agreement or the Security Agreement or any other agreement by and between Wells Fargo and the Borrower;

(b)   The failure of the Borrower to pay Wells Fargo any sum when due under this Agreement or the Security Agreement;

(c)   The occurrence of a material adverse change subsequent to the date of this Agreement with respect to the Borrower's finances or property, it being specifically understood and agreed that Wells Fargo may make such determination in its sole and absolute discretion;

(d)   Any financial statements, affidavits of financial condition or other financial information delivered or provided by the Borrower or in connection with this Agreement or the Security Agreement or any other agreement by and between Wells Fargo and the Borrower is or shall be false or misleading in any material respect;

(e)   Any warranty or representation made or deemed made by the Borrower in this Agreement or the Security Agreement or any other agreement by and between Wells Fargo and the Borrower is or shall be untrue in any material respect;

(f)   The Borrower becomes a debtor in any bankruptcy proceeding;

410035                                           15

(g)     Wells Fargo, after good faith verification, discovers any act of dishonesty by any officer or director of the Borrower as determined by Wells Fargo in its sole discretion;

(h)     The Borrower exceeds cash disbursement levels set forth in the Budget or any Revised Budget by greater than ten percent (10%) on a cumulative 13-week rolling basis, it being specifically understood that the transaction costs (i.e., mortgage recording taxes, professional fees, and the fee referenced in Paragraph 23 herein) associated with this Agreement shall be in excess of the Budget or any Revised Budget, if applicable;

(i)     The Borrower fails to meet profit levels set forth in the Budget or any Revised Budget by greater than ten percent (10%) on a cumulative 13-week rolling basis;

(j)     The Borrower fails to meet sales levels set forth in the Budget or any Revised Budget by greater than ten percent (10%) on a cumulative 13-week rolling basis;

(k)     The Borrower fails to meet cash receipt levels set forth in the Budget or any Revised Budget by greater than ten percent (10%) on a cumulative 13-week rolling basis;

(l)     The Borrower fails to meet availability levels set forth in the Budget or any Revised Budget by greater than ten percent (10%) on a cumulative 13-week rolling basis;

(m)     The Borrower has not received a letter of intent to purchase substantially all of the assets of the Borrower for an amount in excess of the outstanding balance of the indebtedness to Wells Fargo on or before March 31, 2008;

(n)   The Borrower has not received a commitment for the purchase of substantially all of the assets of the Borrower for an amount in excess of the outstanding balance of the indebtedness to Wells Fargo on or before April 30, 2008;

(o)   The Borrower has not closed on the sale of substantially all of the assets of the Borrower for an amount in excess of the outstanding balance of the indebtedness to Wells Fargo on or before June 30, 2008;

(p)   Any indebtedness remains outstanding from the Borrower to Wells Fargo on June 30, 2008.

26.   By executing this Agreement, the Borrower and Guarantor hereby waive, release and discharge any and all claims or causes of action, if any, of every kind and nature whatsoever, whether at law or in equity, arising at or prior to the date hereof, which it or they may have against Wells Fargo and/or its officers and employees in connection with the Security Agreement, this Agreement and all documents executed in connection therewith.  Borrower also agrees that all waivers, releases and agreements made herein are made in consideration of, and in order to induce Wells Fargo to temporarily forbear the exercise or further exercise of its rights and remedies against the Borrower under the Security Agreement and to induce Wells Fargo to enter into this Agreement.

27.   This Agreement shall be construed under and in accordance with the laws of the State of New York.

28.   The Borrower hereby consents to the jurisdiction of the Supreme Court of the State of New York for a determination of any and all disputes connected with this Agreement and/or the Security Agreement, and documents executed in connection therewith and consents to service of process by overnight courier, such service to be deemed effected upon posting.  This is

410035                                                                17

without prejudice to Wells Fargo's right to bring an action in any other jurisdiction for a determination of any dispute connected with this Agreement and/or the Security Agreement or the documents executed in connection therewith.

29.   This Agreement represents the entire agreement between Wells Fargo and the Borrower, all other agreements between Wells Fargo and the Borrower being merged with this Agreement.   The Security Agreement, the Mortgages, the Notes, and all other documents executed in connection with the foregoing, shall remain in full force and effect and modified only as specifically provided for in this Agreement.   The Borrower hereby acknowledges and agrees that Wells Fargo is agreeing to forbear in commencing any action against the Borrower only for Obligations owing to Wells Fargo under the Security Agreement pursuant to the terms and conditions contained in this Agreement.

30.   The Borrower hereto shall execute all additional documents and do all acts not specifically referred to herein which are reasonably necessary to fully effectuate the intent of this Agreement.

31.   The Borrower and Guarantor acknowledge and agrees that (i) Wells Fargo is not, by virtue of this Forbearance Agreement or otherwise, waiving any Default or Event of Default under the Loan Documents and (ii) Wells Fargo is not abandoning, waiving or releasing any claim, right or remedy Wells Fargo has under any of the Loan Documents.   Borrower and Guarantors agree that no delay on the part of Wells Fargo in exercising any power or right under the Loan Agreement, hereunder or any other Loan Document shall operate as a waiver of any such power or right, nor act as a consent to any departure by Borrower or Guarantors from any of the terms or conditions hereof or thereof, preclude other or further exercise thereof, or the

exercise of any other power or right. No waiver whatsoever shall be valid unless in writing signed by Wells Fargo and then only to the extent set forth therein.

32.    No executory agreement and no course of dealing between the Borrower and Wells Fargo shall be effective to change or modify this Agreement in whole or in part; nor shall any change, modification or waiver of any rights or powers of Wells Fargo be valid or effective unless in writing or signed by an authorized officer of Wells Fargo. Notwithstanding anything to the contrary contained herein, Wells Fargo does not agree to change, modify, waive, or forbear in exercising any of its rights or powers with respect to any corporation, shareholder, guarantor or individual other than the Borrower.

33.    The Borrower hereby represents and acknowledges that in connection with the negotiation of this Agreement it has been represented by its own counsel, who has reviewed this Agreement and advised it as to the legal significance and consequences of entering into this Agreement.

34.    Each individual executing this Agreement on behalf of the Borrower and Wells Fargo hereby warrants and represents that he has the requisite corporate authority to execute this Agreement.

35.    This Agreement may be executed in counterparts, each of which will be deemed an original document, but all of which together shall constitute but a single document. An executed facsimile of this Agreement shall be deemed to be a valid and binding agreement between the parties hereto.

IN WITNESS WHEREOF, the undersigned hereby agree to the terms and

conditions as set forth hereinabove.

WELLS FARGO BANK, NATIONAL
ASSOCIATION, acting through its Wells Fargo
Business Credit operating division

By:_____
    Richard Mahtani, Vice President

INTERPHARM, INC.

By:_____
    Raj Sutaria, Executive Vice President
    PETER GIALLORENZO
    CHIEF OPERATING OFFICER;
    CHIEF FINANCIAL OFFICER

Consented to, Agreed, and Acknowledged:

INTERPHARM HOLDINGS, INC.

By:_____
    Raj Sutaria, Executive Vice President
    PETER GIALLORENZO
    CHIEF OPERATING OFFICER;
    CHIEF FINANCIAL OFFICER

410035

20

STATE OF NEW YORK )
                   ) ss.:
COUNTY OF NEW YORK )

On the 5TH day of February, in the year 2008, before me personally came Richard Mahtani, to me known, who, being by me duly sworn, did depose and say that he resides in New York, New York; that he is the Vice President of WELLS FARGO BANK, NATIONAL ASSOCIATION, acting through its Wells Fargo Business Credit operating division., the corporation described in and which executed the above instrument; and that he signed his name thereto by authority of the board of directors of said corporation.

_____
Notary Public


STATE OF NEW YORK )
                   ) ss.:
COUNTY OF NASSAU)

On the 5TH day of February, in the year 2008, before me personally came ~~Raj Sutaria~~, to me known, who, being by me duly sworn, did depose and say that s\he resides in Melville, New York; that he is the ~~Executive Vice President~~ COO/CFO of INTERPHARM, INC. the corporation described in and which executed the above instrument; and that s\he signed her\his name thereto by authority of the board of directors of said corporation.

_Peter Gia\lorenzo_

_____
Notary Public

MICHAEL P. LICITRA
Notary Public, State of New York
No. 01LI4899145
Qualified in Nassau County
Commission Expires June 22, 2011


STATE OF NEW YORK )
                   ) ss.:
COUNTY OF NASSAU )

On the 5TH day of February, in the year 2008, before me personally came ~~Raj Sutaria~~, to me known, who, being by me duly sworn, did depose and say that s\he resides in Melville, New York; that he is the ~~Executive Vice President~~ COO/CFO of INTERPHARM HOLDINGS, INC. the corporation described in and which executed the above instrument; and that s\he signed her\his name thereto by authority of the board of directors of said corporation.

_Peter Gia\lorenzo_

_____
Notary Public

MICHAEL P. LICITRA
Notary Public, State of New York
No. 01LI4899145
Qualified in Nassau County
Commission Expires June 22, 2011

400035

## SCHEDULE 4(c)
## LITIGATIONS

Interpharm, Inc. v. Watson Laboratories, Inc., United States District Court, EDNY, Dkt No. 4600-cv-07 (Counterclaims)

Leiner Health Products v. Interpharm Holdings, Inc., Superior Court of California, Los Angeles, No. BC381396

Forest Laboratories v. Interpharm Holdings, Inc. and Interpharm, Inc., District Court of Delaware, No. 08-52

Ray Vuono v. Interpharm Holdings, Inc., New York Supreme Court, Suffolk County, Index No. 06-13985

Crane Partners v. Interpharm Holdings, Inc. and Interpharm, Inc., Superior Court of New Jersey, Law Division, Bergen County, BER-L-8474-07

Generic Pharmaceutical Services Inc.v. Interpharm Inc., New York Supreme Court, Suffolk County, Index No. 07-39101

Maria D. Amaya v. Interpharm, Inc., New York State Div. Of Human Rights, Case No. 10117146

Threatened Claims:

Possible claim by a female "MR" - January 18, 2008 letter threatening action for pain and suffering in connection with use of a prescribed Interpharm product.

# Exhibit A
# Budget

# EXHIBIT G

8-K 1 v094028.htm

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

### FORM 8-K

### CURRENT REPORT

**Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

Date of Report (Date of earliest event reported) <u>November 7, 2007</u>

<u>Interpharm Holdings, Inc.</u>
(Exact name of Registrant as specified in charter)

| <u>Delaware</u> | <u>0-22710</u> | <u>13-3673965</u> |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

<u>75 Adams Avenue, Hauppauge, New York 11788</u>
(Address of principal executive offices)    (Zip Code)

Registrant's telephone number, including area code: <u>(631) 952 0214</u>

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)
☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)
☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR240.14d-2(b))
☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Items 1.01 Entry into a Material Definitive Agreement**

On October 25, 2007, the Company and Wells Fargo Business Credit finalized a Forbearance Agreement that terminates on December 31, 2007 (the "Forbearance Period"), which was subsequently amended on November 13, 2007. As of June 30, 2007, the Company had defaulted under the Senior Credit Agreement with respect to (i) financial reporting obligations, including the submission of its annual audited financial statements for the fiscal year ending on or about June 30, 2007, and (ii) financial covenants related to minimum net cash flow, maximum allowable total capital expenditures, leverage and unfinanced capital expenditures for the fiscal year ended June 30, 2007 (collectively, the "Existing Defaults"). WFBC agreed to waive the Existing Defaults based upon the Borrower's consummation and receipt of $8,000,000 related to the issuance of subordinated debt described below. The parties have agreed to establish financial covenants for fiscal year 2008 prior to the conclusion of the Forbearance Period.

On November 7, 2007 and November 14, 2007, as required by the Forbearance Agreement, the Company received a total of $8,000,000 in gross proceeds from the issuance and sale of subordinated debt.

On November 7, 2007, Dr. Maganlal K. Sutaria, the Chairman of the Company's Board of Directors, and Vimla M. Sutaria, his wife, loaned $3,000,000 to the Company pursuant to a Junior Subordinated Secured 12% Promissory Note due 2010 (the "Sutaria Note"). Interest of 12% per annum on the Sutaria Note is payable quarterly in arrears, and for the first 12 months of the note's term, may be paid in cash, or additional notes ("PIK Notes"), at the option of the Company. Thereafter, the Company is required to pay at least 8% interest in cash, and the balance, at its option, in cash or PIK Notes.

Repayment of the Sutaria Notes is secured by liens on substantially all of the Company's property and real estate. Pursuant to intercreditor agreements, the Sutaria Notes are subordinated to the liens held by WFBC and the holders of the STAR Notes described below.

On November 14, 2007, the Company issued and sold an aggregate of $5,000,000 of Secured 12% Promissory Notes Due 2009 (the "STAR Notes") in the following amounts to the following parties:

| | |
|---|---|
| Tullis-Dickerson Capital Focus III, L.P. ("TD III") | $  833,333 |
| Aisling Capital II, L.P. ("Aisling") | $  833,333 |
| Cameron Reid ("Reid") | $  833,333 |
| Sutaria Family Realty, LLC ("SFR") | $2,500,000 |

TD III is an investor in the Company and the holder of its Series B-1 Convertible Preferred Stock. Aisling is also an investor in the Company and the holder of its Series C-1 Convertible Preferred Stock.

Reid is the Company's Chief Executive Officer and SFR is owned by Company shareholders who control approximately 45% of the Company's voting stock (the "Major Shareholders"), including Raj Sutaria, who is a Company Executive Vice President.

Interest of 12% per annum on the STAR Notes is payable quarterly in arrears, and may be paid, at the option of the Company, in cash or PIK Notes. Upon the Company obtaining stockholder approval and ratification of the issuance of the STAR Note financing and making the necessary filings with the SEC in connection therewith (the "Stockholder Approval"), which is to occur no earlier than January 18, 2008 and no later than the later of February 28, 2008 or such later date as may be necessary to address SEC comments on the Company's Information Statement on Schedule 14C, the STAR Notes shall be exchanged for:

• Secured Convertible 12% Promissory Notes due 2009 (the "Convertible Notes") in the original principal amount equal to the principal and accrued interest on the STAR Notes through the date of exchange. The conversion price of the Convertible Notes is to be $0.95 per share and interest is to be payable quarterly, in arrears, in either cash or PIK Notes, at the option of the Company;

• Warrants to acquire an aggregate of 1,842,103 shares of Common Stock (the "Warrants") with an exercise price of $0.95 per share.

Each of the Convertible Notes and Warrants are to have anti-dilution protection with respect to issuances of Common Stock, or common stock equivalents at less than $0.95 per share such that their conversion or exercise price shall be reset to a price equal to 90% of the price at which shares of Common Stock or equivalents are deemed to have been issued.

The repayment of the STAR and Convertible Notes is secured by a second priority lien on substantially all of the Company's property and real estate. Pursuant to intercreditor agreements, the STAR Note financing liens are subordinate to those of WFBC, but ahead, in priority, of the Sutaria Notes.

Also, upon the Company obtaining the Stockholder Approval, the Series B-1 and Series C-1 Convertible Preferred Stock held by TD III and Aisling shall be exchangeable for shares of a new Series D-1 Convertible Preferred Stock, which shall be substantially similar to the B-1 and C-1 Convertible Preferred Stock other than the Conversion price which is to be $0.95 per share instead of $1.5338 per share.

Pursuant to the terms of the Securities Purchase Agreements for the Company's Series B-1 and C-1 Convertible Preferred Stock, the consent of TD III and Aisling was required for the issuance of the Sutaria Notes and for the STAR Note financing. On November 7, 2007, we entered into a Waiver and Consent Agreement (the "Waiver") with TD III, Aisling and the Parties to the Financing which provided us with the necessary consent from Tullis and Aisling. In addition, the pursuant to the Waiver, Perry Sutaria, P&K Holdings I, LLC, Rametra Holdings I, LLC, Rajs Holdings I, LLC and Raj Sutaria, the holders of 45.2% of our issued and outstanding common stock (the "Proxy Shares") agreed to, and did give a voting proxy to a committee comprised of Perry Sutaria and a representative from each of TD III and Aisling to vote the Proxy Shares:

1. For the election of directors; and
2. With respect to any changes in the Company by-laws.

In addition, the holders of the Proxy Shares gave TD III and Aisling tag along rights on the Proxy Shares such that in the event of any sale, other than certain exempted sales, of the Proxy Shares, the holders of the Proxy Shares will have an obligation to have the buyer purchase a proportionate number of shares held by TD III and Aisling.

As consideration for the Waiver, the conversion price of the Series B-1 and C-1 Preferred Stock was reduced from $1.5338 to $0.95 and the exercise price of an aggregate of 4,563,828 warrants held by TD III and Aisling was reduced from $1.63 to $0.95.

<u>Signatures</u>

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

INTERPHARM HOLDINGS, INC.

November 14, 2007

By:  /s/ Peter Giallorenzo
     Peter Giallorenzo
     Chief Financial Officer and Chief Operating Officer

# EXHIBIT H

## AMENDED AND RESTATED FORBEARANCE AGREEMENT

**THIS AMENDED AND RESTATED FORBEARANCE AGREEMENT**, dated as of March 25, 2008, entered in by and between Wells Fargo Bank, National Association, acting through its Wells Fargo Business Credit operating division ("Wells Fargo"), having a place of business located at 119 West 40th Street, New York, New York 10018, and Interpharm, Inc. ("Borrower"), having a principal place of business located at 75 Adams Avenue, Hauppauge, NY 11725, amends and restates that certain Forbearance Agreement dated as of February 5, 2008.

**WHEREAS**, Borrower and Wells Fargo entered into that certain Credit and Security Agreement dated February 9, 2006, whereby Wells Fargo agreed to make secured loans and advances to or for the benefit of Borrower, together with all amendments and modifications thereto, including but not limited to the Initial Forbearance Agreement, the Interim Forbearance Agreement, and the Forbearance Agreement, each as defined below (collectively, the "Security Agreement")[1]; and

**WHEREAS**, the Security Agreement provides for advances to be made separately as (i) Revolving Advances, as evidenced by the Revolving Note and the $7MM Termed (Revolver) Note, (ii) an M&E Advance, as evidenced by the M&E Note, (iii) Cap Ex Advances, as evidenced by the Cap Ex Note, (iv) a Real Estate Advance, as evidenced by the Real Estate Note, and (v) Real Estate Line of Credit Advances, as evidenced by the Real Estate Line of Credit Note.

**WHEREAS**, to secure the payment and performance of the Obligations (as hereinafter defined) when due, Borrower granted to Wells Fargo a first priority security interest

---

[1] Capitalized terms used herein have the meanings given to them in the Security Agreement unless otherwise specified.

in and to all of Borrower's assets, including, but not limited to, all of Borrower's then existing and thereafter acquired inventory, equipment, accounts, chattel paper, instruments (including but not limited to all promissory notes), goods, letter-of-credit rights, letters of credit, documents, deposit accounts, investment property, supporting obligations, money, other rights to payment and performance, and general intangibles (including but not limited to all software and all payment intangibles and specifically including all Abbreviated New Drug Applications ("ANDAs") filed with the United States Federal Drug Administration Center for Drug Evaluation and Research, Office of Generic Drugs (the "FDA") and all ANDAs owned by the Borrower), all fixtures and all products and proceeds (including but not limited to, all insurance payments) of or relating to the foregoing property; and

**WHEREAS**, to further secure the payment and performance of the Borrower's obligations under the Real Estate Note, the Borrower granted to Wells Fargo a security interest in the Real Estate, as evidenced by that certain Demand Mortgage and Security Interest dated as of February 9, 2006, that certain Mortgage Modification, Consolidation and Extension Agreement dated as of February 9, 2006, and documents executed therewith, recorded with the clerk of the County of Suffolk on February 22, 2006 at Liber 21239 Page 931 (the "Mortgage"); and

**WHEREAS**, to further secure the payment and performance of the Borrower's obligations under the Real Estate Line of Credit Note, the Borrower granted to Wells Fargo a security interest in the Real Estate, as evidenced by that certain Revolving Line of Credit Mortgage dated as of February 1, 2008, and documents executed therewith, (the "Second Mortgage" and, together with the Mortgage, the "Mortgages"); and

**WHEREAS**, to further secure the payment and performance of the Borrower's obligations under the $7MM Termed (Revolver) Note, the Borrower granted to Wells Fargo a

2

security interest in the Real Estate, as evidenced by that certain Mortgage Agreement dated as of February 5, 2008, and documents executed therewith, (the "Collateral Mortgage" and, together with the Mortgage and the Second Mortgage, the "Mortgages"); and

WHEREAS, pursuant to that certain Guaranty by Corporation dated February 9, 2006, Interpharm Holdings, Inc. (the "Guarantor") guaranteed to Wells Fargo all of the obligations then owing or thereafter owing by Borrower to Wells Fargo under the Credit Agreement and otherwise (the "Guaranty"); and

WHEREAS, pursuant to the Security Agreement, Wells Fargo agreed to provide Borrower with certain financing; and

WHEREAS, certain defaults occurred under the Security Agreement; and

WHEREAS, Borrower and Wells Fargo entered into that certain Forbearance Agreement dated October 26, 2007 (the "Initial Forbearance Agreement"), whereby Wells Fargo agreed to forbear in commencing an action against the Borrower until December 31, 2007 pursuant to the terms and conditions contained therein; and

WHEREAS, certain defaults existed under the Security Agreement and the Initial Forbearance Agreement; and

WHEREAS, Borrower requested that Wells Fargo forbear in commencing any action against the Borrower under or pursuant to the Security Agreement and allow the Borrower a reasonable amount of time to effect a sale of its company or assets or refinance a part or all of its assets; and

WHEREAS, the Borrower had certain immediate cash needs on February 1, 2008, and, in order to avoid irreparable injury to its business, Borrower requested certain specific immediate advances from Wells Fargo, which Wells Fargo was only willing to make upon the

terms and conditions contained in that written agreement dated as of February 1, 2008, which provided, in part, for the requested advances, the grant of the Revolving Line of Credit Mortgage to secure such advances, and Wells Fargo's agreement to forbear in commencing any action against the Borrower (the "Interim Forbearance Agreement"); and

**WHEREAS**, Borrower and Wells Fargo entered into that certain Forbearance Agreement dated February 5, 2008 (the "Forbearance Agreement"), whereby Wells Fargo agreed to forbear in commencing an action against the Borrower until June 30, 2008 pursuant to the terms and conditions contained therein; and

**WHEREAS**, as per that certain engagement letter by and between the Borrower and Getzler Henrich & Associates LLC, on or about March 17, 2008, Getzler Henrich & Associates LLC was retained as Borrower's Chief Restructuring Officer ("CRO") in place of NachmanHaysBrownstein Inc.; and

**WHEREAS**, as a result of the Inventory Valuation, dated March 5, 2008, prepared by Hilco Appraisal Services, LLC in the ordinary course of the existing financing, Wells Fargo deems it necessary to adjust the inventory advance rates under the existing financing arrangement; and

**WHEREAS**, the Borrower has cash needs in excess of the amounts presently available under the existing financing arrangement; and

**WHEREAS,** as of the close of business on March 24, 2008, the Borrower was obligated to Wells Fargo under the Security Agreement in the principal amount of $30,928,858.02, plus interest from March 1, 2008, together with all other Obligations that may be owing by Borrower to Wells Fargo including, but not limited to its costs (legal fees, and any fees, costs, expenses, disbursements), fees, expenses and disbursements, and any and all

4

additional advances that may be made by Wells Fargo to the Borrower whether to protect the Collateral (as that term is defined in the Security Agreement), in connection with the liquidation of Borrower's assets or otherwise (collectively, the "Obligations"); and

**WHEREAS**, Borrower remains obligated to Wells Fargo for the monies owed under the Security Agreement and otherwise; and

**WHEREAS**, the Borrower and Wells Fargo have agreed to the terms of Wells Fargo's continued forbearance through June 30, 2008, pursuant to the terms and conditions provided for herein.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.      All of the above recitals are hereby incorporated by reference and made part of this Agreement.

2.      Borrower hereby acknowledges that it is indebted to Wells Fargo under the Security Agreement in the amount of the Obligations.

3.      Borrower hereby acknowledges that the Borrower has defaulted under the Security Agreement, and that Wells Fargo may currently exercise its remedies pursuant to the Security Agreement and applicable law to recognize upon the Collateral or to otherwise proceed against the Borrower.

4.      The Borrower hereto acknowledges and represents that:

(a)      Borrower is in default under the Security Agreement and Wells Fargo has the right, subject to the provisions contained herein, at any time, to demand the amounts due and payable in full pursuant to Section 7.2 of the Security Agreement;.

(b)    The execution and delivery of this Agreement by Borrower and the compliance with the terms hereof do not violate any provision of the corporate documents of Borrower and do not violate any provision of any existing law or regulation or any writ or decree of any court or governmental instrumentality or any agreement or instrument to which Borrower is a party or which is binding upon Borrower or its assets and will not result in the creation or imposition of any lien, security interest, charge or encumbrance of any nature whatsoever. No consent of any other party and no consent, license, approval or authorization or registration or declaration with, any governmental bureau or agency is required in connection with the execution, delivery, performance, validity and enforceability of this Agreement.

(c)    Except a set forth on "Schedule 4(c)" of this Agreement there is no action, suit, proceeding or investigation pending or threatened (or any basis therefor) against Borrower which, if adversely determined, would in any case or in the aggregate, materially and adversely affect any of Borrower's properties, assets, financial condition or businesses or materially impair any of Borrower's right to carry on business substantially as now conducted or proposed to be conducted.

(d)    This Forbearance Agreement is intended to supplement the Security Agreement and the rights and obligations of the parties under the Security Agreement and other loan documents shall not in any way be vacated, modified or terminated except as herein provided. All terms and conditions contained in each and every agreement or promissory note or other evidence of indebtedness of Borrower to Wells Fargo are incorporated herein by reference.

6

(e)    The Borrower agrees that Wells Fargo has a first priority perfected security interest in the Collateral and in the Real Estate (as each term is defined in the Security Agreement). Guarantor, by its execution hereof, consents to the terms hereof and acknowledges and affirms that the Guaranty remains in full force and effect without defense, setoff or counterclaim. The Borrower hereby acknowledges and agrees that (A) throughout its relationship with Wells Fargo in connection with the transactions described in the Security Agreement, Wells Fargo and all of its officers, directors, shareholders, employees and agents have acted in good faith in complying with the terms of the Security Agreement, and (B) there does not exist as of the date hereof any defense, claim, claim of offset, cause of action or any other claim of liability (hereinafter referred to collectively as "Claims") in favor of any party against Wells Fargo or any of its officers, directors, shareholders, employees, or agents, and in consideration of the agreement by Wells Fargo to enter into this Agreement, the Borrower and Guarantors, hereby waive, release and discharge any Claims and causes of action, if any, of any kind whatsoever, whether at law or in equity, arising on or prior to the date hereof, which each may have against Wells Fargo.  Borrower and Guarantors each also agree that all waivers, releases and agreements made herein are made in consideration of, and in order to induce Wells Fargo to temporarily forbear in the exercise or further exercise of its rights and remedies under the Security Agreement and to induce Wells Fargo to enter into this Agreement.

(f)    As of the date hereof, this Agreement has been duly authorized, executed and delivered by Borrower.

7

(g)     This Agreement does not contravene any law, rule or regulation applicable to Borrower or any of the terms of any indenture, agreement or undertaking to which Borrower is a party.

(h)     Borrower shall not (i) apply for or consent to the appointment of, or the taking possession by, a receiver, custodian, trustee or liquidator of all or a substantial part of their property, (ii) make a general assignment for the benefit of creditors, (iii) commence a voluntary case under any state or federal bankruptcy laws (now or hereafter in effect), (iv) file a petition or application seeking to take advantage of any law providing for the relief of debtors, (v) be subject to any petition filed against it commencing any involuntary case under such bankruptcy laws unless it obtains an order from the bankruptcy court authorizing Wells Fargo to continue to provide financing under this Agreement and the Security Agreement, or (vi) take any action for the purpose of effecting the foregoing.

(i)     In the event of the filing of any voluntary or involuntary petition in bankruptcy by or against Borrower:  (i) Borrower shall not assert or request any other party to assert that the automatic stay provided by section 362 of the Bankruptcy Code shall operate or be interpreted to stay, interdict, condition, reduce or inhibit Wells Fargo from enforcing any rights it has by virtue of the Security Agreement or this Agreement or at law or in equity, or any other rights Wells Fargo has whether now or hereafter acquired, against Borrower or its successors or assigns or against the Collateral; and (ii) Borrower shall not seek any financing pursuant to section 364(d) of the Bankruptcy Code, which grants a lender any security interest senior to the interests of Wells Fargo.

8

(j)     In the event of any voluntary or involuntary bankruptcy filing, Wells Fargo shall be entitled, and Borrower irrevocably consents, to an order granting relief from all stays, including the automatic stay imposed by Section 362 of the Bankruptcy Code, so as to permit Wells Fargo to foreclose upon its Collateral and to exercise any and all rights and remedies of Wells Fargo under the Security Agreement or this Agreement, or at law.

(k)     The Borrower agrees that in the event of any involuntary bankruptcy filing, the Borrower must immediately obtain an order of the Bankruptcy Court authorizing the Borrower to continue to borrow from Wells Fargo on a secured basis in accordance with the Security Agreement pending the dismissal of the involuntary petition or entry of an order for relief in form and substance acceptable to Wells Fargo.

(l)     The Borrower hereby represents and warrants that all financial statements, affidavits of financial condition and other financial information delivered or provided by Borrower to Wells Fargo are true, correct and accurate.

(m)     The Borrower hereby represents and warrants that all warranties and representations made to Wells Fargo as of the date hereof are true, correct and accurate.

5.     The Borrower hereby confirms the security interests and liens granted by the Borrower to Wells Fargo in and to the Collateral and Real Estate in accordance with the Security Agreement, Mortgages and other loan documents as security for its Obligations to Wells Fargo. The Guarantor hereby confirms the security interests and liens granted by the Guarantor to Wells Fargo in and to the Guarantor's assets as security for the Borrower's and Guarantor's obligations to Wells Fargo.

6.     Wells Fargo agrees to forbear from exercising its rights, including, but not limited to those rights pursuant to the Uniform Commercial Code against the Borrower under the Security Agreement until June 30, 2008 (the "Forbearance Period"), provided that during the Forbearance Period there is no default under this Agreement, or any new default under the Security Agreement.

7.     Borrower has provided Wells Fargo with projections of the Borrower's cash receipts and disbursements, including line item projections for weekly cash requirements, projected sales, projected inventory positions, projected loan balances and the Availability (either as a positive or negative number) for all loans for the period through June 6, 2008 (the "Budget", attached hereto as Exhibit "A"). The Borrower shall deliver to Wells Fargo an updated budget on a rolling thirteen week rolling basis, no later than every Monday of each week by 5:00 p.m. (each a "Revised Budget"), which Revised Budget shall be subject to the approval of Wells Fargo, in its sole discretion. The Borrower warrants and represents that Revised Budget shall include all reasonable, necessary and foreseeable expenses to be incurred with the operation of Borrower's business for the period set forth in the Revised Budget and that the Revised Budget reflects Borrower's best good faith projections for all data contained therein.

8.     The CRO shall have full authority to review the Budget and each Revised Budget with full oversight. The Borrower, through its CRO shall, in conjunction with other members of the Borrower's management team: (i) prepare and timely deliver each Revised Budget (subject to Wells Fargo's consent) under which the Borrower shall operate under this Forbearance Agreement; (ii) request advances from Wells Fargo to effect payments on the Borrower's behalf; (iii) administer the Budget and each Revised Budget; (iv) negotiate with all vendors and customers; and (v) solicit refinancing opportunities and offers to purchase all or any part of the

10

Borrower's business. The term "in conjunction with other members of the Borrower's management team" as used in this Forbearance Agreement is for information purposes only and shall not create any duty upon Wells Fargo to verify or confirm that the CRO has actually acted together with any other member of management. Borrower hereby agrees that the CRO shall be the sole designee appointed by the Borrower on its behalf to communicate with Wells Fargo and to relay information and instruction to it and that such communications, information and instructions shall be binding upon the Borrower. The CRO shall have such additional functions as may be set forth any retention agreement by and between Borrower and such CRO, copies of which shall be provided to Wells Fargo within one day of them being entered into between such CRO and the Borrower.

9.     No later than 5:00 p.m. on each Monday hereafter, the Borrower shall provide Wells Fargo with (a) a compliance report in the same spreadsheet form as the Budget and each Revised Budget, certified in writing as true and accurate, that shows the comparison of all budget categories with the actual levels of expenditures and revenues generated for the preceding week (a "Budget Compliance Report"); (b) weekly inventory reports and (c) such other reports and financial information required by the Security Agreement in accordance with its terms.

10.     Provided that no Event of Default has occurred under this Agreement or any new Event of Default under the Security Agreement, there shall be a moratorium of principal payments under the M&E Note, Cap Ex Note and the Real Estate Note.

11.     Section 1.1 (Definitions) of the Security Agreement is hereby amended to delete the definitions of "Availability", "Borrowing Base", "Default Rate", "Floating Rate", and "Maximum Line Amount" and replace them with the following:

"'Availability' means the amount, if any, by which the Borrowing Base exceeds the sum of (a) the outstanding principal balance of the Revolving Note,

11

(b) the face amount of the $7MM Termed (Revolver) Note, and (c) and the outstanding principal balance of the Real Estate Line of Credit Note."

"Borrowing Base" means at any time the lesser of:

     (a)    The Maximum Line Amount less the outstanding principal balance of (a) the Real Estate Note; (b) the Cap Ex Note; and (c) the M&E Note; or

     (b)    Subject to change from time to time in the Lender's reasonable discretion, the sum of:

         (i)    The product of the Accounts Advance Rate times Eligible Accounts, plus

         (ii)    The lesser of (A) the product of the Inventory Advance Rate times Eligible Inventory, or (B) 85% (or such lesser rate as the Lender in its commercially reasonable discretion may deem appropriate from time to time) of the Net Orderly Liquidation Value of Eligible Inventory, or (C) 100% (or such lesser rate as the Lender in its reasonable discretion may deem appropriate from time to time) of the amount of availability from b(i) above, or (D) $7,000,000, less

         (iii)    The face amount of the Real Estate Line of Credit Mortgage ($2,999,999); less

         (iv)    The Borrowing Base Reserve, less

         (v)    Obligations that the Borrower owes to the Lender that have not yet been advanced on the Revolving Note, and the dollar amount that the Lender in its discretion believes is a reasonable determination of the Borrower's credit exposure with respect to Wells Fargo Affiliate Obligations and obligations owed to Wells Fargo Merchant Services, LLC.

"'Default Rate' means an annual interest rate in effect during a Default Period or following the Termination Date, which interest rate shall be equal to three percent (3%) over the applicable Floating Rate, as such rate may change from time to time."

"'Floating Rate' means an annual interest rate equal to the sum of the Prime Rate plus two and one half of one percent (2.5%), which interest rate shall change when and as the Prime Rate changes."

"'Maximum Line Amount' means $35,151,500.33."

12.    Section 1.1 (Definitions) of the Security Agreement is hereby amended by

deleting subparagraph (xvii) to the definition of "Eligible Accounts", and replacing it with new

subparagraphs (xvii) and (xviii) as follows:

"(xvii)        Accounts owed by AmeriSource Bergen, McKesson, Cardinal
Health, or any other wholesaler (except Watson Pharmaceutical), to the extent accrued
after January 21, 2008;"

"(xviii)        Accounts owed by Watson Pharmaceutical, to the extent such
accounts exceed $1,100,000;"

13.    Section 1.1 (Definitions) of the Security Agreement is hereby amended by adding

a new subparagraph (ix) to the definition of "Eligible Inventory" as follows:

"(ix) Inventory comprised of work in process to the extent such
exceeds the amount of $6,718,000 ("Eligible WIP"), which Eligible WIP
shall be reduced by the amount of $200,000 per week commencing the week
ending February 8, 2008 until such time as the Eligible WIP is reduced to
the amount of $5,518,000."

14.    Section 1.1 (Definitions) of the Security Agreement is hereby amended by adding

a definition for "Inventory Advance Rate" as follows:

"'Inventory Advance Rate' means up to forty-nine percent (49%), or
such lesser rate as the Lender in its sole discretion may deem appropriate
from time to time. Notwithstanding anything to the contrary stated herein,
the Inventory Advance Rate shall be reduced by one percentage point (1%)
per week commencing on March 31, 2008 and each Monday thereafter until
such time that the Borrower has obtained (i) a commitment from a third
party to refinance at least $30,000,000 of the Obligations and (ii) a proposal,
accepted by the Borrower, from a third party to refinance the balance of the
Obligations, each satisfactory to Wells Fargo in its sole discretion. In the
event (a) the Borrower has not refinanced the Obligations in full by April
30, 2008 or (b) an event of default has occurred under this Agreement,
Inventory Advance Rate shall mean up to thirty-nine percent (39%), or such
lesser rate as the Lender in its reasonable discretion may deem appropriate
from time to time."

15.    Section 2.2(a) of the Security Agreement is hereby amended to delete it in its

entirety and replace it with the following:

13

"(a)    Type of Advances.    Each Advance shall be funded as a Floating Rate Advance."

16.    Section 2.4 of the Security Agreement is hereby amended by deleting subparagraph (d)(ii) in its entirety and replacing it with the following:

"(ii) Repayment of Real Estate Line of Credit Advance. On the earlier of the occurrence of an event of default under this Agreement, or June 30, 2008, the entire unpaid principal balance of the Real Estate Line of Credit Note, and all unpaid interest accrued thereon, shall in any event be due and payable."

17.    During the Forbearance Period, all Advances made under the Security Agreement shall be made as a Real Estate Line of Credit Advance or as a Revolving Advance, as determined by Wells Fargo in its sole discretion.

18.    At the Borrower's request, Wells Fargo agreed to allow the Borrower to decrease the outstanding principal amount under the Revolving Note by $7,000,000. In order to meet the Borrower's request and to provide the Borrower with additional liquidity, Wells Fargo agreed to *term out* part of the obligations presently covered by the Revolving Note. This reduced the Revolving Note by the requested amount with the *termed out* obligations being evidenced by a new $7MM Termed (Revolver) Note, which such $7MM Termed (Revolver) Note shall remain secured by the Collateral as provided in Article III of the Credit Agreement and shall also be secured by the Real Estate. Interest on the $7MM Termed (Revolver) Note shall accrue at the Floating Rate. On the earlier of the Maturity Date, the Termination Date, or June 30, 2008, the entire unpaid principal balance of the $7MM Termed (Revolver) Note, and all unpaid interest accrued thereon, shall be due and payable.

19.    To secure the obligations under the $7MM Termed (Revolver) Note, the Borrower executed and delivered to Wells Fargo that certain Mortgage Agreement in the original

14

principal amount of $7,000,000 (the "Collateral Mortgage"), granting to Wells Fargo a security interest in and to the Real Estate. Borrower caused to be issued to Wells Fargo an ALTA Title Insurance Policy with respect to the property mortgaged in this paragraph, naming Wells Fargo as the insured party.

20.    Borrower hereby agrees to pay any and all mortgage taxes, recording fees, insurance premiums, and any and all costs, fees and expenses relating to the mortgages given to Wells Fargo herein.

21.    Except as specifically provided for in this Paragraph 21, Wells Fargo shall not be obligated to apply payments received from or on behalf of the Borrower towards any particular loan, and specifically shall not be obligated to apply any amounts received towards reduction of indebtedness under the Real Estate Line of Credit Note. Any amounts received by Wells Fargo may be applied against any outstanding indebtedness of the Borrower in Wells Fargo's sole discretion. Notwithstanding, in the event of any refinance, sale or sale-leaseback of the premises securing the Mortgages, the proceeds from any such refinancing, sale or sale-leaseback shall be applied as follows: (a) first to the satisfaction of the Real Estate Note; then (b) to the satisfaction of the Real Estate Line of Credit Note; then (c) to the satisfaction, in part or in full, of the M&E Note. Upon the satisfaction in full of the Real Estate Note, Real Estate Line of Credit Note and the M&E Note, Wells Fargo agrees to release or assign (without recourse and subject to an indemnity in favor of Wells Fargo for any claim arising out of or in connection with such assignment) the Mortgages and the Collateral Mortgage.

22.    Borrower hereby waives any and all defenses, claims, setoffs and discharges of the Borrower or any other obligor pertaining to the Obligations of the Borrower to Wells Fargo except the defense of discharge by payment in full. The Borrower expressly waives notice of the

15

sale, lease or other disposition of the Borrower's or other obligor's collateral and any right of redemption that the Borrower may have.

23.    Wells Fargo shall be entitled to perform periodic inspections of the Borrower's accounts, inventory, equipment and all other assets securing the Obligations and the Borrower agrees to fully cooperate with Wells Fargo in the performance of said inspections.

24.    Upon execution and delivery of this Amended and Restated Forbearance Agreement, the Borrower shall be obligated to Wells Fargo, in addition to all other fees previously paid to Wells Fargo, in the amount of $250,000. such amount to then be immediately due and owing but payable on the Termination Date.

25.    In the event Borrower shall complete a sale of its stock or assets or any part thereof in an amount sufficient to pay the outstanding balance of the Obligations owing to Wells Fargo, the Borrower acknowledges that such sale would be a direct result of Wells Fargo's efforts and willingness to forbear from exercising its remedies against the Collateral, and agrees and acknowledges that Wells Fargo is entitled to a fee of $500,000 (the "Success Fee"), due and payable from the proceeds of such sale.  Wells Fargo agrees to reduce the Success Fee as follows:  In the event the Borrower pays the outstanding balance of the Obligations owing to Wells Fargo on or before February 28, 2008, the Success Fee shall be reduced to $250,000; in the event the Borrower pays the entire indebtedness due to Wells Fargo on or before March 31, 2008, the Success Fee shall be reduced to $350,000; in the event the Borrower pays the outstanding balance of the Obligations owing to Wells Fargo on or before April 30, 2008, the Success Fee shall be reduced to $450,000. It is specifically agreed that the Success Fee shall not be earned in the event of a refinancing unless such refinancing is related to a sale of substantially all of the Borrower's stock or assets.

16

26.     At the time Borrower requests that Wells Fargo release any of its liens (whether in connection of a payoff of the Obligations or otherwise), and as inducement to Wells Fargo for it to do so, Borrower agrees (and shall be obligated) to waive, release and discharge any and all claims or causes of action, if any, of every kind and nature whatsoever, whether at law or in equity, arising at or prior to the date thereof, which it may have against Wells Fargo and/or any of its officers, employees, agents and/or representatives.

27.     An Event of Default under this Agreement shall mean any of the following:

(a)     The failure of the Borrower to observe, or timely comply with, or perform any covenant or term contained in this Agreement or the Security Agreement or any other agreement by and between Wells Fargo and the Borrower;

(b)     The failure of the Borrower to pay Wells Fargo any sum when due under this Agreement or the Security Agreement:

(c)     The occurrence of a material adverse change subsequent to the date of this Agreement with respect to the Borrower's finances or property, it being specifically understood and agreed that Wells Fargo may make such determination in its sole and absolute discretion;

(d)     Any financial statements, affidavits of financial condition or other financial information delivered or provided by the Borrower or in connection with this Agreement or the Security Agreement or any other agreement by and between Wells Fargo and the Borrower is or shall be false or misleading in any material respect;

(e)     Any warranty or representation made or deemed made by the Borrower in this Agreement or the Security Agreement or any other agreement by and between Wells Fargo and the Borrower is or shall be untrue in any material respect;

17

(f) The Borrower becomes a debtor in any bankruptcy proceeding;

(g) Wells Fargo, after good faith verification, discovers any act of dishonesty by any officer or director of the Borrower as determined by Wells Fargo in its sole discretion;

(h) The Borrower exceeds cash disbursement levels set forth in the Budget or any Revised Budget by greater than ten percent (10%) on a cumulative 13-week rolling basis, it being specifically understood that the transaction costs (i.e., mortgage recording taxes, professional fees, and the fee referenced in Paragraph 23 herein) associated with this Agreement shall be in excess of the Budget or any Revised Budget, if applicable;

(i) The Borrower fails to meet profit levels set forth in the Budget or any Revised Budget by greater than ten percent (10%) on a cumulative 13-week rolling basis, tested on a monthly basis against the financial statements provided in accordance with the Credit Agreement;

(j) The Borrower fails to meet sales levels set forth in the Budget or any Revised Budget by greater than ten percent (10%) on a cumulative 13-week rolling basis;

(k) The Borrower fails to meet cash receipt levels set forth in the Budget or any Revised Budget by greater than ten percent (10%) on a cumulative 13-week rolling basis;

(l) The Borrower fails to meet availability levels set forth in the Budget or any Revised Budget by greater than ten percent (10%) on a cumulative 13-week rolling basis;

(m) The Borrower has not received either (i) a letter of intent to purchase substantially all of the assets of the Borrower for an amount in excess of the outstanding

balance of the Obligations owing to Wells Fargo or (ii) a proposal letter(s) from a third party(ies) to refinance the outstanding balance of the Obligations owing to Wells Fargo executed by the Borrower and such third party(ies), on or before March 31, 2008;

(n)    The Borrower has not received either (i) a commitment for the purchase of substantially all of the assets of the Borrower for an amount in excess of the outstanding balance of the Obligations owing to Wells Fargo or (ii) both (x) a commitment from a third party to refinance at least $30,000,000 of the Obligations and (y) a proposal, accepted by Borrower, from a third party to refinance the balance of the Obligations, each satisfactory to Wells Fargo in its sole discretion, on or before April 30, 2008;

(o)    The Borrower has not either (i) closed on the sale of substantially all of the assets of the Borrower for an amount in excess of the outstanding balance of the Obligations owing to Wells Fargo or (ii) closed on the refinancing by a third party of the outstanding balance of the Obligations owing to Wells Fargo, on or before June 30, 2008;

(p)    Any indebtedness remains outstanding from the Borrower to Wells Fargo on June 30, 2008.

28.    By executing this Agreement, the Borrower and Guarantor hereby waive, release and discharge any and all claims or causes of action, if any, of every kind and nature whatsoever, whether at law or in equity, arising at or prior to the date hereof, which it or they may have against Wells Fargo and/or its officers and employees in connection with the Security Agreement, this Agreement and all documents executed in connection therewith. Borrower also agrees that all waivers, releases and agreements made herein are made in consideration of, and in order to induce Wells Fargo to temporarily forbear the exercise or further exercise of its rights

19

and remedies against the Borrower under the Security Agreement and to induce Wells Fargo to enter into this Agreement.

29.    This Agreement shall be construed under and in accordance with the laws of the State of New York.

30.    The Borrower hereby consents to the jurisdiction of the Supreme Court of the State of New York for a determination of any and all disputes connected with this Agreement and/or the Security Agreement, and documents executed in connection therewith and consents to service of process by overnight courier, such service to be deemed effected upon posting. This is without prejudice to Wells Fargo's right to bring an action in any other jurisdiction for a determination of any dispute connected with this Agreement and/or the Security Agreement or the documents executed in connection therewith.

31.    This Agreement represents the entire agreement between Wells Fargo and the Borrower, all other agreements between Wells Fargo and the Borrower being merged with this Agreement.    The Security Agreement, the Mortgages, the Notes, and all other documents executed in connection with the foregoing, shall remain in full force and effect and modified only as specifically provided for in this Agreement. The Borrower hereby acknowledges and agrees that Wells Fargo is agreeing to forbear in commencing any action against the Borrower only for Obligations owing to Wells Fargo under the Security Agreement pursuant to the terms and conditions contained in this Agreement.

32.    The Borrower hereto shall execute all additional documents and do all acts not specifically referred to herein which are reasonably necessary to fully effectuate the intent of this Agreement.

33.    The Borrower and Guarantor acknowledge and agrees that (i) Wells Fargo is not, by virtue of this Forbearance Agreement or otherwise, waiving any Default or Event of Default under the Loan Documents and (ii) Wells Fargo is not abandoning, waiving or releasing any claim, right or remedy Wells Fargo has under any of the Loan Documents. Borrower and Guarantors agree that no delay on the part of Wells Fargo in exercising any power or right under the Loan Agreement, hereunder or any other Loan Document shall operate as a waiver of any such power or right, nor act as a consent to any departure by Borrower or Guarantors from any of the terms or conditions hereof or thereof, preclude other or further exercise thereof, or the exercise of any other power or right. No waiver whatsoever shall be valid unless in writing signed by Wells Fargo and then only to the extent set forth therein.

34.    No executory agreement and no course of dealing between the Borrower and Wells Fargo shall be effective to change or modify this Agreement in whole or in part; nor shall any change, modification or waiver of any rights or powers of Wells Fargo be valid or effective unless in writing or signed by an authorized officer of Wells Fargo. Notwithstanding anything to the contrary contained herein, Wells Fargo does not agree to change, modify, waive, or forbear in exercising any of its rights or powers with respect to any corporation, shareholder, guarantor or individual other than the Borrower.

35.    The Borrower hereby represents and acknowledges that in connection with the negotiation of this Agreement it has been represented by its own counsel, who has reviewed this Agreement and advised it as to the legal significance and consequences of entering into this Agreement.

21

STATE OF NEW YORK          )
                           ) ss.:
COUNTY OF NEW YORK  )

On the ___ day of March, in the year 2008, before me personally came Richard Mahtani, to me known, who, being by me duly sworn, did depose and say that he resides in New York, New York; that he is the Vice President of WELLS FARGO BANK, NATIONAL ASSOCIATION, acting through its Wells Fargo Business Credit operating division., the corporation described in and which executed the above instrument; and that he signed his name thereto by authority of the board of directors of said corporation.

_____
Notary Public

STATE OF NEW YORK          )
                           ) ss.:
COUNTY OF                  )

On the ___ day of March, in the year 2008, before me personally came Cameron Reid, to me known, who, being by me duly sworn, did depose and say that s\he resides in _____; that he is the Chief Executive Officer of INTERPHARM, INC. the corporation described in and which executed the above instrument; and that s\he signed her\his name thereto by authority of the board of directors of said corporation.

_____
Notary Public

STATE OF NEW YORK          )
                           ) ss.:
COUNTY OF                  )

On the ___ day of March, in the year 2008, before me personally came Raj Sutaria to me known, who, being by me duly sworn, did depose and say that s\he resides in Melville, New York; that he is the Chief Executive Officer of INTERPHARM HOLDINGS, INC. the corporation described in and which executed the above instrument; and that s\he signed her\his name thereto by authority of the board of directors of said corporation.

_____
Notary Public

414629

36.    Each individual executing this Agreement on behalf of the Borrower and Wells Fargo hereby warrants and represents that he has the requisite corporate authority to execute this Agreement.

37.    This Agreement may be executed in counterparts, each of which will be deemed an original document, but all of which together shall constitute but a single document. An executed facsimile of this Agreement shall be deemed to be a valid and binding agreement between the parties hereto.

IN WITNESS WHEREOF, the undersigned hereby agree to the terms and conditions as set forth hereinabove.

WELLS FARGO BANK, NATIONAL ASSOCIATION, acting through its Wells Fargo Business Credit operating division

By:_____
     Richard Mahtani, Vice President

INTERPHARM, INC.

By:_____
     Cameron Reid, Chief Executive Officer

Consented to, Agreed, and Acknowledged:

INTERPHARM HOLDINGS, INC.

By:_____
     Cameron Reid, Chief Executive Officer

STATE OF NEW YORK )
) ss.:
COUNTY OF NEW YORK )

On the *25* day of March, in the year 2008, before me personally came Richard Mahtani, to me known, who, being by me duly sworn, did depose and say that he resides in New York, New York; that he is the Vice President of WELLS FARGO BANK, NATIONAL ASSOCIATION, acting through its Wells Fargo Business Credit operating division., the corporation described in and which executed the above instrument; and that he signed his name thereto by authority of the board of directors of said corporation.

_____
Notary Public

STATE OF NEW YORK )
) ss.:
COUNTY OF )

ROBNA MCEWEN
Notary Public - State of New York
NO. 01MC6166374
Qualified in Kings County
My Commission Expires _2011_

On the ___ day of March, in the year 2008, before me personally came Cameron Reid, to me known, who, being by me duly sworn, did depose and say that s\he resides in _____; that he is the Chief Executive Officer of INTERPHARM, INC. the corporation described in and which executed the above instrument; and that s\he signed her\his name thereto by authority of the board of directors of said corporation.

_____
Notary Public

STATE OF NEW YORK )
) ss.:
COUNTY OF )

On the ___ day of March, in the year 2008, before me personally came Raj Sutaria to me known, who, being by me duly sworn, did depose and say that s\he resides in Melville, New York; that he is the Chief Executive Officer of INTERPHARM HOLDINGS, INC. the corporation described in and which executed the above instrument; and that s\he signed her\his name thereto by authority of the board of directors of said corporation.

_____
Notary Public

## SCHEDULE 4(c)
## LITIGATIONS


Interpharm, Inc. v. Watson Laboratories, Inc., United States District Court, EDNY, Dkt No. 4600-cv-07 (Counterclaims)

Leiner Health Products v. Interpharm Holdings, Inc., Superior Court of California, Los Angeles. No. BC381396

Forest Laboratories v. Interpharm Holdings, Inc. and Interpharm, Inc., District Court of Delaware, No. 08-52

Ray Vuono v. Interpharm Holdings, Inc., New York Supreme Court, Suffolk County, Index No. 06-13985

Crane Partners v. Interpharm Holdings, Inc. and Interpharm, Inc., Superior Court of New Jersey, Law Division, Bergen County, BER-L-8474-07

Generic Pharmaceutical Services Inc.v. Interpharm Inc., New York Supreme Court, Suffolk County, Index No. 07-39101

Maria D. Amaya v. Interpharm, Inc., New York State Div. Of Human Rights, Case No. 10117146


Threatened Claims:

Possible claim by a female "MR" - January 18, 2008 letter threatening action for pain and suffering in connection with use of a prescribed Interpharm product.

**Exhibit A**
**Budget**

# EXHIBIT I

8-K 1 v108743_8k.htm

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

## FORM 8-K

### CURRENT REPORT

**Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

Date of Report (Date of earliest event reported) <u>March 25, 2008</u>

<u>Interpharm Holdings, Inc.</u>

(Exact name of Registrant as specified in charter)

| Delaware | 0-22710 | 13-3673965 |
|---|---|---|
| (State or other jurisdic-<br>tion of incorporation) | (Commission<br>File Number) | (IRS Employer<br>Identification No.) |

|  |  |
|---|---|
| 75 Adams Avenue, Hauppauge, New York | 11788 |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: <u>(631) 952 0214</u>

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)
☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)
☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR240.14d-2(b))
☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

## Item 1.01  Entry into a Material Definitive Agreement

As set forth in its Current Report on Form 8-K filed with the Securities and Exchange Commission on February 6, 2008, on February 5, 2008, Interpharm Holdings, Inc. ("Holdings") and Interpharm, Inc. (the "Company") entered into a Forbearance Agreement (the "Forbearance Agreement") with Wells Fargo Bank, National Association ("Wells Fargo") which, provided Holdings and the Company with additional credit and provided for a forbearance by Wells Fargo from exercising its remedies based on previous defaults with respect to Holdings' and the Company's credit agreement with Wells Fargo (the "Wells Fargo Credit Agreement").

On March 25, 2008, Holdings and the Company entered into an Amended and Restated Forbearance Agreement with Wells Fargo (the "Amended Forbearance Agreement"). Pursuant to the Amended Forbearance Agreement, in exchange for a $250,000 payment and other consideration, Wells Fargo agreed to provide the Company with additional borrowing availability through: (i) increasing the cap on the Company's revolving credit line by approximately $2.3 million; (ii) increasing the percentage of inventory which is eligible as collateral for borrowing; and (iii) adding eligible receivables against which to borrow.

In addition to the foregoing, the Amended Forbearance Agreement provides that it will be an event of default if the Company has not received a letter of intent for a purchase of substantially all of its assets for an amount in excess of the amounts owing to Wells Fargo or a proposal to refinance the amounts owing to Wells Fargo by March 31, 2008. The Company has already received a refinancing proposal.

The foregoing description of the Amended Forbearance Agreement is qualified, in its entirety, by the text of the agreement itself, which is annexed hereto as Exhibit 10.1.

## Item 9.01   Financial Statements and Exhibits

Exhibit. The following is furnished as an exhibit to this report:

| Exhibit No. | Exhibit Description |
|---|---|
| 10.1 | Amended and Restated Forbearance Agreement dated March 25, 2008 among Wells Fargo Bank, National Association, acting through its Wells Fargo Business Credit operating division and Interpharm, Inc. and Interpharm Holdings, Inc. |

<u>Signatures</u>

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

INTERPHARM HOLDINGS, INC.

March 31, 2008

By: <u>/s/ Peter Giallorenzo</u>
Peter Giallorenzo
Chief Financial Officer and
Chief Operating Officer

# EXHIBIT J

8-K 1 v110912_8k.htm

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

## FORM 8-K

## CURRENT REPORT

### Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

Date of Report (Date of earliest event reported) April 16, 2008

### Interpharm Holdings, Inc.

#### (Exact name of Registrant as specified in charter)

| Delaware | 0-22710 | 13-3673965 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

| 75 Adams Avenue, Hauppauge, New York | 11788 |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: (631) 952 0214

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 3.01          Notice of Failure to Satisfy a Continued Listing Rule**

On April 10, 2008, Interpharm Holdings, Inc. (the "Company") received notice from the American Stock Exchange ("AMEX") that the Company is not in compliance with the following continuing listing standards contained in the AMEX Company Guide:

1. Section 1003(a)(i) because of stockholders equity less than $2,000,000 and losses from continuing operations and net losses in two out of its three most recent fiscal years;
2. Section 1003(a)(ii) because of stockholders equity of less than $4,000,000 and losses from continuing operations and net losses in three out of its four most recent fiscal years; and
3. Section 1003(a)(iv) because of sustained losses.

In response to the AMEX letter, the Company plans to submit a plan of operations demonstrating how it will regain compliance with AMEX continuing listing standards.

**Item 5.02 Departure of Directors or principal Officers; Election of Directors, Appointment of Principal Officers**

On April 10, 2008, the Company's Board of Directors accepted the resignation of the Company's Chief Executive Officer, Cameron Reid. Mr. Reid is continuing in his service to the Company as a consultant assisting in the management of the Company's business.

**Item 9.01          Financial Statements and Exhibits**

Exhibit 99.1                    Press release, dated April 16, 2008.

<u>Signatures</u>

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

INTERPHARM HOLDINGS, INC.

April 16, 2008                                    By: /s/ Peter Giallorenzo.
                                                      Peter Giallorenzo
                                                      Chief Financial Officer and
                                                      Chief Operating Officer